ALEX G. TSE (CABN 152348)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

ELISE LAPUNIZNA (NYBN 2540730)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    elise.lapunzina@usdoj.gov; 415-436-6878
    waqar.hasib@usdoj.gov; 415-436-7261

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 3:15-CR-582 WHO |
|           Plaintiff, | ) |
| | ) **UNITED STATES' TRIAL MEMORANDUM** |
|     v. | ) |
| | ) Pretrial Conference Date:   August 13, 2018 |
| ADAM SHAFI, | ) Pretrial Conference Time:   2:00 p.m. |
| | ) |
|           Defendant. | ) |
| | ) |

## I.    INTRODUCTION

Defendant Adam Shafi is charged in the Indictment with a single count of attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). The jury trial is scheduled to begin on August 27, 2018, at 8:30 a.m., before the Honorable William H. Orrick. The defendant is detained pending trial.

The United States files this trial memorandum, in accordance with this Court's pretrial order instructing the parties to follow the requirements of Criminal Local Rule 17.1-1, supplemented with a brief statement of the legal bases for the charges, the anticipated evidence, and addressing any evidentiary, procedural, or other legal issues.

## II.    LEGAL BASES FOR THE CHARGES

###     A.    Statutory Language Pertinent to Charged Offense

U.S. TRIAL MEMORANDUM    1

**1.   Providing Material Support or Resources to Designated Foreign Terrorist Organizations, 18 U.S.C. § 2339B**

Section 2339B(a)(1) of Title 18 of the United States Code provides the following:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

**2.   Defined Terms**

**(i)   "Material Support or Resources"**

Section 2339A(b)(1) defines the term "material support or resources" for both § 2339A and § 2339B (*see* § 2339B(g)(4)). The term "material support or resources" means:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

**(ii)   "Personnel"**

Section 2339B(h) provides the following regarding the term "personnel":

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

**(iii)   "Terrorist Organization"**

Section 2339B(g)(6) provides that the term "terrorist organization" means "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act."

Section 219 of the Immigration and Nationality Act authorizes the Secretary of the U.S. Department of State to make such designations upon the Secretary finding that:

> (A) the organization is a foreign organization;

U.S. TRIAL MEMORANDUM                                                                    2

(B) the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title or terrorism (as defined in section 2656f(d)(2) of title 22), or retains the capability and intent to engage in terrorist activity or terrorism); and

(C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

8 U.S.C. § 1189(a)(1). The designation takes effect upon the Secretary publishing the designation in the Federal Register, and "a defendant in a criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing."[1] *Id.* § 1189(a)(2), (8).

### (iv)    "Terrorist Activity" and "Engage in Terrorist Activity"

Section 2339B(a)(1) explicitly incorporates the definitions for "terrorist activity" and "engage in terrorist activity" from section 212(a)(3)(B) of the Immigration and Nationality Act.

For the term "terrorist activity," section 212 of the Immigration and Nationality Act provides the following definition:

[T]he term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I)     The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

(II)    The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III)   A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18) or upon the liberty of such a person.

(IV)    An assassination.

(V)     The use of any—

(a)     biological agent, chemical agent, or nuclear weapon or device, or

---

[1]    *See also United States v. Afshari*, 426 F.3d 1150, 1155-59 (9th Cir. 2005) (affirming prohibition against collateral attack of designation during criminal prosecution, rejecting defendant's due process challenge, and stating "the element of the crime that the prosecutor must prove in a § 2339B case is the predicate fact that a particular organization was designated at the time the material support was given, not whether the government made a correct designation").

U.S. TRIAL MEMORANDUM                                                                                    3

  (b)  explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

  (VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(iii).

For the term "engage in terrorist activity," section 212 of the Immigration and Nationality Act provides the following definition:

[T]he term "engage in terrorist activity" means, in an individual capacity or as a member of an organization—

  (I)  to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

  (II)  to prepare or plan a terrorist activity;

  (III) to gather information on potential targets for terrorist activity;

  (IV) to solicit funds or other things of value for—

    (aa) a terrorist activity;
    (bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or
    (cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

  (V)  to solicit any individual—

    (aa) to engage in conduct otherwise described in this subsection;
    (bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or
    (cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

  (VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

    (aa) for the commission of a terrorist activity;
    (bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;
    (cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

> (dd)    to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv).

### (v)    "Terrorism"

Section 2339B(a)(1) explicitly incorporates the definitions for "terrorism" from section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989. That Act provides that "the term 'terrorism' means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, Pub. L. 100-204, *codified at* 22 U.S.C. § 2656f(d)(2).

### B.    Elements of Attempting to Provide Material Support or Resources to Foreign Terrorist Organization

The elements of attempting to provide material support or resources to a foreign terrorist organization are the following:

> **First**, the defendant intended to commit the crime of providing material support or resources to a foreign terrorist organization; and

> **Second**, the defendant did something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime.

Ninth Circuit Model Criminal Jury Instructions, No. 5.3 (approved March 2018) (modifications incorporated to reflect crime charged in Indictment). Additionally, the Ninth Circuit Model Criminal Jury Instruction provides the following:

> Mere preparation is not a substantial step toward committing the crime. To constitute a substantial step, a defendant's act or actions must demonstrate that the crime will take place unless interrupted by independent circumstances.

> Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial step toward the commission of a crime.

The substantive crime of providing material support or resources to a foreign terrorist organization, which the Indictment charges the defendant with attempting, has the following elements:

> **First**, the defendant provided material support or resources;

> **Second**, the defendant provided this support or resources to a foreign terrorist organization;

> **Third**, the defendant acted knowingly;

U.S. TRIAL MEMORANDUM                                                                5

**Fourth**, the defendant knew that the foreign terrorist organization:

    (a)  was a designated foreign terrorist organization;
    (b)  had engaged or was engaging in terrorist activity; or
    (c)  had engaged or was engaging in terrorism; and

**Fifth**, at least one of the following is true:

    (a)  the defendant is a national of the United States or an alien lawfully admitted for permanent residence in the United States;
    (b)  the offense occurred in whole or in part within the United States; or
    (c)  the offense occurred in or affects interstate or foreign commerce.

18 U.S.C. § 2339B(a), (d); *see also* Court's Jury Instruction No. 28 in *United States v. Elhuzayel, et al.*, C.D.Cal. Case No. 8:15-CR-60-DOC, Docket No. 163 (June 21, 2016).

The government need not prove a specific intent to advance the organization's terrorist activities. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-18 (2010) (rejecting defendant's argument that specific intent was required, and stating that "Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities"); *see also United States v. Mehanna*, 735 F.3d 32, 42 (1st Cir. 2013) (citing *Holder* in holding that specific intent was not required); *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011) (identifying "two express scienter requirements: that the aid be intentional and that the defendant know the organization he is aiding is a terrorist organization or engages in acts of terrorism").

## III.    ANTICIPATED EVIDENCE

The government anticipates introducing evidence at trial to establish the following facts, among others.

On August 17, 2014, the defendant's father, a U.S. citizen from Fremont, California, who was vacationing in Egypt, visited the U.S. Embassy in Cairo and reported that the defendant, his son, had gone missing. The father added that the defendant had sent a text message that morning saying he had gone to "protect Muslims." The following day, the defendant's father reported to the U.S. Embassy that the defendant had been reunited with his family in Cairo, and that they would all be returning to San Francisco later that week. Upon returning to the United States, the defendant was interviewed by U.S. Customs and Border Patrol officers. The defendant told them that he left Cairo and traveled to Turkey

allegedly to help Syrian refugees, that he met his friend (referred to in pleadings thus far as A.N.) in Turkey, that he and A.N. both flew to Turkey on one-way tickets, that the defendant did not tell his parents about his plans to travel to Turkey, and that he and A.N. quickly ran out of cash so they decided to return from Turkey after spending one night there. The government will also offer financial records and other documents demonstrating that the defendant had another of his friends (referred to in pleadings thus far as S.K.) purchase the defendant's ticket from Cairo to Istanbul, which the government will argue is evidence of the defendant's desire to conceal his travel plans from his parents. The government will also offer evidence that S.K. had purchased a one-way ticket for himself to Istanbul from San Francisco and was due to arrive there the same day as the defendant and A.N., but that S.K. never boarded his outbound flight at SFO. The government will also offer evidence that the defendant had e-mailed A.N. and S.K. a list of gear needed for a "backpacking" trip. The government will also offer evidence that A.N. had written a draft e-mail to himself noting possible entry points into Syria from Turkey, and that upon A.N.'s return to the United States from Turkey, A.N. had with him a copy of the defendant's itinerary.

As a result of the father's report to the U.S. Embassy, the Federal Bureau of Investigation opened a case on the defendant. As part of this case, the government will offer evidence of telephone calls, text messages, and other communications that took place in the months after the defendant returned to the United States, leading up to his attempt to return to Turkey on June 30, 2015. These communications will demonstrate that the reason the defendant was trying to travel to Turkey in 2014 was so that he could cross into Syria and join the al-Nusrah Front. For example, in various telephone calls, the defendant stated to S.K. that, among other things, it was now clear to the defendant after watching a two-hour interview with the emir of the al-Nusrah Front that the al-Nusrah Front was superior to other organizations such as ISIL. The defendant further stated that he now knew of his love for the emir of the al-Nusrah Front, better understood life in Syria, was committed to die with the al-Nusrah Front, and reaffirmed his belief that America was the enemy. The defendant reflected on meeting a "guy" on his prior trip to Turkey in August 2014 with A.N., and that the "guy" could have taken him then to the al-Nusrah Front. The defendant further discussed how "nothing going to stop me now," expressed how he wanted to go soon, stated that he already had money to do so, and prodded his associates A.N. and S.K.

to do the same.  The defendant also privately admitted in these conversations that he "hope[d] Allah doesn't take my soul until I have at least, like, a couple gallons of blood that I've spilled for him," he was jealous of learning of a 25-year-old cousin of S.K. who died fighting and became a martyr in Syria, and how he wanted to go to a place not only where Muslims were being mistreated, but also to a place where he could "kill some frickin' people that were supporting America or American soldiers or something."  Additionally, in text messages the defendant said that it was permissible to die in Islam as a martyr, even if one's mother disallowed it, so long as the Ummah [the Nation, or the global Muslim community] was being massacred "and we are expelled from our homes forced to live under the rule of the enemies of Allah."  The government will also offer evidence of the defendant discussing potentially traveling to Turkey from cities outside of the United States, so as to circumvent the no-fly list.

The government will offer evidence of the defendant's online Google and YouTube search and viewing activities leading up to his attempted travel to Turkey on June 30, 2018, to prove that the purpose of his travel was to join the al-Nusrah Front.  Specifically, the defendant accessed an online Al Jazeera interview with the emir of the al-Nusrah Front, shortly before he had a lengthy telephone call with S.K. in which the defendant said that he was completely fine dying with ANF.  The government will also offer evidence that the defendant searched for and/or viewed webpages relating to, among other things: Anwar al-Awlaki and his lectures; jihad; the towns of Urfa, Van, and Gaziantep in Turkey (all located in southern Turkey near the Syrian border); the towns of Raqqah and Aleppo in Syria; al-Nusrah, ISIL, al-Qaeda, Ayman al-Zawahiri, Abu Bakr al-Baghdadi, and other individuals associated with those designated foreign terrorist organizations and terrorists; atrocities committed by ISIL; and suicide bombers.  The government will also offer evidence recovered from the defendant's electronic devices indicating that those devices contained files relating to, among other things, the Constants of Jihad lecture series by Anwar al-Awlaki, and images relating to ISIL.  The government will also offer evidence that the defendant searched for information about particular firearms, including AK-47s, and will offer evidence proving that he in fact visited a shooting range a few months before attempting to return to Turkey.

The government will also offer evidence that the defendant's family attempted to discourage the defendant from traveling to join a terrorist organization.  For example, at the suggestion of the

defendant's family, the defendant visited an individual in prison, Armin Harcevic, who was at that time himself detained pending trial on material support charges. In addition, the government will offer evidence that the defendant's family closely monitored the defendant's activities and whereabouts, by, for example, sharing geolocation applications on their cell phones.

On June 30, 2015, the defendant attempted to return to Turkey, on a one-way ticket he bought on Turkish Airlines from San Francisco to Istanbul. An employee at the Turkish Airlines check-in counter noticed the defendant hesitating around the check-in counter. Upon checking the defendant in for the flight, the employee noticed that the defendant's boarding pass was marked for secondary security screening. A short time later, as the flight was preparing for boarding, federal law enforcement agents approached the defendant at the gate. The agents told the defendant that they needed to speak with him. The defendant agreed, and was escorted to an interview room at the airport. The flight left SFO without the defendant on board.

During a subsequent interview at the airport, the defendant stated that he no longer wanted to live in the United States (citing the Supreme Court's decision allowing same-sex marriage), and that he wanted to be in a country of similar mindset and religion as himself. The defendant said that if things did not work out in Turkey, he planned on traveling to Egypt, where he had family. The defendant said that he did not tell his parents or anyone else about his plans, because he did not want them to interfere with his travel. The defendant said that he bought his ticket to Turkey approximately 3 days earlier. The defendant mentioned his previous trip to Turkey, in August of 2014. With respect to this prior trip, the defendant confirmed that he had traveled there with A.N., and returned after two days and one in night Istanbul. The defendant said that while he was in Istanbul on that prior trip, someone stole his laptop and other possessions while he was sleeping at the airport. The defendant reiterated that he had not told his parents about his current plans to travel to Turkey, and that they thought he was going for an interview at San Francisco State University that day. When asked by law enforcement if he was going to Turkey to cross into Syria and join the Islamic State in Iraq and the Levant (ISIL), the Al-Nusrah Front (ANF), or another terrorist organization, the defendant said no. A search of the defendant's carry-on bag and backpack ensued. After the search, the defendant was escorted to the airport BART station, where he boarded a train bound for Fremont, where he resided with his parents.

Unbeknownst to the defendant, FBI agents got on the BART train with him to monitor his movements. Also unbeknownst to the defendant, at the time the government was continuing to conduct court-authorized intercepts on the defendant's telephone. While on the train, agents observed the defendant speaking on the phone with his relative (referred to in pleadings thus far as Relative 2). During this call, the defendant expressed his suspicion that his father had contacted the FBI in an attempt to stop him from travelling. Relative 2 replied that the defendant's parents had not contacted the FBI, but instead had contacted some friends in Egypt, and asked them to travel to Istanbul to intercept the defendant when he landed there to prevent him from leaving the airport. The defendant further joked with Relative 2 as to what he viewed as the FBI's incompetence, stating "Those guys, you know, I think they are a lot more stupid than we think, bro… they were just like, 'So who you gonna go join, you know, one of those groups in Syria"? Is that what you were trying to do?' And I was like, 'What the hell, do you think I am gonna say 'yes'? What type of fricking idiot would say 'yes'?" The defendant stated further, "Dude, honestly, you want to know, you want to know how I feel bro? I would honestly, if this is the case, I'd rather just be in jail bro. What the hell am I gonna do out here? Be like everyone else and betray [the Nation, or the global Muslim community]? I can't go anywhere else, I can't fight or nothing."

Still while on the BART train, the defendant spoke on the phone with A.N., the individual with whom the defendant traveled on his prior trip to Turkey in August of 2014, according to the defendant's statement to law enforcement at the airport. A.N. told the defendant that the defendant's father had called A.N. to say that the defendant may have left the country. The defendant confirmed to A.N. that he almost did leave the country, but that the FBI stopped him from getting on the plane. The defendant explained to A.N. that the FBI asked him if he was going to join a terrorist group, to which the defendant said, "What the freaking hell do you think I am gonna say, yes?" The defendant then added, "even if I was gonna do that, what the hell, what the hell?" A.N. then asked "Where were you going? … Can you say it over the phone? Or you don't want to? Where were you going? Or planning? Where was your flight…" to which the defendant responded, "You know where I was gonna go… I was going to Turkey." A.N. scolded the defendant, "Yeah, damn bro. All right, bro, damn, you ain't better leave without telling us." The defendant replied, "I'm alri –I know you guys don't want to go, so I…"

The following day the defendant spoke on the phone with S.K.  In this call, the defendant told S.K., among other things, that he had been prevented from boarding the flight to Turkey the previous night.  S.K. expressed anger that the defendant had made plans to leave the country without telling S.K.  The defendant explained that if the defendant found his passport, he should take it as a sign from Allah, and he found his passport, so he decided to travel.  S.K. then asked, "So you gonna go kill Muslims?... You're making an excuse to go kill Muslims, huh?"  The defendant replied, "That's what I was thinking the whole time; that's why my blood pressure was so high.  But I… I don't know.  I don't know, dude."  The defendant replied, "What are you gonna do?  G-go there and then be the better of the two sons of Adam?  Is that what you're gonna do?  You just gonna go there and then just gonna kill for no reason?"  The defendant replied, "Yeah, it was definitely the wrong choice, man.  I didn't say that it was… "  S.K. interrupted, "you gonna throw yourself into a place where Muslims are killing Muslims?  Ah why, wh- the [Companions of Mohammed] ran away from that and you're going toward it… "

Evidence at trial will also include items recovered during searches of the defendant's residence and automobile on July 3, 2015, the date he was arrested.  Among these items were various electronic devices, travel documents related to the defendant's attempted travel to Turkey on June 30, 2015, as well as his previous trip in 2014, a wall hanging, and other items.

The defense has indicated to the government that it will stipulate that the al-Nusrah Front is and was at all relevant times a designated foreign terrorist organization, and engaged in terrorist activities.  In the unlikely event that the stipulation is for some reason withdrawn, the government reserves the right to introduce evidence proving these facts.  The government will also offer evidence that the defendant was a U.S. citizen at the time he is alleged to have attempted to travel to join al-Nusrah.

Finally, the government will offer expert testimony to explain the concept of radicalization, and to opine on whether particular evidence in this case is consistent with that concept, in order to prove that the defendant intended to join al-Nusrah, and that he knew that al-Nusrah was a foreign terrorist organization.  This testimony was described in further detail in previous government pleadings.  See Docket Nos. 210 (United States' Opposition to Defendant's Motion to Exclude Expert Testimony of Dr. Lorenzo Vidino) and 216 (United States' Letter Regarding Supplemental Expert Disclosure).

U.S. TRIAL MEMORANDUM                                                                                               11

## IV. EVIDENTIARY, PROCEDURAL, AND LEGAL ISSUES SET FORTH IN LOCAL RULE 17-1.1 REQUIREMENTS

In accordance with the Court's Pretrial Order, below the government addresses each of the matters listed in Criminal Local Rule 17-1.1(b).

### 1. Disclosure and contemplated use of statements or reports of witnesses under the Jencks Act, 18 U.S.C. § 3500, or Fed. R. Crim. P. 26.2

By virtue of the extensive discovery materials that have been disclosed in this case, the government has already produced virtually all of the statements and reports of witnesses it intends to call during its case-in-chief at trial, well in advance of trial. *See*, *e.g.*, *United States Statement Regarding Discovery*, Docket No. 68, at fn. 3. This includes, and will continue to include, statements and reports created recently during the course of trial preparation, to the extent that any such materials are disclosable under the Jencks Act, 18 U.S.C. § 3500. If there are any remaining statements that have not been produced, the government will produce them during trial, in compliance with the requirements of the Jencks Act, or in advance of trial.

### 2. Disclosure and contemplated use of grand jury testimony of witnesses intended to be called at the trial

The government does not anticipate calling any witnesses at trial who also testified in the grand jury. Accordingly, disclosure and contemplated use of grand jury testimony is not an issue in this case.

### 3. Disclosure of exculpatory or other evidence favorable to the defendant on the issue of guilt or punishment

Starting with the earliest production of discovery in this case, the government has produced any exculpatory material in its possession pursuant to its duties and obligations under *Brady v. Maryland*, 373 U.S. 83 (1967). In addition, over the government's objection the Court granted the defendant's request to impose a *Brady* production deadline date. Docket No. 219. While the government continues to object to the imposition of such a deadline, the government assures the Court that it understands its continuing duty to disclose any exculpatory material promptly to the defendant, and will continue to do so within 24 hours as to any additional materials it acquires, or of which it becomes aware, during trial preparation and trial.

### 4.   Stipulation of facts which may be deemed proved at the trial without further proof by either party and limitation of witnesses

As mentioned briefly above, the parties have at least tentatively agreed to one stipulation of fact, that the al-Nusrah Front is and was at all relevant times a designated foreign terrorist organization, and engaged in terrorist activities.  The parties have discussed numerous additional stipulations.  Specifically, on June 29, 2018, the government provided the defendant with a list of 30 categories of evidence that could potentially be amenable to stipulations for authentication purposes.  These included stipulations as to the authenticity of intercepted calls, digital files found on particular electronic devices, phone records, financial records (from, among others, Bank of America, American Express, and Wells Fargo) prison visitor logs and recordings of meetings, emails, travel records (from, among others, Student Universe and Royal Jordanian Airlines), and business records (from, for example, a shooting range that the defendant visited).  The proposed stipulations were for authentication only, i.e., the defendant would preserve his ability to object on other grounds at trial such as relevance or hearsay.  On July 3, 2018, the defendant responded that he was not amenable to entering into any of these stipulations.  More recently, however, the parties have reinitiated discussion about these, and other, potential stipulations.  That renewed discussion is ongoing as of the writing of this trial memorandum.

### 5.   Appointment by the Court of interpreters under Fed. R. Crim. P. 28

The government is unaware of any need for appointment of an interpreter in this case.

### 6.   Dismissal of counts and elimination from the case of certain issues, e.g., insanity, alibi and statute of limitations

The defendant is charged in a one-count indictment in this case.  The government does not anticipate superseding the indictment prior to trial; accordingly, dismissal of counts prior to trial is not an issue here.  As for elimination of other issues, the government, pursuant to Rules 12.1, 12.2, and 12.3 of the Federal Rules of Criminal Procedure, has requested notice of any intended defenses based on an alibi, mental condition, or public authority.  No notice of any such defenses has been provided.   As such, to the extent that the defendant attempts to rely on any such defenses, the United States reserves the right to seek to preclude evidence relating to such defenses at trial.  Fed. R. Crim. P. 12.1(e), 12.2(d), 12.3(c).

**7.    Joinder pursuant to Fed. R. Crim. P. 13 or the severance of trial as to any co-defendant**

The defendant is the only person charged in this case.  Accordingly, the government is unware of any issues relating to joinder or severance.

**8.    Identification of informers, use of lineup or other identification evidence and evidence of prior convictions of defendant or any witness, etc.**

The government does not anticipate calling any informants in its case in chief.  There is at least one potential issue regarding informants, however, that the government anticipates could arise either in the defense case, if there is one, or in the government's rebuttal case, if there is one.  That potential issue was raised in further detail in the defendant's motions *in limine*.  Docket No. 224 at pg. 11.

No lineup evidence was used in this case.  There will be some limited identification evidence, as necessary to identify the defendant's voice on recordings.  Rule 901(b)(5) sets a low threshold for voice identifications offered to determine the admissibility of recorded conversations. Under this rule, audio recordings may be authenticated by persons who are not parties to the recorded conversation, as long as the person can identify the voices on the recording. Fed. R. Evid. 901(b)(5); *United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir. 1990); *United States v. Thomas*, 586 F.2d 123, 133 (9th Cir. 1978). A witness's opinion testimony in this regard may be based upon his having heard the voice on another occasion under circumstances connecting it with the alleged speaker. Fed. R. Evid. 901(b)(5); *Torres*, 908 F.2d at 1425 ("Testimony of voice recognition constitutes sufficient authentication."); *United States v. Bassey*, 613 F.2d 198, 202 n.2 (9th Cir. 1979); *United States v. Turner*, 528 F.2d 143, 163 (9th Cir. 1975). If the identifying witness is "'minimally familiar' with the voice he identifies, Rule 901(b) is satisfied." *United States v. Plunk*, 153 F.3d 1011, 1022-23 (9th Cir.), *amended*, 161 F.3d 1195 (9th Cir. 1998).

The speaker's identity also can be established by circumstantial evidence. Fed. R. Evid. 901(b)(5), (6). Such evidence may include: (1) defendant's identification of himself during the conversation either by surname, first name, or nickname (*United States v. Vento*, 533 F.2d 838, 864 (3d Cir. 1976); *United States v. Turner*, 528 F.2d 143, 163 (9th Cir. 1975); *Palos v. United States*, 416 F.2d 438, 440 (5th Cir. 1969)); (2) listing of the telephone in the defendant's name or the location of the

telephone at the defendant's residence (Federal Rule of Evidence 901(b)(6) (call placed to phone number assigned to defendant plus self-identification of recipient of call is sufficient to identify defendant as recipient)); (3) the speaker's revelation of information particularly known to the person he purports to be (*United States v. Sawyer*, 607 F.2d 1190, 1193 (7th Cir. 1977); *United States v. Ross*, 321 F.2d 61, 69 (2d Cir. 1963)); (4) the giving of directions which prove to be correct, or returning a call and referring to what was said in a previous conversation (*Sawyer*, 607 F.2d at 1193); or (5) visual surveillance of the defendant after the conversation doing what he said he would do (*United States v. McMillan*, 508 F.2d 101, 105 (8th Cir. 1974); *United States v. Bonanno*, 487 F.2d 654, 659 (2d Cir. 1973); see also *Van Ripper v. United States*, 13 F.2d 961, 968 (2d Cir. 1926) ("[T]he substance of the communication may itself be enough to make prima facie proof [of identity]")).

The government is unaware of any prior convictions relating to any witnesses it intends to offer in its case in chief.  The government is also unaware of any prior convictions relating to the defendant.

**9. Pretrial exchange of lists of witnesses intended to be called in person or by deposition to testify at trial, except those who may be called only for impeachment or rebuttal**

In accordance with the Court's Pretrial Order, the government is serving on the defense a witness list identifying individuals the government anticipates calling during its case-in-chief, along with a brief summary of the testimony of each witness.

**10. Pretrial exchange of documents, exhibits, summaries, schedules, models or diagrams intended to be offered or used at trial, except materials that may be used only for impeachment or rebuttal**

In accordance with the Court's Pretrial Order, the government filed an exhibit list.  All items on the exhibit list had been previously produced in discovery (Bates numbers of the items are included on the exhibit list) or have been made available for examination.  If the government intends to use any charts or summaries during opening statement, it will provide advance notice to the defendant.  The government requests the same courtesy from the defendant.

**11. Pretrial resolution of objections to exhibits or testimony to be offered at trial**

The parties have filed numerous motions *in limine* with respect to particular exhibits or testimony to be offered at trial; those motions are currently pending before this Court.  Since filing those motions, the defendant has identified one set of exhibits that it intends to use at trial, a group of

photographs of the defendant's car with graffiti written on it by an unknown individual, at an unknown time. The government objects to the admissibility of these photographs on the grounds that the fact that it is irrelevant that the defendant's car was apparently vandalized by an unknown individual at an unknown time (assuming it is in fact the defendant's car depicted in the photographs, a fact that the government does not concede).

### 12. Preparation of trial briefs on controverted points of law likely to arise at trial

To the extent that there are controverted points of law likely to arise at trial, these have already been briefed extensively in previous litigation before this Court, such as in the motions *in limine*, or in the motions relating to the issue of whether the defendant was under the "direction and control" of a foreign terrorist organization. *See*, *e.g.*, Defendant's Motion to Dismiss Indictment and United States' Opposition, Docket Nos. 123 and 133. The government is unaware of any additional controverted points of law that have not already been addressed.

### 13. Scheduling of the trial and of witnesses

The United States anticipates its case-in-chief to last approximately two weeks. This estimate of the government's case-in-chief accounts for opening statements and closing arguments, but does not include time for jury selection or any defense case. As discussed above, the parties are discussing stipulations regarding authenticity, which could have an impact on this estimate of the government's case-in-chief.

### 14. Request to submit questionnaire for prospective jurors pursuant to Crim. L.R. 24-1, voir dire questions, exercise of peremptory and cause challenges and jury instructions

In accordance with the Court's Pretrial Order, the parties have filed joint jury instructions, highlighting those areas where the parties were unable to reach agreement. Docket No. 238. The parties have also submitted a proposed joint juror questionnaire. Docket No. 235.[2]   The government submits that the combination of the proposed juror questionnaire, the Court's voir dire and attorney voir dire should be sufficient to pick a jury. With respect to exercise of peremptory and cause challenges, the

---

[2] The defendant also filed a separate proposed jury questionnaire, containing additional questions not agreed to by the government. Docket No. 236. The government objects to these additional questions.

U.S. TRIAL MEMORANDUM                                                                              16

government has no additional requests beyond the procedures set forth in Fed. R. Crim. P. 24. and Criminal Local Rules 24-1 and 2.

### 15.    Any Other Matter Which May Tend to Promote a Fair and Expeditious Trial

#### i.    CIPA Issues

The government notes that while there has been significant classified discovery disclosed in this case, it appears at this time that there will be no classified evidence offered at trial.  In particular, the government is unaware of any notice from the defense to use classified information, pursuant to Section 5 of the Classified Information Procedures Act.

#### ii.    Transcripts for recorded conversations

As part of its presentation of evidence at trial, the government anticipates playing audio recordings. The audio recordings consist of court-authorized interceptions of conversations over the defendant's telephone.  The recordings are occur primarily in English.  To the extent that there are Arabic words or phrases used, the government intends to introduce into an evidence an abbreviated Arabic-English glossary, created by a linguist who listened to the recordings.  This glossary will help familiarize the jury with the English translation of any Arabic words or phrases that may occur in the otherwise-primarily English language recordings.

The government has had transcripts prepared for all of the recordings it anticipates playing at trial. The sponsoring witness will be able to authenticate the recording and testify to the accuracy of the transcript. The government anticipates introducing the entirety of the recording of the calls into evidence.   However, it may play only certain passages from these recordings. In most cases, the jury will be able to view the transcript of the passage on their screens as the audio plays. The government will not be seeking to introduce the transcripts themselves into evidence, only the Arabic glossary.

## V.    MISCELLANEOUS ISSUES

### 1.    Reciprocal Discovery

Pursuant to Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure, the United States has requested reciprocal discovery.  No reciprocal discovery has been provided.  As such, to the extent that the defendant attempts to introduce or use any evidence that has not been produced as reciprocal discovery, the United States reserves the right to seek to have such evidence precluded at trial.  *See*

*United States v. Urena*, 659 F.3d 903, 908 (9th Cir. 2011) (affirming exclusion of defense expert testimony that had not been previously designated, and stating that district courts "ha[ve] unquestioned discretionary power to exclude evidence that should have been produced in reciprocal discovery"); *see also United States v. Young*, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion of audiotape evidence that defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

### 2.       Anonymous Jury

The government has requested that the names of jurors be protected from public disclosure. This issue was addressed in further detail in the government's motions *in limine*. Docket No. 225 at pg. 19-20.

Respectfully submitted,

ALEX G. TSE
United States Attorney

DATED: August 6, 2018

S. WAQAR HASIB
ELISE LAPUNZINA
Assistant United States Attorneys