Volume 4

Pages 472 - 571

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )      **NO: CR 15-582 WHO**
                               )
  VS.                          )      Page 513, Line 14 to
                               )        Page 515, Line 21
Adam Shafi,                    )      Sealed and Bound Separately
                               )
           Defendant.          )
_____)


                         San Francisco, California
                         Friday, August 31, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          United States Attorney's Office
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:   **S. WAQAR HASIB, ESQ.**
                        **ELISE LAPUNZINA, ESQ.**


For Defendant:          Office of the Federal Public Defender
                        1301 Clay Street, Suite 1350N
                        Oakland, CA  94612
                  BY:   **HANNI M. FAKHOURY, ESQ.**
                        **JEROME E. MATTHEWS, ESQ.**



Reported By:  Vicki Eastvold, RMR, CRR
              Official Reporter

# I N D E X

Friday, August 31, 2018 - Volume 4

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **REINKE, CHRIS (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 487 | 4 |
| Direct Examination resumed by Mr. Hasib | 487 | 4 |
| Cross-Examination by Mr. Fakhoury | 504 | 4 |
| Redirect Examination by Mr. Hasib | 560 | 4 |
| Recross-Examination by Mr. Fakhoury | 566 | 4 |

PROCEEDINGS

1    <u>**Friday - August 31, 2018**</u>                                    <u>**7:45 a.m.**</u>

2                          <u>**P R O C E E D I N G S**</u>

3    (The following proceedings were held in open court, outside the

4    presence of the jury:)

5                              **---oOo---**

6          **THE COURT:**  All right.  Let's proceed.  Good morning,

7    everybody.  There are a couple of things to do.  The first -- I

8    assume you've had no further conversations with respect to

9    Dr. Vidino.

10         **MR. FAKHOURY:**  Well, I think we have irreconcilable

11   difference of opinion.

12         **THE COURT:**  So let me give you mine on this.  Although

13   in the normal circumstances I would allow it, I'm not going to

14   in this case.  I think the jury hasn't heard the government's

15   evidence about what happened during the time period of the

16   indictment.  I think it would be confusing for Dr. Vidino to go

17   in before Special Agent Reinke finishes.  Special Agent

18   Reinke's a critical witness and I think it's unfair not to

19   allow his cross-examination before Dr. Vidino gets on the stand

20   because otherwise I think there would be an undue amplifying

21   effect of the testimony.

22         And, I would like to be in trial on Tuesday if things

23   can't finish today, but if Dr. Vidino has unmovable appointment

24   then we can -- I would prefer to go dark on Tuesday and start

25   on Wednesday than to allow this testimony to be interrupted.

**PROCEEDINGS**

1   So I think -- find out from Dr. Vidino whether it's really

2   pivotal.

3       And the other thing is I would be happy to hold the trial

4   a little longer today if the jury was able to do it, unless

5   they have some irreconcilable appointments, just so that we

6   could finish things up.

7       **MS. LaPUNZINA:**  Thank you, Your Honor.

8       **THE COURT:**  So that's that.  I don't think any further

9   argument's necessary.

10      **MR. HASIB:**  Will the Court inquire of the jury before

11  they get here?  Or -- not before they get here.  I don't know

12  how the Court's going to do that.  But when they get here will

13  the Court inquire whether they're available after 1?

14      **THE COURT:**  Yes.  I'll ask Ma'am Clerk to do that to

15  see whether there would be a problem.  And it would be no more

16  than an extra hour.  We couldn't go, I don't think, the full

17  day.  But whatever we can do.  We'll see how it goes.

18      **MR. MATTHEWS:**  Your Honor, there's one more issue.

19  You recall we had to have a sidebar with one of the jurors

20  about possible testimony regarding Burma and his potential

21  connection to and possible reaction to that.

22      If I recall, I think there's going to be two or three

23  instances, if Mr. Hasib intends to go line by line with Special

24  Agent Reinke, where there will be two additional mentions, I

25  believe, of Burma or going to learn how to speak Burmese.

**PROCEEDINGS**

1    So it might be appropriate after that time to just have a

2    quick follow-up and possibly confirm with the juror whether at

3    that point he thinks there's anything that would prevent him or

4    influence him unduly in rendering a fair verdict.

5         **THE COURT:**  And perhaps we should wait until the end

6    of the -- until next week and then check in with him to see

7    whether there's any issue.

8         **MR. MATTHEWS:**  Right.  I think that's fine.  I just

9    wanted to highlight it.  And given the fact we will have this

10   additional testimony on the issue be something to bring up at

11   the appropriate time.

12        **THE COURT:**  Fair enough.

13   Okay.  So since we have a couple of extra minutes I had

14   said that we would have a jury instruction conference at 3.  I

15   don't think it's necessary to hold Mr. Shafi over until 3 for

16   that.  And I think I can tell you what I'm thinking now and you

17   can -- if you want to make any particular kind of pitch at 1:00

18   on this you can.  And otherwise, if you wanted to give me short

19   briefs on why I've got it wrong that would be fine.

20   So I'll just tell you that with respect to the First

21   Amendment issue, I agree with the government's instruction.

22   The *Hassan* instruction.  I think the government's theory

23   regarding material support is personnel, it's not speech.  And

24   I think the defendant's proposed instructions would be

25   confusing and potentially misleading.

**PROCEEDINGS**

1    And I am otherwise a big fan of the Ninth Circuit's model

2    instructions which I think the government's versions of

3    reasonable doubt, and attempt, and material support or

4    resources is closer to that line.  And I think the defendant's,

5    particularly with respect to material support or resources, is

6    somewhat confusing.

7    With the foreign terrorist organization, I'm inclined to

8    give the defendant's, but I'm not sure if there's substantial

9    differences between the two.  I just didn't see it.

10    And then I need a verdict form which you could give me on

11    Tuesday.

12    **MS. LaPUNZINA:**  We'll prepare one, Your Honor.

13    **THE COURT:**  So those -- that's what I'm thinking.  And

14    if you want to talk about those briefly at 1:00 -- or not

15    briefly at 1:00 -- we can do that.  But then I think we can let

16    everybody go for the weekend.

17    **MR. MATTHEWS:**  That would be great.

18    **THE COURT:**  And then the final -- was there something

19    you wanted to say, Mr. Hasib?

20    **MR. HASIB:**  No, no, no.  Continue, Your Honor.  Your

21    Honor may get to it.  If not, I'll raise it.

22    **THE COURT:**  I'm going to another issue entirely.

23    **MR. HASIB:**  It's not on jury instructions.

24    **THE COURT:**  Then I saw the government's brief on the

25    summary timeline and I looked at the cases this morning.  And,

**PROCEEDINGS**

1  again, I'm going to deny the government's motion.

2      It seems to me that the timeline is just -- it's not a

3  Rule 1006 summary.  It's a cherry-picked view of the evidence

4  from the government's perspective from a number of voluminous

5  records.  It's very unlike the real estate records in

6  *United States versus Rizk*.  And it's much like the analysis in

7  the other case that the government cited, *Davis and Cox v.*

8  *Summa Corp* of the attorney's fees record summary that the judge

9  didn't admit because it didn't fairly represent the underlying

10 documents.

11     So -- and I will not allow the timeline to go back to the

12 jury.  So you have to make clear what you need to make clear

13 during closing.

14         **MR. HASIB:**  Yeah.

15         **THE COURT:**  So those were the things that I had -- oh.

16 And then the final thing, which is left over from yesterday,

17 Mr. Fakhoury asked that I give a more detailed instruction

18 regarding the other acts.

19     I'm not sure that -- I don't think it's required.  I could

20 say to the jury that I'd like to be a bit more specific and

21 that they could consider the evidence only for its bearing, if

22 any, on the question of the defendant's intent, mode of

23 opportunity, preparation, plan and knowledge and for no other

24 purpose.  And I'm not sure that that's all that -- I'm not sure

25 the defense would want me to give that instruction.  And I'm

**PROCEEDINGS**

1  not sure what the government's perspective is one way or

2  another.  But I could do that and it wouldn't do violence to my

3  view of the reason that the evidence is being produced.

4      **MR. FAKHOURY:**  We can live with the instruction as

5  given.  That's fine, Your Honor.  Meaning, the instruction

6  given yesterday.

7      **THE COURT:**  I would think.  Okay.

8    Mr. Hasib.

9      **MR. HASIB:**  I do have one other issue on my list of

10  things to talk about this morning.  There was an objection

11  yesterday when we tried to offer some text messages into

12  evidence and the Court suggested the parties should talk about

13  it.  We talked about it.  I think we are perhaps closer but not

14  there yet.

15      **THE COURT:**  Okay.

16      **MR. HASIB:**  So what the government offered yesterday

17  was a pretty large exhibit -- I can't remember how many pages,

18  but it was at least a couple hundred -- of the text messages

19  that were recovered from the defendant's phone.  It was a

20  printout from the Cellebrite report which is all of the

21  defendant's text messages.  And we were going to highlight a

22  couple that Special Agent Reinke was going to talk about and

23  ended up reading from yesterday.

24    The defendant objected.  And our understanding was the

25  objection was that the report was hearsay and it should not

**PROCEEDINGS**

1    come in.

2        What we've done -- we disagree with that assessment.  What

3    we've done is we've limited the report to just the text

4    messages that (indicating) Special Agent Reinke read about

5    yesterday and some others that we expect he's going to talk

6    about this morning.

7        I do not believe they are hearsay.  I believe this is

8    evidence that has come directly from the defendant's phone.

9    The text messages that he sends to other people are defendant's

10   admissions.  The text messages that other people send back to

11   him in response I think Your Honor has made clear are

12   admissible not for the truth of the matter asserted.

13       The other information on the exhibits are the dates and

14   times and sort of identifying information for the text

15   messages.  I don't think these are hearsay, I don't think these

16   are police report; I think these are tangible evidence.  And

17   that's what we would propose offering today into evidence while

18   Reinke's on the stand.

19            **THE COURT:**  Okay.  So Mr. Fakhoury, I looked at those

20   during the testimony yesterday after you made that objection.

21   They're not police records.  They might be something else, but

22   I don't know why what Mr. Hasib suggests wouldn't be

23   appropriate.

24            **MR. FAKHOURY:**  Well, Your Honor, in our view it's a

25   police report.  Let me explain why.

**PROCEEDINGS**

1    I don't question that the message Mr. Shafi sends is an

2    admission.  The question is the form in which his admission

3    comes into evidence.

4        If the government took a copy and paste of that Cellebrite

5    report and put it in a FBI 302 and it had Mr. Shafi's

6    statements in it, that FBI 302 would not come into evidence.

7        So it's the same exact thing.  It's a Cellebrite report.

8    We've heard three witnesses testify that Cellebrite's an

9    FBI-approved forensic tool.  It has information that is outside

10   the scope of just simply Mr. Shafi's statement.  And so that's

11   why it's a police report.

12       I think it would be a different -- it's -- actually,

13   there's a pretty stark contrast with like the Google records.

14   So the Google records we didn't object on hearsay because

15   that's a business record.  Those are records the government

16   obtained from Google.  It's a business record.  We can't

17   quibble with that.

18       This is not a business record.  These are not records

19   obtained from T-Mobile.  Nor is it the actual -- the phone

20   itself has not been admitted into evidence.  And so this is

21   simply a police-generated report from Cellebrite documenting

22   evidence it intends to admit.

23       I obviously can't complain if Agent Reinke, as he's done

24   so far, testifies about the substance of Mr. Shafi's

25   statements; and with a limiting instruction, any responses

PROCEEDINGS

1   offered by anybody else he's communicating with.  But to send

2   in the actual report, the police -- the FBI-generated

3   documentation of the messages from an FBI-generated technology,

4   an FBI-generated forensic -- an FBI forensic examiner who's the

5   one producing this, that's a police report.  It's a very 21st

6   century police report, in our view, but it's a police report

7   all the same.  They wouldn't be allowed to put in a 302 that

8   had a copy and paste of the exact information.

9          MR. HASIB:  If it was a 302, Your Honor, I would

10  readily agree with Mr. Fakhoury.  And it's not.  And I think

11  now that you've looked at it you see what it is.

12         The only other option, frankly, is for us to bring the

13  phone into evidence and read from what's on the phone.  That's

14  why we have Attachment C in this district because the

15  government is required to make a forensic image of the device

16  and then give the phone back.

17         I suggested yesterday that we had given the phone back.

18  Candidly, I haven't had a chance to look through our records to

19  determine where the phone is right now.  But that's our only

20  other option.  All we have right now that's available to us is

21  the forensic image.  And that is pulled -- the forensic image

22  is essentially what you're looking at.  That's how it looks.

23         MR. FAKHOURY:  Again, the issue is not whether there

24  can be testimony about the contents of the phone.  We readily

25  agree the government can elicit testimony about the contents of

**PROCEEDINGS**

1  the phone.  The question is does the report go into evidence?

2  In our view, we've got to stop there.  The report itself

3  doesn't come in.

4      Agent Reinke can testify.  Ideally he testifies from his

5  own personal recollection.  Of course, I understand he's not

6  going to remember every text message on the phone and he can

7  use the report to refresh his recollection.  And that's

8  essentially what was happening yesterday.  We weren't objecting

9  to that.

10     The issue is the admission of the Cellebrite report, not

11  the substance of the conversation -- or, not the substance of

12  Mr. Shafi's statements nor the surrounding context by other

13  individuals with a limiting instruction.

14         **THE COURT:**  So couple questions.  First, I assume that

15  there aren't any cases regarding the Cellebrite reports one way

16  or another.

17         **MR. HASIB:**  I haven't --

18         **MR. FAKHOURY:**  I didn't look, Your Honor.

19         **THE COURT:**  Well --

20         **MR. FAKHOURY:**  I can do that.

21         **THE COURT:**  And then second, my assumption is that the

22  -- that you've had this information and have had the ability to

23  test the information, the accuracy of the information.  So this

24  is really just -- this is a 302 kind of argument that you're

25  making.

PROCEEDINGS

1      **MR. FAKHOURY:**  I certainly have had the forensics of

2  the phone.  I'm not claiming that the Cellebrite report has a

3  defect.  And we didn't cross on that.  That's not the issue.

4      Again, the issue is --

5      **THE COURT:**  I understand what the issue is.

6      **MR. FAKHOURY:**  Thank you.

7      **THE COURT:**  Okay.  So I'm -- for now I'm not going to

8  admit this.  I do -- well, we've already got 137, or whichever

9  exhibit it is, has been introduced.  Is that true?

10      **MR. HASIB:**  Yes.  So the master set of all the text

11  messages.

12      **THE COURT:**  The master set has been introduced.  And

13  the foundation laid.

14      **MR. HASIB:**  Correct.

15      **THE COURT:**  So then the question is for the subset.

16  And maybe the thing to do is to identify this, have Agent

17  Reinke explain what it is, and I will think about the admission

18  of the document.  And if the government is fortunate enough to

19  rest today, we can leave that open and I'll deal with it on --

20  whenever we resume.  Hopefully Tuesday morning.

21      **MR. HASIB:**  May we publish it today as a demonstrative

22  so the jury can see what it is?

23      **MR. FAKHOURY:**  And our view would be that would be

24  redundant of the summary.  The substance of what's in the

25  messages is already in the summary that's been used as a

**PROCEEDINGS**

1    demonstrative so I don't see the need to do that.

2        It's a different scenario with like the email receipts of

3    the plane tickets, for example, or the bank records.  The

4    substance of a bank record looks markedly different than the

5    line item on the summary.  But this is a verbatim copy of

6    what's on the summary, in essence.  So it's redundant of the

7    summary.  I mean, they have the summary already.  I think we

8    should just leave it at that.

9        **THE COURT:**  I think I would allow a one showing of

10   what this is that he's referring to, but not repetitively.  In

11   other words, so the jury can see what this looks like

12   (indicating.)  What the Cellebrite report is reporting and the

13   manner in which it's reporting.  But I don't want you to use it

14   every time just to show that.  And then Agent Reinke can

15   continue on and discuss what the admissions are.

16       **MR. HASIB:**  Okay.  I think I got it.  And I think I

17   heard Mr. Fakhoury say if Agent Reinke needs it for refreshing

18   recollection while he's on the stand --

19       **MR. FAKHOURY:**  There's no issue with that.

20       **THE COURT:**  Thank you.

21       **MR. HASIB:**  I think I understand.

22       **THE COURT:**  All right.  So we'll be back in five

23   minutes.

24                    (Recess taken at 8:00 a.m.)

25                    (Proceedings resumed at 8:05 a.m.)

PROCEEDINGS

1        THE COURT:  So we can go an extra hour if necessary

2   today.  And with that, let's get the jury.

3        (The following proceedings were heard in open court in the

4   presence of the jury:)

5        THE COURT:  All right.  Please be seated, everybody.

6        Ladies and gentlemen, good morning.  Thank you for being

7   here, for being so prompt, and for your flexibility.  We'll see

8   how the day progresses as to whether we need to go past 1:00.

9   And we will have an absolute firm cutoff by 2:00 regardless of

10  what's going on.  But that's helpful for us for planning

11  purposes.

12       And so Special Agent Reinke's on the stand.  Go ahead,

13  Mr. Hasib.

14       MR. HASIB:  Thank you, Your Honor.  Before we start, I

15  notice that television in the corner is kind of not doing

16  anything.  Can we turn it?

17       THE COURT:  I think that would be a lovely, idea.  Are

18  you going to turn it towards the -- no.  I think the other way.

19  I don't think the jury -- the jury has plenty of big screens in

20  front of it now.

21       These screens are new, ladies and gentlemen, and they are

22  -- getting used to them.  They're large, I know, for the people

23  in front and somewhat bright.  But --

24       MR. HASIB:  Sorry.  Which way did you want the --

25       THE COURT:  I was thinking the other way, but it

1    doesn't matter.  If everybody's happy let's just proceed.

2                           **CHRIS REINKE**,

3    called as a witness for the Plaintiff, having been previously

4    duly sworn, testified further as follows:

5                    **DIRECT EXAMINATION**   (Resumed)

6    BY MR. HASIB:

7    **Q.**   Special Agent Reinke, before we go back to the call that

8    we were listening to yesterday, you were testifying about some

9    text messages.  Do you recall that?

10   **A.**   I do.

11   **Q.**   I'm placing before you what's been marked as Government

12   Exhibit 144.  And do you recognize that exhibit?

13   **A.**   I do.

14   **Q.**   What is it?

15   **A.**   It is a printout of the text messages from Mr. Shafi's

16   phone that he received or sent, and it was produced by the FBI

17   Cellebrite machine.

18   **Q.**   And does it display all the text messages that the FBI

19   recovered in this case or just a subset of them?

20   **A.**   No, it does not.  Just contains the text messages that

21   I've thus far referenced in my timeline summary and future ones

22   that I will reference later this morning.

23           **MR. HASIB:**  Your Honor, this is marked as Government

24   Exhibit 144.  I would offer it into evidence mindful of the

25   discussion we just had, and ask to display it for a moment

**REINKE - DIRECT / HASIB**

1    before the jury.

2            **THE COURT:**  All right.  So I'll allow you to display

3    it just to show the jury what it is.  I'm not admitting it at

4    the moment, but I'm going to rule on it at a later time.

5            **MR. HASIB:**  If I may have the Elmo for a moment?

6    **BY MR. HASIB:**

7    **Q.**   Are those some of the text messages that you testified

8    about yesterday?

9    **A.**   They are.

10   **Q.**   Okay.  And the remaining pages in Government Exhibit 144,

11   do those depict other text messages that you testified about

12   yesterday?

13   **A.**   They do.

14   **Q.**   Okay.

15           **MR. HASIB:**  Thank you, Your Honor.

16       Ma'am clerk, if we could go back to the government's

17   computer, please.

18   **BY MR. HASIB:**

19   **Q.**   Special Agent Reinke, yesterday we were playing a call

20   that occurred on June 5, 2015.  Do you recall what time that

21   call took place?

22   **A.**   Approximately 2:30 in the morning Pacific Standard Time.

23   So here in San Francisco or Fremont.

24   **Q.**   And before we go back into the call, there were some

25   Arabic terms that were used during the portion that we heard

1  yesterday and I'd like to ask you about some of those.  You've

2  reviewed Ms. Butros' chart, Government Exhibit 33?

3  **A.**   I have.

4  **Q.**   What is the translation for the word *da'wah*?

5  **A.**   So *da'wah* is preaching.

6  **Q.**   And how about the translation for the word *bay'ah*.

7  **A.**   *Bay'ah* is pledge of allegiance.  And I can't read after

8  the slash that Ms. Butros put on there from this distance,

9  but --

10  **Q.**   But you see it says pledge of allegiance -- let me bring

11  it closer to you.

12  **A.**   My eyesight is degrading.  Pledge of allegiance and pledge

13  of loyalty or fealty.

14  **Q.**   How about *kuffar*?

15  **A.**   *Kuffar* is nonbeliever.

16  **Q.**   And lastly *khilafah*.

17  **A.**   *Khilafah* is caliphate.

18  **Q.**   Okay.  Ms. Yee, if you could play the recording from where

19  we left off yesterday.

20            (Audio was played but not reported.)

21       **MR. HASIB:**  Ms. Yee, please pull up the next clip,

22  006-003.  This is about a three-minute clip and it's a

23  continuation.

24            (Audio was played but not reported.)

25  **Q.**   Special Agent Reinke, before we go on to the next clip,

1   there was a reference there to someone named Baghdadi.  Do you

2   know who the leader of ISIS is?

3   **A.**   Abu Bakr al-Baghdadi.

4   **Q.**   Ms. Yee, if you could pull up Government Exhibit 6, clip

5   003.  No.  I'm sorry.  Clip 004.

6        And Ms. Lamparelli, if you could pull up the corresponding

7   transcript, 6-004.  And this is transcript -- Government

8   Exhibit 22 is the transcript.

9                 (Audio was played but not reported.)

10        **MR. HASIB:**  And moving to the next clip which is the

11   same page.

12                 (Audio was played but not reported.)

13        **MR. HASIB:**  Ms. Lamparelli, if you could go to the

14   next bookmark on the transcript on Government Exhibit 22.  This

15   is just a few seconds later at 32 minutes, 41 seconds.  This is

16   a clip about two minutes long.

17        Go ahead and play that clip.

18                 (Audio was played but not reported.)

19        **MR. HASIB:**  Ms. Yee, if you could play clip 006-007

20   from 41 minutes --

21                 (Audio was played but not reported.)

22   **BY MR. HASIB:**

23   **Q.**   Special Agent Reinke, showing you government's

24   translation, Government Exhibit 33, reference there just now to

25   *juhannam*.  What is *juhannam*?

1   **A.**   *Juhannam* is hell.

2   **Q.**   And a reference to *shaitan*.   What is *shaitan*?

3   **A.**   *Shaitan* is Satan.

4                 (Audio was played but not reported.)

5         **MR. HASIB:**   Ms. Yee, if you could pull up clip

6   006-008.

7         Ms. Lamparelli, if you could pull up the corresponding

8   transcript at 51 minutes, 26 seconds.

9                 (Audio was played but not reported.)

10  **BY MR. HASIB:**

11  **Q.**   Special Agent Reinke, there was a reference in that clip

12  that we just heard to the Arabic word *Sham*.   S-H-A-M.   In the

13  transcript let me bring --

14  **A.**   You're fine.   *Sham* is Syria.

15  **Q.**   *Sham* is Syria.

16        **MR. HASIB:**   Ms. Lamparelli, if you could pull up the

17  last clip from hour and two minutes, 20 seconds.   And, Ms. Yee,

18  if you could play clip 006-009 in a moment.   Just a second.

19  It's a long clip.   It's about a 20-minute clip.

20                (Audio was played but not reported.)

21  **BY MR. HASIB:**

22  **Q.**   Special Agent Reinke, there was a word there mentioned,

23  *Tawfiq*.   Is *tawfiq* listed on Government Exhibit 33, Arabic

24  translations?   What does that stand for?

25  **A.**   *Tawfiq* is success.

1          (Audio was played but not reported.)

2     **Q.**   Special Agent Reinke, do you have your timeline in front

3     of you, Government Exhibit 118?

4     **A.**   I do.

5     **Q.**   We left off yesterday looking at this timeline on June 5,

6     2015.  That last entry for that date, June 5, 2015.  What is

7     that entry on your timeline?

8     **A.**   That was a reflection of the phone call we just listened

9     to where --

10    **Q.**   That was the call that we just heard?

11    **A.**   Correct.

12    **Q.**   Let me ask you to describe what's the next entry in your

13    timeline on June 8, 2015.

14    **A.**   So on June 8, 2015, Mr. Shafi calls Mr. Karim to discuss a

15    dream that Mr. Shafi recently had.  Some of the quotes from

16    that call are:  We both got married and then we were just like,

17    okay, how are we going to leave, or whatever?  And then?

18    Mr. Karim says.  Mr. Shafi replies:  And then we were just

19    like -- we'll just take them and put them in the city.  That's

20    all -- they all put them in the city.  And I was like:  Okay.

21    Mr. Karim responded:  In what city?  Mr. Shafi said:  In *Halab*.

22    **Q.**   Does the Arabic linguist, Ms. Butros, testify that *Halab*

23    is the Arabic word for Aleppo?

24    **A.**   She did.

25    **Q.**   Is that Exhibit 7 that was played in court a few days ago?

 1  **A.**   It is.

 2  **Q.**   Special Agent Reinke, the next item on your timeline

 3  June 10, 2015, what is that?

 4  **A.**   On June 10, Mr. Shafi and Mr. Karim had a text exchange.

 5  **Q.**   Before you go any further, is that text exchange reflected

 6  on Government Exhibit 144 that you reviewed earlier?

 7  **A.**   It is.

 8  **Q.**   What happened in that text exchange, if you recall?  Or if

 9  you see it on your timeline.

10  **A.**   It's on my timeline.  And Mr. Shafi texted Mr. Karim:

11  Have you found room in your heart for contentment under the

12  enemies of *Allah*?  Mr. Karim responds:  No, bro.  Mr. Shafi

13  responds:  What do you want to do, then?  Or have you silenced

14  your pleading heart?  Mr. Karim said:  Just make us feel like

15  feces.

16  **Q.**   And Special Agent Reinke, if you could describe the next

17  few items on your timeline from June 11 through June 15, 2015?

18  **A.**   On June 11, 2015, reflexatron@gmail.com conducted a

19  YouTube search in Arabic for:  Die a martyr if you will.  On

20  June 14, 2015, reflexatron@gmail.com viewed an image from a

21  website entitled the Legal Foundations of the Islamic State.

22  Reflexatron@gmail.com reviewed that three times.

23      On June 14, 2015, reflexatron@gmail.com conducted Google

24  searches in Arabic for the Islamic State, four times.  And the

25  Sign of Monotheism, four times.  And then on June 15, 2015,

REINKE - DIRECT / HASIB

1  reflexatron conducted a YouTube search in Arabic for *Tal Abyad*

2  five times.

3  **Q.**   Have you done any research on what *Tal Abyad* is?

4  **A.**   Yes, I have.

5  **Q.**   What is *Tal Abyad*?

6  **A.**   *Tal Abyad* is a city, it's a border town.

7        **MR. FAKHOURY:**  Basis of knowledge.

8  **BY MR. HASIB:**

9  **Q.**   How did you research what *Tal Abyad* is?

10 **A.**   I conducted a Google search and looked at Google Maps.

11 **Q.**   Based on that search that you did, what is *Tal Abyad*?

12 **A.**   *Tal Abyad* is a border town that's bisected by the

13 Turkish-Syrian border.  So half the town is in Turkey and half

14 of town is in Syria.  It's located halfway between roughly Urfa

15 and Gaziantep in north central Syria or southeast Turkey.

16 **Q.**   Special Agent Reinke, the next item in your timeline

17 June 16, 2015.  Is there another call that occurs on that day?

18 **A.**   There is.

19       **MR. HASIB:**  Miss Lamparelli, if you could pull up

20 government transcript 24 and put that up on the screen.

21       And, Ms. Yee, if you could play Government Exhibit 8 in

22 its entirety.

23       This is about a three and-a-half minute call, Your Honor.

24            (Audio was played but not reported.)

25 **Q.**   Special Agent Reinke, turning back to your timeline,

1   Government Exhibit 118, is there an entry for June 18, 2015?

2   **A.**   There is.  There's a phone call between Mr. Shafi and

3   Mr. Karim during which Mr. Shafi expresses jealousy at news of

4   an acquaintance's cousin who was killed fighting in Syria.

5   **Q.**   Was that Government Exhibit 9 that was played in court

6   earlier this week?

7   **A.**   Yes.

8   **Q.**   Special Agent Reinke, could you just walk the jury through

9   the next couple of entries on your timeline for June 20, 2015?

10          **MR. FAKHOURY:**  Your Honor?  I'm sorry to interrupt.

11   But before we do this, could we have a very brief sidebar?

12          **THE COURT:**  Sure.

13          (The following proceedings were heard at the sidebar:)

14          **MR. FAKHOURY:**  I am sorry that I did not catch this

15   earlier.  But on the entry for June 20, 2015, it has a

16   reference to *pembantaian*, P-E-M-B-A-N-T-A-I-A-N, which

17   translates to massacre.  This is not an Arabic word.  I believe

18   this is a Indonesian or Malaysian word, so I don't know the

19   basis where this translation is coming from.  I'm very sorry I

20   didn't catch this earlier.

21          **MR. HASIB:**  I believe Special Agent Reinke will

22   testify that he -- well, put it there (indicating), he did some

23   research on the internet to find out what *pembantaian* would

24   translate.

25          **MR. FAKHOURY:**  Is this Wikipedia article?

1          MR. HASIB:  Yes.  Maybe others.

2          MR. FAKHOURY:  We would object on foundation.  I

3    apologize I didn't catch this earlier.

4          THE COURT:  Wikipedia would not be a source that I

5    would use for translating a word that nobody knows.

6          MR. HASIB:  Okay.  How do you suggest -- should I --

7          THE COURT:  Skip over that one.

8          MR. HASIB:  I'm happy to --

9          MR. FAKHOURY:  I appreciate the government will skip

10   over it, but the issue is obviously the jury has the timeline.

11   Again, I wish I had caught this earlier.

12       I don't know.  Maybe we can just give them a limiting

13   instruction to disregard that entry or that translation just so

14   they understand why we're not having questions about it.

15         MR. MATTHEWS:  Possibly, since the Court feels that

16   Wikipedia not an appropriate source from which a translation

17   should be derived you could actually tell them that.  I think

18   that would make the point.  What do you think?

19         MR. FAKHOURY:  That's fine.

20         THE COURT:  Yeah.  I'll do that.

21         MR. HASIB:  Your Honor, I'm sorry.  The timeline

22   suggests that it was Mr. Shafi that visited the Wikipedia site.

23   I'm actually not sure how Special Agent Reinke came up with

24   that translation.  That probably makes it even more worthy of a

25   limiting instruction.

1           **THE COURT:**  Yeah, I will do that.  I will give a

2    limiting instruction that we can -- that the translation does

3    not -- we don't have a translation for that term.

4           **MR. HASIB:**  Okay.

5           **MR. FAKHOURY:**  Thank you.

6       (The following proceedings were heard in open court:)

7    BY MR. HASIB:

8    **Q.**   Special Agent Reinke, on page 11, could you just explain

9    to the jury what those two entries are on your timeline for

10   June 20, 2015?

11   **A.**   Yes.  So on June 20, 2015, reflexatron@gmail.com conducts

12   YouTube searches for Burma, nine times; and also conducts

13   Google searches in Arabic, and the search term was:  They fight

14   *jihad* for God's cause with their possessions and their lives.

15   And that was done twice.

16   **Q.**   And was there a subsequent text message conversation on

17   June 20, 2015, on your timeline?

18   **A.**   There is.

19   **Q.**   And what -- what happened in that text message

20   conversation if you have it on your timeline or if you recall

21   from your memory?

22   **A.**   So on my timeline on June 20, 2015, there's a text

23   exchange between Mr. Shafi and Mr. Karim's cell phones.

24   Mr. Shafi says:  Dude, Armin is still in jail.  What the hell

25   are we doing?  Mr. Karim responds:  What can we do?  Mr. Shafi

1  says -- texts -- IDK, but this isn't right.  How can I enjoy

2  anything while he's locked up in a cage?  Mr. Karim texts:  I

3  don't enjoy.  And then texts:  Anything.  Mr. Shafi responds:

4  Me, too.  Dude, he's in a freaking cage.  We have to do

5  something.  Honestly, sometimes feel like if there's really

6  nothing I can do, I just rather be with him in the cage.  At

7  least he won't be alone.  Mr. Karim texts back:  You think they

8  would put you in the same cage?  LOLL.  Mr. Shafi texts back:

9  Even if it's not the same cage, at least I'll be going through

10  what he's going through instead of just eating my fancy meals

11  and sleeping in my fancy house while he's in a cage.  If

12  there's nothing I can do, then that's what I should do.  IA.

13  That would make me feel better dying like that instead of like

14  this.  Mr. Karim responds with a text:  Burma.  Mr. Shafi

15  responds with a text:  That works, too.

16         **MR. HASIB:**  Your Honor, I'm going to then skip over

17  the next couple of items unless Your Honor has --

18         **THE COURT:**  All right.  And ladies and gentlemen,

19  because you have the document in front of you, there is a

20  non-Arabic word that's translated there, and there's no

21  translation for that term.  We don't have that.  That's not --

22  that's not in evidence at all so you should disregard that.

23      Then go ahead.

24  **BY MR. HASIB:**

25  **Q.**   Special Agent Reinke, was there a call on June 23, 2015?

1    **A.**   There was.   There's a phone call from Mr. Shafi with

2    Mr. Karim where Mr. Shafi discusses a daydream where -- that he

3    took over Egypt and killed the whole army:  I like went and

4    destroyed the freaking hell out of Israel.

5    **Q.**   Let me stop you there for a second.  Is that Government

6    Exhibit 10, the audio, and the transcript Government Exhibit

7    26?

8    **A.**   It is.

9         **MR. HASIB:**  Ms. Lamparelli, if you could pull up

10   Government Exhibit 10 from the first clip, which is at 2

11   minutes, 40 seconds.

12        And, Ms. Yee, if you could play Government Exhibit 010,

13   the first clip, 001.

14             (Audio was played but not reported.)

15        **MR. HASIB:**  And Ms. Lamparelli, if you could turn to

16   the second clip in that exhibit.

17        And, Ms. Yee, if you could pull up Government Exhibit

18   010-002, which is from about 7 minutes, 10 seconds, to 8

19   minutes, 44 seconds.

20             (Audio was played but not reported.)

21        **MR. HASIB:**  Ms. Lamparelli, I'm going to skip one

22   ahead.  Could you pull up the clip for 28 seconds -- sorry --

23   28 minutes, 12 seconds.

24        And, Ms. Yee, if you could go to clip 010-004 at 28

25   minutes, 12 seconds.

 1          (Audio was played but not reported.)

 2          **MR. HASIB:**  And Ms. Lamparelli, if you could go to --

 3  that should be clip -- the fifth clip at 31 minutes, 08

 4  seconds.

 5          And, Ms. Yee, if you could play clip 010-005 from 31

 6  minutes and 8 seconds.

 7          (Audio was played but not reported.)

 8          **MR. HASIB:**  And if we could go to the last clip,

 9  Ms. Lamparelli, at 37 minutes.  And this is about a one-minute

10  clip.

11          Ms. Yee, if you could play from 37 minutes, Government

12  Exhibit 010-006.

13          (Audio was played but not reported.)

14  **BY MR. HASIB:**

15  **Q.**   Special Agent Reinke, turning back to your timeline to

16  page 13.  Is there another call on June 23, 2015?

17  **A.**   There is.  There's a --

18          **MR. HASIB:**  Ms. Lamparelli, if you could put up

19  Government Exhibit 27.

20          And, Ms. Yee, if you could play Government Exhibit 11 is

21  the audio from, let's see, 11-001.  It's one minute, 50

22  seconds.

23          (Audio was played but not reported.)

24          **MR. HASIB:**  And Ms. Lamparelli, if you could go to the

25  second clip in that transcript.  And Ms. Yee, if you could pull

 1  up the second clip, 11-002.

 2      Your Honor, I note it's about 9:30.  If I play this clip,

 3  we're pretty close.

 4          **THE COURT:**  All right.

 5              (Audio was played but not reported.)

 6          **MR. HASIB:**  Your Honor, I have one more call that's

 7  three and-a-half minutes, and a handful of questions for

 8  Special Agent Reinke.  I leave it to the Court's discretion.

 9          **THE COURT:**  I think we'll take a break at this point.

10  So ladies and gentlemen, we'll take our first break in the

11  morning and come back at quarter of 10.  Please remember the

12  admonitions.

13              (Recess taken at 9:32 a.m.)

14              (Proceedings resumed at 9:45 a.m.)

15          **THE COURT:**  All right.  Please be seated, everybody.

16      Go ahead.

17          **MR. HASIB:**  Thank you, Your Honor.

18  **BY MR. HASIB:**

19  **Q.**   Special Agent Reinke, when we left off we'd just listened

20  to a call on June 23, 2015, on your timeline.  Can you describe

21  for the jury the next couple of entries on June 24 and 25 on

22  your timeline?

23  **A.**   Sure.  On June 24, 2015, reflexatron@gmail.com conducted

24  YouTube searches in Arabic for the Islamic State, five times.

25  The next day on June 25, 2015, reflexatron@gmail.com conducted

1   YouTube searches in Arabic for the Islamic State anthem,

2   homeland, five times.  And the Islamic State anthem.

3   **Q.**   Now on June 26, 2016 (sic), was there another telephone

4   call?

5   **A.**   There was.

6        **MR. HASIB:**  Ms. Yee, if you could -- actually,

7   Ms. Lamparelli, if you could put Government Exhibit 28 on the

8   screen.

9        And, Ms. Yee, if you could play Government Exhibit 12 from

10   the beginning until about 3 minutes, 30 seconds.

11        (Audio was played but not reported.)

12   **BY MR. HASIB:**

13   **Q.**   Special Agent Reinke, there was an Arabic word there

14   mentioned, the word *nikkah*.

15   **A.**   *Nikkah* means wedding.

16   **Q.**   Did you say "wedding"?

17   **A.**   Yes.  Wedding.

18   **Q.**   Could you just briefly describe the last items in your

19   timeline from June 29?

20   **A.**   Sure.  On June 29 Mr. Shafi purchases a Turkish Airlines

21   plane ticket to Istanbul, Turkey, using a Bank of America card.

22   On June 30 he attempts to fly out of SFO to Istanbul, is

23   stopped, interviewed by FBI agents in the SFO terminal.  On

24   June 30, 2015, Mr. Shafi calls his brother, Mr. Izze Shafi,

25   regarding being stopped at the airport.  Also on June 30, 2015,

1    Mr. Shafi calls Mr. Niazi about asking *Allah* to find his

2    passport and trying to fly out of SFO.  On July 1, 2015, Mr.

3    Shafi calls Mr. Karim to tell him he tried to go to Turkey and

4    was stopped by the FBI.  During the call, Mr. Shafi says:  I

5    was wrong.  I was wrong to go.

6    **Q.**   Let me just stop you there for a second.  Are those the

7    calls that were played yesterday with Special Agent Matt Sung?

8    **A.**   Correct.

9    **Q.**   Were those the calls -- two of them occurred on the BART

10   train?

11   **A.**   Correct.

12   **Q.**   And lastly, Ms. Yee, if you could pull up Government

13   Exhibit 129-004, which is in evidence.  And if you could zoom

14   in on the top half of that.

15        Special Agent Reinke, what is that exhibit?

16   **A.**   These are records from Turkish Airlines.

17   **Q.**   And can you just walk the jury through what those records

18   show?

19   **A.**   Sure.  So on the top, the third row down, it says:  Pax

20   name, Shafi, Adam.  The ticket was issued on June 29, 2015.

21   **Q.**   How do you know that?

22   **A.**   It says issued on 20150629.

23   **Q.**   Does it say where the ticket is to?

24   **A.**   It does.

25   **Q.**   Where is that?

1   **A.**   On the bottom, the second row from the bottom, it says:

2   20150630, so June 30, 2015; SFO, which is San Francisco

3   International Airport; and IST which is the airport code for

4   the Istanbul Atatürk Airport.

5           **MR. HASIB:**   No further questions for Special Agent

6   Reinke.

7           **THE COURT:**   Thank you.  Mr. Fakhoury.

8           **MR. FAKHOURY:**   Thank you.  One second, Your Honor.

9       And if I could ask Ma'am Clerk if we could have the

10  computer turned on.

11          **THE CLERK:**   Yes.

12                        <u>**CROSS-EXAMINATION**</u>

13  **BY MR. FAKHOURY:**

14  **Q.**   All right.  Good morning, Agent Reinke.

15  **A.**   Good morning, Mr. Fakhoury.

16  **Q.**   Am I saying your last name right?

17  **A.**   Close enough.

18  **Q.**   Close enough?  My last name is Fakhoury, so you can

19  imagine the trouble I get.

20  **A.**   I think we've had the same issues in our lives.

21  **Q.**   So you testified you're the FBI case agent on this case,

22  correct?

23  **A.**   Correct.

24  **Q.**   And you've been the case agent since May of 2017.

25  **A.**   Approximately May, June, 2017, correct.

1    Q.    Now, by being the case agent, that means you're the lead

2    agent on the case.

3    A.    That's correct.

4    Q.    You work very closely with the prosecutors in the case.

5    A.    That's correct.

6    Q.    You've been here all -- during the entire trial, right?

7    A.    Yes.

8    Q.    As a case agent, it's you're responsibility to know all of

9    the details of the evidence and the investigation, correct?

10   A.    To the best of my ability, yes.

11   Q.    And as part of your duties and responsibilities as a case

12   agent is to review all the records and evidence that have been

13   collected, right?

14   A.    Yes.

15   Q.    And you've done that in this case, correct?

16   A.    I've tried.  There's quite a bit.  But --

17   Q.    I'm sure there is.  We've seen bank records and credit

18   card records, right?

19   A.    Correct.

20   Q.    Google records.

21   A.    Correct.

22   Q.    There's been electronic devices.

23   A.    Yes.

24   Q.    Okay.  And you're not the first case agent on this

25   specific case, correct?

1   **A.**   That's correct.

2   **Q.**   There were other case agents that were assigned as the

3   lead case agent on this investigation before you took over in

4   May 2017.

5   **A.**   There was one prior case agent, yes.

6   **Q.**   Okay.  Who was that?

7   **A.**   That was Special Agent Dale Ryan Sutter.

8   **Q.**   Okay.  And when the case shifted from Agent Sutter to you,

9   obviously you reviewed all of the work that had been done up

10  until the time you had taken over the responsibilities as a

11  case agent, correct?

12  **A.**   I did.  As I stated, to the best of my ability.

13  **Q.**   Okay.  Now, you testified at length about this timeline.

14  And what I want to do is spend some time going through this

15  timeline, as well, and asking some follow-up questions.

16  **A.**   Sure.

17  **Q.**   Now, the first thing I wanted to ask was you testified

18  that this timeline was designed to make things easier.  Right?

19  **A.**   Correct.

20  **Q.**   And these are items of interest for the investigation,

21  correct?

22  **A.**   Correct.

23  **Q.**   Obviously, it doesn't tell the whole story of what's in

24  the volume of the Google search records, for example.

25  **A.**   That's correct.

**REINKE - CROSS / FAKHOURY**

1    Q.    Right?   That's this behemoth of an exhibit that you have

2    in your binder (indicating)?

3    A.    It's included in this behemoth of an exhibit.

4    Q.    So this is all the Google search queries you've been

5    testifying about came -- you've turned them into this kind of

6    easy-to-handle spreadsheet.   Right?

7    A.    Again, I tried, yes.

8    Q.    And this Google search record has over 9,000 search

9    queries between 2014 and 2015, correct?

10   A.    I don't know the exact number.   I know the exhibit we cut

11   it off on January 1, 2014.   There were actually more records

12   that went further back, and that might be the number you're

13   referencing.   So post January 1, 2014, I couldn't give you the

14   number.

15   Q.    I think it's important that we get it down.   So why don't

16   you take -- go ahead and open that binder and take a look at

17   Exhibit 137, page 236.

18        And, Ms. Cruz, could you publish that, please?   Maybe we

19   could zoom in on the last couple lines.

20        So that shows that in this exhibit (indicating), the

21   Google search records from January 1, 2014, to July 3, 2015,

22   there's 9,439 search queries.

23   A.    It shows there's 9,439 Excel rows.   So if you take off the

24   first -- I think there's six rows on the top on the first page

25   of it, that would give you 9,433.

REINKE - CROSS / FAKHOURY

1  **Q.**   Okay.  That works for me.

2  **A.**   Close enough.

3  **Q.**   Same thing with the YouTube search records.  That's

4  Exhibit 138, right?

5  **A.**   Correct.

6  **Q.**   And Ms. Cruz, could you pull up Exhibit 138, page 35?

7       Basically, the same question, right?

8  **A.**   Sure.

9  **Q.**   About 1,480, give or take a couple items for -- as -- just

10  like the search records, right?

11  **A.**   1,472, I think.

12  **Q.**   Sure.  Okay.  So obviously, this timeline doesn't have

13  1,400 YouTube search queries on it.

14  **A.**   No, it does not.

15  **Q.**   Now the timeline indicates a couple times when Mr. Shafi

16  spoke to law enforcement.  For example, the timeline indicates

17  that on -- let me get the specific date -- that on August 20,

18  2014, Mr. Shafi was interviewed by Customs and Border

19  Protection at SFO, the airport, right?  That's on page 4 of the

20  timeline.

21  **A.**   Yes.

22  **Q.**   Okay.  And if you jump to page 13 of the timeline, it says

23  on June 30, 2015, Mr. Shafi was interviewed by FBI agents in

24  SFO, right?

25  **A.**   It does, yes.

 1  Q.   Okay.  Now, you testified that Agent Sutter was the case

 2  agent before you took over the investigation, right?

 3  A.   Yes.

 4  Q.   And you're aware that on September 4, 2014, Agent Sutter

 5  interviewed Mr. Shafi as well, correct?

 6  A.   I'm not sure about the date, but I recall an interview

 7  occurring, yes.

 8  Q.   Okay.  You said you don't recall the date.  You don't

 9  recall the specific date being September 4?

10  A.   Correct.

11  Q.   But you would agree it was sometime in September of 2014.

12  A.   That's correct.

13  Q.   Okay.  Where on the timeline is that interview indicated?

14  A.   It's not.

15  Q.   Okay.  Now, you're aware that after Mr. Shafi returned

16  from Istanbul in 2014, the FBI had placed him under physical

17  surveillance, correct?

18  A.   I'm not sure exactly when it was right after the 2014

19  trip, but, yes, eventually there was a physical surveillance

20  that was initiated.

21  Q.   And physical surveillance in this context means there are

22  agents sort of monitoring him and watching where he's going,

23  right?

24  A.   It can be agents or surveillance specialists.

25  Q.   Okay.  Now these surveillance specialists, they're not

1  parked in a van that says "FBI" in big letters on the outside,

2  right?

3  **A.**   No, they're not.

4  **Q.**   They're intended to be covert, I guess is the way you

5  could call it.

6  **A.**   Sure.

7  **Q.**   And you're aware that your predecessor, Agent Sutter, that

8  he himself conducted spot checks on Mr. Shafi during the fall

9  and spring -- the fall of 2014 and the spring of 2015.  Right?

10 **A.**   That sounds accurate, yes.

11 **Q.**   Here's a specific example.  On November 6, 2014, you're

12 aware that Agent Sutter conducted a spot check of Mr. Shafi.

13 **A.**   Again, to the exact date, I'm not sure.  But that sounds

14 about around that time, yes.

15 **Q.**   Okay.  And you're aware that Agent Sutter observed

16 Mr. Shafi's car parked at 465 Fairchild Drive in Mountain View.

17 Are you aware of that?

18 **A.**   That sounds familiar.

19 **Q.**   You're aware that that was a Coding Dojo.

20 **A.**   Correct.

21 **Q.**   And a Coding Dojo is, basically, like a boot camp for

22 people who want to learn computer programming, right?

23 **A.**   That's my understanding.

24 **Q.**   You're aware that there was another spot check of

25 Mr. Shafi done on November 25, 2014, right?

1   A.   That sounds approximate around the date, yes.

2   Q.   And on that day Mr. Shafi's car was parked outside his

3   house in Fremont, right?

4   A.   It could be for that surveillance, yes.

5   Q.   Okay.  And to not go through 100 of these -- I mean, there

6   were several other times when the FBI conducted physical

7   surveillance on Mr. Shafi, right?

8   A.   I wouldn't say 100, but there were other surveillance

9   operations that were conducted, correct.

10  Q.   Okay.  So there was surveillance operations conducted on

11  December 6, 2014, for example, right?

12  A.   Yes.

13  Q.   December 7, 2014.

14  A.   Not sure about 7th, but again that sounds correct.

15  Q.   December 19, 2014.

16  A.   Approximately.

17  Q.   January 2, 2015.

18  A.   Again, approximately, yes, there might have been one.

19  Q.   March 1, 2015.

20  A.   Potentially.

21  Q.   June 7, 2015.

22  A.   Yes.

23  Q.   June 8 -- June 18, 2015.

24  A.   The date sounds correct.

25  Q.   And June 27, 2015.

1    **A.**    Yes.

2    **Q.**    Okay.  Were any of those dates put on this timeline?

3    **A.**    No, they were not.

4    **Q.**    Okay.  We've heard several phone calls, recordings of

5    phone calls, that Mr. Shafi made.  We've had them played in

6    court throughout the trial.  Obviously, you're familiar with

7    those phone calls, right?

8    **A.**    Correct.

9    **Q.**    You're familiar with the way in which the FBI obtained

10   these recordings, right?

11   **A.**    I am.

12   **Q.**    They obtained a court order that authorized the collection

13   of these recordings, right?

14   **A.**    That's correct.

15   **Q.**    Okay.  And so far in trial we've heard about -- or, excuse

16   me.  So far there have been 15 specific phone calls that have

17   been admitted into evidence, correct?

18   **A.**    Correct.

19   **Q.**    Now those 15 phone calls aren't the entire universe of the

20   phone calls that Mr. Shafi made, right? from 2014 to 2015.

21   Let's bind it that way.

22   **A.**    No.  Much like the Google and YouTube searches, we chose

23   to play the ones that were of investigative interest.

24   **Q.**    Okay.  Now, you're aware that the FBI -- or, put it this

25   way.  You're aware that Mr. Shafi's phone calls began to be

REINKE - CROSS / FAKHOURY

1   recorded in December of 2014, correct?

2   **A.**   No.

3   **Q.**   Okay.  When did the recordings start?

4   **A.**   The recordings that were authorized for Mr. Shafi began

5   around the 1st of June, 2015.

6   **Q.**   The 1st of June, 2015?

7   **A.**   It may have been May 31 or May 30.

8           **MR. HASIB:**  Your Honor, if this is going to go any

9   further, I'm going to object for the reasons discussed in the

10  motions *in limine*.

11          **MR. FAKHOURY:**  It has nothing to do with the issue in

12  the motions *in limine*.  We could take a sidebar.

13          **THE COURT:**  Let's go to the sidebar for a second.

14

15

16  **(This sidebar was placed under seal by Order of the Court and**
    **is not a part of this transcript.  Page 513, Line 14 through**
17  **Page 515, Line 21)**

18

19

20

21

22

23

24

25

**(Sidebar under seal)**

1

2

3

4       **(Sidebar under seal)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          (The following proceedings were heard in open court:)

23             **THE COURT:**  Mr. Hasib, the parties have a stipulation?

24             **MR. HASIB:**  We do, Your Honor.  The parties agree to

25       stipulate that there were at least 450 calls relating to

1    Mr. Shafi that were intercepted from the period of December of

2    2014 to July of 2015.

3              **MR. FAKHOURY:**  Yes.

4              **THE COURT:**  All right.  And ladies and gentlemen, as I

5    mentioned earlier, that stipulation requires to further

6    evidence.  You can accept that.

7              **MR. FAKHOURY:**  Give me one second.  Let me just get

8    sorted out here.

9    **BY MR. FAKHOURY:**

10   **Q.**   Okay.  Sorry for the delay there.

11        Now, you testified that as a case agent you tried to

12   review as much of the material as you possibly could, right?

13   **A.**   Correct.

14   **Q.**   And that includes the forensic images made of seized

15   electronic devices in this case, right?

16   **A.**   That's right.

17   **Q.**   Okay.  I think it was the gentleman whose name I'm going

18   to completely butcher.

19   **A.**   You can say his first name.

20   **Q.**   Mr. Rajkumar, the computer scientist.  He testified kind

21   of the way the FBI does things -- and you can correct me if I'm

22   wrong -- that the way that the FBI does things is when they

23   take the forensic image they place it within AD lab which

24   allows case agents, and really only case agents, to review the

25   forensic image.  Correct?

**REINKE - CROSS / FAKHOURY**

1   **A.**   Correct.

2   **Q.**   Go ahead.  Did you --

3   **A.**   No, that's essentially correct, yes.  The case agent may

4   bring someone else in that may have more experience to help

5   review said evidence on AD labs -- or, "AD labs" -- but for the

6   most part it's up to the case agent's discretion on who gets to

7   see that and who's able to see that.

8   **Q.**   Okay.  And part of your training is to receive -- or, to

9   learn how to review that forensic image, correct?

10  **A.**   That's correct.

11  **Q.**   Now, in this case, there was several electronic devices

12  seized, right?

13  **A.**   That's correct.

14  **Q.**   And imaged, correct?

15  **A.**   Yes.

16  **Q.**   So we've heard a lot about a Samsung Galaxy cell phone

17  belonging to Mr. Shafi, right?

18  **A.**   Yes.

19  **Q.**   And we've heard -- Agent Posadas testified about an LG

20  cell phone that he imaged relating -- belonging to Saleem

21  Karim, correct?

22  **A.**   Correct.

23  **Q.**   Then a MacBook -- an Apple MacBook Pro was also imaged

24  that belonged to Mr. Shafi, right?

25  **A.**   Yes.

REINKE - CROSS / FAKHOURY

1   **Q.**   And you've reviewed the items on those forensic images,

2   right?

3   **A.**   I have.

4   **Q.**   And you can generate reports based on your review of those

5   images, right?

6   **A.**   Yes.

7   **Q.**   And you've done that in this case, right?

8   **A.**   I have.

9   **Q.**   You testified yesterday that Mr. Shafi, while he was in

10   Istanbul, had visited Hagia Sophia and the Blue Mosque.  Do you

11   remember that?

12   **A.**   I do.

13   **Q.**   Those are very popular tourist destinations in Istanbul,

14   right?

15   **A.**   They are.

16   **Q.**   And your testimony was that you determined that that took

17   place because there were photos on Mr. Shafi's cell phone of

18   those locations, right?

19   **A.**   Yes.

20   **Q.**   And they had metadata that showed that the photo was

21   taken -- I think it was August 17, 2014 -- while Mr. Shafi was

22   in Istanbul, correct?

23   **A.**   That's what the data said.

24   **Q.**   So that's an example of evidence that you were able to

25   review from the forensic image of the Samsung Galaxy cell

1   phone, right?

2   **A.**   Yes.  I believe those same photos are on the MacBook Pro.

3   **Q.**   So Mr. Shafi's MacBook, right?

4   **A.**   Correct.

5   **Q.**   Where on -- strike that.  Excuse me.

6        Now, to recap some of the testimony we heard yesterday,

7   when a forensic image is taken of a phone or a computer, the

8   image captures everything that's on the phone or the computer

9   at the time it's imaged, right?

10  **A.**   Correct.  To my knowledge.

11  **Q.**   Okay.  And so with a cell phone, for example, like the

12  Samsung Galaxy phone, you have insight into how many text

13  messages are on the phone, right?

14  **A.**   How many were on the phone when it was seized.

15  **Q.**   Right.  Exactly.  So you can see how many text messages

16  were on the phone at the time it was seized, right?

17  **A.**   We can see the text messages that were on there when it

18  was seized; not any other deleted texts or anything like that.

19  **Q.**   You can see the images on the phone at the time it was

20  seized, correct?

21  **A.**   Correct.

22  **Q.**   The videos that were on the phone at the time it was

23  seized.

24  **A.**   If there are any, yes.

25  **Q.**   Sure.  And that's true for all of the categories of

1  information, right?

2  **A.**    Exactly.

3  **Q.**    You're limited to only what's on the device at that time.

4  **A.**    At the time it was seized.

5  **Q.**    Correct.  And it's essentially the same thing with the

6  MacBook, right?

7  **A.**    Correct.

8  **Q.**    Okay.  Now, you testified -- and you reviewed the forensic

9  images that were taken in this case, right?

10  **A.**    I did.

11  **Q.**    Okay.  So you reviewed the forensic image of Mr. Shafi's

12  cell phone, right?

13  **A.**    I did.

14  **Q.**    So you know that at the time the cell phone was

15  extracted -- meaning after his arrest on July 3 -- there were

16  3,562 SMS or text messages on the phone.  Correct?

17  **A.**    That number sounds about what it was.

18  **Q.**    Now, obviously, this timeline doesn't have 3,500 text

19  messages on it, right?

20  **A.**    Correct.

21  **Q.**    Now, the image of Mr. Shafi's Samsung Galaxy cell phone

22  also this 1,517 images or pictures on it, right?

23  **A.**    Again, that number sounds about accurate.

24  **Q.**    And had 656 audio files.  Does that sound right?

25  **A.**    The Samsung Galaxy S4?

REINKE - CROSS / FAKHOURY

1  **Q.**   Correct.

2  **A.**   That number doesn't sound accurate.

3  **Q.**   Okay.  Would it refresh your recollection to take a look

4  at the forensic report generated from the Samsung Galaxy cell

5  phone?

6  **A.**   When you're saying the Galaxy Samsung cell phone forensic

7  report, are you referring to which date?

8  **Q.**   I'm referring to the extraction done on July 10, 2015, by

9  Agent Miller.

10  **A.**   Okay.

11  **Q.**   Yes?  It would refresh your recollection?

12  **A.**   Yes.

13        **MR. FAKHOURY:**  May I approach, Your Honor?

14        **THE COURT:**  You may.

15  **BY MR. FAKHOURY:**

16  **Q.**   Why don't you take a look at that and let me know when

17  you've had a chance to review it.

18  **A.**   I've had a chance.

19  **Q.**   Okay.  So now that you've had a chance to review it, there

20  were 656 audio files on the Samsung Galaxy phone when it was

21  imaged in July 2015, correct?

22  **A.**   Correct.

23  **Q.**   Let me grab that report from you.

24        **MR. FAKHOURY:**  May I approach, Your Honor?

25        **THE COURT:**  Go ahead.

REINKE - CROSS / FAKHOURY

BY MR. FAKHOURY:

Q.   Now, you testified that you were -- are assigned to a counterterrorism unit within the FBI.  Did I have that correct?

A.   I was.

Q.   And obviously given the fact it's the 21st century and everybody's got a cell phone, part of your training and education on counterterrorism is about how people communicate online.

A.   That's a part of it, yes.

Q.   You're aware that there are messaging apps on cell phones, correct?

A.   I am.

Q.   And there's some pretty obvious ones everybody knows about like iMessage if you have an iPhone, or Facebook Messenger, right?

A.   Correct.

Q.   Now as part of your counterterrorism training, you've been trained, I assume, about apps that terrorist organizations, like ISIS, for example, rely on in order to communicate with potential other individuals.  Right?

A.   I have.

Q.   Like an app like Telegram, for example.

A.   That's one of them, yes.

Q.   KIK is another one.  K-I-K.  Right?

A.   Correct.

REINKE - CROSS / FAKHOURY

1   Q.   These apps have sort of like enhanced privacy protection,

2   right?

3   A.   Correct.  Encrypted.

4   Q.   Exactly.  They're encrypted.  What does encryption mean

5   just so everybody's on the same page here?

6   A.   I can give you a laymen's term.

7   Q.   Sure.

8   A.   I'm definitely not like Mr. Rajkumar, a computer

9   scientist.  But encryption to me means that it's unable to be

10  cracked or intercepted by any outside parties besides the

11  sender and the receiver.

12  Q.   Got it.  Okay.  Yeah, that's -- that works.  Now some of

13  these programs that you've talked -- that we've been talking

14  about, like Telegram or KIK, as you said these are encrypted

15  messenger apps.  Right?

16  A.   Correct.

17  Q.   They don't come standard on a Samsung Galaxy cell phone,

18  right?

19  A.   No.

20  Q.   You'd have to go out of your way to download the app onto

21  your phone in order to use it.  Right?

22  A.   Well, today I'm not sure if a new Galaxy would come with

23  one of those.  But I think in 2015, 2014, that's accurate.

24  Q.   Now, the Samsung Galaxy cell phone -- Mr. Shafi's Samsung

25  Galaxy cell phone -- didn't have Telegram installed on it,

1  correct?

2  **A.**   It did not.

3  **Q.**   It did not have KIK installed on it, correct?

4  **A.**   It did not.

5  **Q.**   Okay.  You reviewed the image of Mr. Shafi's MacBook,

6  right?

7  **A.**   Correct.

8  **Q.**   And sort of -- we've talked very briefly about encryption

9  on a cell phone.  A laptop can also have encryption programs

10  built into it as well, right?

11  **A.**   To my knowledge.

12  **Q.**   Okay.  Now, I'm assuming as part of your duties with the

13  FBI you're familiar with some computer software, computer

14  program, called Tor.  Have you ever heard of that before?

15  **A.**   I have.

16  **Q.**   What's Tor?

17  **A.**   I wouldn't want to give my extreme layperson's definition

18  of Tor, because I couldn't -- it's just a way to -- my

19  understanding it's a way to be dark on the internet.

20  **Q.**   Okay.  What do you mean by "dark on the internet"?

21       **MR. HASIB:**  Objection, Your Honor.  I'm not sure that

22  the witness is qualified to answer that question.

23       **THE COURT:**  Well, he can testify to what he was saying

24  when he said "dark."

25       **THE WITNESS:**  In the sense that, similar to

1   encryption, it's hard to track a user that might be using the

2   Tor network.

3   **BY MR. FAKHOURY:**

4   **Q.**   And just like terrorist groups like ISIS rely on encrypted

5   messenger programs on cell phones to communicate with people,

6   these groups also -- and tell me if you know this -- but these

7   groups also rely on the dark web in order to get their message

8   out to potential recruits, or whatever you want to -- people

9   interested in the group.   Correct?

10   **A.**   To my understanding, yes.

11   **Q.**   Okay.   Now, this dark web -- to the extent -- just answer

12   based on what you know and what you feel comfortable telling

13   me.   The dark web, like you said, makes it hard to trace where

14   the user is coming from.   That's, basically, the point of it,

15   right?

16   **A.**   To my understanding, yes.

17   **Q.**   Now, you testified that you reviewed the forensic image of

18   Mr. Shafi's MacBook, right?

19   **A.**   I did.

20   **Q.**   And there's -- it doesn't have the Tor software installed

21   on it, correct?

22   **A.**   No, it does not.

23   **Q.**   Are you familiar with what a virtual private network or

24   VPN is?

25   **A.**   Vaguely.

1  Q.   Okay.  What does it mean to you?  Or describe -- describe

2  what you know about it.

3  A.   I wouldn't -- I wouldn't want to opine on that one.

4  Q.   Okay.  So far we've talked about Mr. Shafi's MacBook, and

5  we've talked about Mr. Shafi's cell phone.  And we've already

6  heard testimony about Mr. Karim's cell phone, right?

7  A.   Correct.

8  Q.   Okay.  Now, there are other electronic devices at

9  Mr. Shafi's home on July 3 that the FBI did not take, right?

10 A.   Correct.

11 Q.   Okay.

12      MR. FAKHOURY:  Ms. Cruz, could you pull up AS-00056?

13 This is Exhibit 64-031.  These exhibits have all been admitted

14 into evidence.

15 Q.   So this is an example of a laptop that was not seized or

16 imaged by the FBI, correct?

17 A.   Correct.

18 Q.   And that's because there was no indication that Mr. Shafi

19 used this laptop, right?

20 A.   Correct.

21 Q.   Okay.

22      MR. FAKHOURY:  Ms. Cruz, could you pull up AS-0038,

23 this is Exhibit 64-038 -- I'm sorry.  I have the wrong Bates

24 number.

25      Give me one second, Your Honor.  Thank you.

1          (Pause.)

2               **MR. FAKHOURY:**  My apologies.

3               **THE COURT:**  No problem.

4    **BY MR. FAKHOURY:**

5    **Q.**   Okay.  Now we've got the right exhibit.  This is Trial

6    Exhibit 64-031.  Here's some additional electronic devices that

7    were not seized or searched by the FBI, right?

8    **A.**   Correct.

9    **Q.**   Okay.

10        Can you go to the next page, Ms. Cruz?

11        Here's another -- this is an Apple desktop computer,

12   correct?

13   **A.**   Correct.

14   **Q.**   And one more, can you go to the next page?

15        There's two laptops there, actually, right?  And those

16   were not seized, either, correct?

17   **A.**   No, I'm not sure about that one.

18   **Q.**   Was the -- well, let's start with the Del computer.  The

19   Del computer was not seized, correct?

20   **A.**   The Del computer was not seized.

21   **Q.**   And the MacBook in the back there, that's Mr. Shafi's

22   MacBook then.

23   **A.**   Yes, it is.

24   **Q.**   Okay.  I want to turn gears now, or shift gears now, to

25   talk in some detail -- a little more detail the timeline and

REINKE - CROSS / FAKHOURY

1   some of the Google records related to the timeline, okay?

2   **A.**   Okay.

3   **Q.**   And I guess the first thing I wanted to ask is more of a

4   general question.  With a YouTube search, it's pretty easy to

5   figure out what exactly the user is looking for.  They're

6   looking for a video, right?

7   **A.**   Correct.

8   **Q.**   That's only thing you can find on YouTube, right?

9   **A.**   It's a video-sharing site yes.

10  **Q.**   If a person does a search in Google Maps for directions,

11  it's pretty clear what they're looking for, right?

12  **A.**   Yes.

13  **Q.**   They're looking for directions, right?

14  **A.**   Correct.

15  **Q.**   Now if a person does a search within Google, is it clear

16  what exactly they're looking for?

17  **A.**   I don't know -- when you're saying "when a person," just

18  any person in general?

19  **Q.**   Okay.  Let me say -- ask it differently.  A person types

20  in a phrase in the Google search box.  They could be looking

21  for all sorts of things related to that topic, right?

22  **A.**   Potentially.

23  **Q.**   Okay.  So they could be looking for news articles.  That's

24  one example.  Right?

25  **A.**   They could.

1  **Q.**   They could be looking for the Wikipedia article for the

2  item that they searched for, right?

3  **A.**   In this hypothetical, you're asking about?

4  **Q.**   I'm just saying in general.  I'm just talking about

5  generally how people use Google.

6  **A.**   Yeah.  Sure.

7  **Q.**   It's not obviously -- well, let me say it this way:  It

8  can sometimes be obvious what a person is looking for when they

9  do a Google search query.  Like if they search for "directions

10  to Costco," right?

11  **A.**   Yes.  In that instance.

12  **Q.**   It can sometimes not be clear what a person is searching

13  for if they do a search for something like "burgers," to use a

14  benign example.

15  **A.**   You could say that.

16  **Q.**   Okay.  So with that sort of starting point I want to turn

17  to the timeline now, and I want to start my turning your

18  attention to page 4 of your timeline, the entry for August 22,

19  2014.

20      Now, on the timeline on August 22, 2014, you noted that

21  there were Google searches for how to format a hard drive; how

22  to format a hard drive Mac, X 2; how to restore a Mac with a

23  password; and that there was a visit to an article on

24  Lifehacker that has the URL "How to erase and format a hard

25  drive."  Do you see that entry?

1    **A.**   I do.

2    **Q.**   Ms. Cruz, could you pull up Trial Exhibit 137-183.  And

3    can you look for the lines 7814 towards the bottom?  Zoom in

4    there, and then scroll down.  Sorry.  From 7814 to the bottom

5    of the page.  Thank you.

6         So that's where -- on the screen here, that's where in the

7    Google records that search query comes from, correct?

8    **A.**   That's correct.

9    **Q.**   Okay.

10        Ms. Cruz, can you pull up page 187 of that same exhibit?

11   Exhibit 137?  And can you zoom in on starting at line 7883 all

12   the way to the bottom.

13        Now, these are Google records from the same exhibit,

14   right?

15   **A.**   Correct.

16   **Q.**   And these are the Google search queries done on July 2,

17   2014, for reflexatron@gmail.com.  Correct?

18   **A.**   Correct.

19   **Q.**   And these search queries indicate that there were searches

20   done for how to restore a Mac with a password, correct?

21   **A.**   Correct.

22   **Q.**   As well as searches for how to factory reset a Mac,

23   correct?

24   **A.**   Correct.

25   **Q.**   If you look specifically at line item 7891, it indicates

REINKE - CROSS / FAKHOURY

1    there was a search for:  Can I restore a Mac that has a

2    password.  Right?

3    **A.**    Yes, I see that.

4    **Q.**    You could take that down, Ms. Cruz.

5          Now, the day after those searches, on July 3, 2014,

6    there's a $2,156 purchase at the Apple store in Walnut Creek on

7    your timeline.  Right?

8    **A.**    There is.

9    **Q.**    Okay.  Okay.  Let's keep going through this timeline.  I

10   had some other items I wanted to talk with you about.

11         On the timeline on May 12, 2014, there's a YouTube search

12   for:  Join ISIS, Syria.  Do you see that on the top of the page

13   -- top of page 2?

14   **A.**    I do.

15   **Q.**    Okay.  Can you point to me where in the timeline there was

16   a search for "join ISIS" after June 1, 2015 -- I'm sorry --

17   June 1 -- yes.  June 1, 2015.

18   **A.**    From the timeline.

19   **Q.**    From the timeline.

20   **A.**    You said June 1, 2015?

21   **Q.**    Correct.

22   **A.**    I don't see any with that same wording.

23   **Q.**    Okay.  Can you tell me -- can you show me where on the

24   timeline there's a search on Google for "join ISIS" that took

25   place after August 20, 2014?

1   **A.**   You said "join ISIS"?

2   **Q.**   Correct.

3   **A.**   There isn't one.

4   **Q.**   Okay.  Let's keep going through the timeline.  Now, you

5   mentioned that the -- sorry.

6        Actually, here, let's do this:  Let's jump to June 25,

7   2015, on the timeline.  Let me know when you have that.

8   **A.**   Okay.

9   **Q.**   Okay.  Now, on the timeline it indicates that there was a

10  YouTube search in Arabic for the Islamic State anthem,

11  homeland, five times, correct?

12  **A.**   Correct.

13  **Q.**   Okay.  Ms. Cruz, can you pull up Trial Exhibit 138-002?

14  Can you jump into, basically, the top half of the page?

15       Okay.  The entries here, starting at lines 42 and going

16  down, that's the search for the Islamic State anthem, done on

17  YouTube, correct?

18  **A.**   I can't read Arabic.

19  **Q.**   Okay.  Well, these are the only search entries for

20  June 25, correct?  On the YouTube search results.  Right?

21  **A.**   No, I see one below it.  Row 47.

22  **Q.**   Oh, I see it.  Okay.  And let me just double check here.

23       Well, let's do it this way.  You have Trial Exhibit 138 in

24  front of you, right?

25  **A.**   Yes.

1   Q.   Okay.  Why don't you take a look at the first two pages.

2   Just the bottom line of -- starting at line -- actually, no,

3   I'm sorry.  Strike that.

4        Go to page 2 of that exhibit, look at line 42 through line

5   47.  Those are the only searches on YouTube on June 25,

6   correct?

7   A.   Correct.

8   Q.   Now, you testified a lot about these date lines; they have

9   the date and the time in UTC format.  Right?

10  A.   Correct.

11  Q.   You're able to do something I can't, which is to convert

12  UTC to Pacific Standard Time.  But in any event, these searches

13  were all done within a 26-minute window, correct?  All of the

14  searches on June 25 took place in a 26-minute window, right?

15  A.   Approximately, yes.

16  Q.   Okay.  And, in fact, if you look at line 47, there's a

17  search done at 7:01 UTC and 50 seconds, and then a second

18  search done at 7:02:39 UTC, right?

19  A.   Correct.

20  Q.   So that's 40 seconds later, give or take five seconds.

21  Correct?

22  A.   Correct.

23  Q.   And then the next search is done about two minutes later,

24  right?

25  A.   Yes.

1    Q.   Then there's about a 22-minute gap before the next search,

2    right?

3    A.   That's correct.

4    Q.   Line 44?

5    A.   Correct.

6    Q.   And then the three remaining searches from that day all

7    took place in a span of about 25 seconds, right?

8    A.   Yes.

9         **MR. FAKHOURY:**  You could take that down, Ms. Cruz.

10   Q.   Let's go to June 14, 2015, on your timeline.  Let me know

11   when you have that.  It's on page 11.

12   A.   I'm there.

13   Q.   So on June 14, 2015, there's two, entries.  There's viewed

14   image at targmat.com, the Legal Foundations of the Islamic

15   State; and there's a Google search in Arabic for the Islamic

16   State, four times; and the sign of monothesim, four times.  Do

17   you got that?

18   A.   I do.

19   Q.   Ms. Cruz, can you pull up Exhibit 137-006?  And can you

20   zoom in on line 191 and to the top of the page.

21        Okay.  Now, line 191 is the search for the Islamic State.

22   A.   Again, I can't read Arabic.

23   Q.   Okay.  Well, let's take a look at line 190, then.  190 is

24   a search done about 45 seconds -- or, I'm sorry.  It's an image

25   was viewed 45 seconds after this search listed at line item

1   191.  Do you see that?

2   **A.**   I do.

3   **Q.**   Okay.  And it indicates that the image that was viewed was

4   an image from Al Jazeera, is that right?

5   **A.**   Yes.

6   **Q.**   The very next image, so this would be line number 189, is

7   another image viewed from Al Jazeera.  Do you see that?

8   **A.**   I do.

9   **Q.**   And then the next item, which is about 30 seconds or 40

10  seconds later is an image from france24.com.  Do you see that?

11  **A.**   I do.

12  **Q.**   And then the next image viewed, which is about a minute

13  later, is from the timesofisrael.com.  Do you see that?

14  **A.**   I do.

15  **Q.**   Ms. Cruz, can you go to page 7 of that exhibit?  137.

16  Thank you.

17      Okay.  And Ms. Cruz, can you zoom in on items 207 to 212.

18  Okay.

19      So now this viewed image of the Legal Foundations of the

20  Islamic State, that's on your timeline on page 11, right?

21  **A.**   Correct.

22  **Q.**   And here -- and it indicates that it was viewed three

23  times, right?

24  **A.**   Correct.

25  **Q.**   Okay.  And here is, in the Google data, the three times

1   that this was viewed, right?

2   A.   Correct.

3   Q.   So if you look at line 212, it indicates that the image

4   was viewed at 8:50 and 29 seconds, UTC right?

5   A.   Yes.

6   Q.   And then viewed again 14 seconds later, right?

7   A.   That's correct.

8   Q.   And then viewed again about -- I'm a lawyer, I can't do

9   math -- so about 19 seconds later, right?

10   A.   That looks right.

11   Q.   You can take that down.

12        Okay.  I want to turn now to June 5, 2015.  We've heard a

13   lot about June 5, 2015.  And let's start by talking about --

14   this is the day that Mr. Shafi -- or, reflexatron or

15   Mr. Shafi -- viewed the video of the *emir* of the al-Nusrah

16   Front.  Right?

17   A.   That's the day that reflexatron viewed the video.

18   Q.   Sure.  And that's what is indicated in the timeline,

19   right?  On June 5, 2015.  Right?

20   A.   Correct.

21   Q.   You've watched that interview, right?

22   A.   I have.

23   Q.   Now that interviewed was aired on Al Jazeera, right?

24   A.   To my understanding, yes.

25   Q.   And in this case it was viewed on YouTube, correct?

1   **A.**   Correct.

2   **Q.**   You didn't need to use Tor or some secret encryption tool

3   or go on the dark web to watch this interview.

4   **A.**   That's correct.

5   **Q.**   Now you said you watched this interview, right?

6   **A.**   So we had an agent that downloaded the interview when it

7   was still able to be found on the internet.  But recently we've

8   been trying to find it and couldn't find it on the internet.

9   Apparently, it was taken down.

10   **Q.**   But you have it in your case file, right?

11   **A.**   Yes, we do.

12   **Q.**   And you know the video is about an hour long.  The

13   interview is about an hour long, right?

14   **A.**   I believe it's more than an hour.

15   **Q.**   More than an hour.  Do you know how much longer?

16   **A.**   I couldn't give you the exact time.  It's in two parts.

17   **Q.**   Okay.  But it's at least an hour long.

18   **A.**   At least.

19   **Q.**   In your timeline, you indicate that there was a YouTube

20   search for that video four times, right?  On June 5?

21   **A.**   That's correct.

22   **Q.**   Okay.  Ms. Cruz, can you -- oops, sorry.  That's the wrong

23   exhibit.

24        Ms. Cruz, can you pull up Exhibit 138-004?  And can you

25   zoom in on lines 116 through 120.  That's fine like that.

1    Thank you.

2        These are the YouTube searches for that video, right?

3    **A.**   Again, I can't read Arabic.  But potentially.

4    **Q.**   Okay.  Now, line item 120 shows that a video was searched

5    for on 7:32:50, UTC time.  Right?

6    **A.**   It does.

7    **Q.**   Then the next item, 119, shows a search done at 8:24:46

8    UTC.  Right?

9    **A.**   It does.

10   **Q.**   It's about 50 minutes after the first search, right?

11   **A.**   Correct.

12   **Q.**   Then the next search at 118 is exactly about three

13   and-a-half minutes later, right?

14   **A.**   Correct.

15   **Q.**   Then there's a big gap in time.  About a ten-hour gap.

16   Right?

17   **A.**   Yes.

18   **Q.**   Then there's a video searched for at 18:16:46 UTC.  Right?

19   That's item 117?

20   **A.**   Correct.

21   **Q.**   Then the next search is about five minutes later, right?

22   **A.**   That's right.

23   **Q.**   Now, like I said, you can convert UTC to Pacific Time and

24   I can't.  So you're aware that the first time the -- this

25   al-Joulani video was accessed on YouTube was at 8:28 a.m. UTC

1    time, right?

2    **A.**    Again, I can't read Arabic, so I'm not sure which line

3    you're referring to.

4    **Q.**    Would it refresh your recollection if I showed you a 302

5    you wrote containing the same information?

6    **A.**    It might.

7    **Q.**    Okay.

8          **MR. FAKHOURY:**  May I approach, Your Honor?

9          **THE COURT:**  You may.

10   **BY MR. FAKHOURY:**

11   **Q.**    Showing you what's been marked as trial Exhibit 103.  Can

12   you just take a look at that, familiarize yourself with it, and

13   then let me know when you're done.

14   **A.**    Okay.

15   **Q.**    Okay.  Let me grab that back from you.

16          **MR. FAKHOURY:**  May I approach, Your Honor?

17          **THE COURT:**  Yes.

18   **BY MR. FAKHOURY:**

19   **Q.**    Has your memory been refreshed?

20   **A.**    Yes.

21   **Q.**    So approximately the first time this video was viewed on

22   the reflexatron account was around 8:27 a.m. UTC time, right?

23   **A.**    According to that 302?  Or according to this?

24   **Q.**    According to your report (indicating.)  Do you need to see

25   it again?

REINKE - CROSS / FAKHOURY

1    **A.**    Yeah, it would help.

2    **Q.**    Sure.

3            **MR. FAKHOURY:**  May I approach?

4            **THE COURT:**  Go ahead.

5            **THE WITNESS:**  Okay.

6    BY MR. FAKHOURY:

7    **Q.**    Okay.  Your memory's refreshed again?

8    **A.**    Yes.

9    **Q.**    So it's about 8:27 a.m.?

10   **A.**    Can you repeat the full question?

11   **Q.**    Sure.  Let's do it this way.  Why don't you hold on to

12   this.

13   **A.**    Thank you.

14   **Q.**    Sure.  So the question was:  According to your report --

15   and I understand you can't read Arabic, but --

16   **A.**    Sure.

17   **Q.**    But around the same -- but it essentially lines up with

18   the YouTube records.  This video was accessed for the first

19   time at 8:28 a.m. UTC time.

20   **A.**    By Mr. Shafi?  Or by reflexatron@gmail.com?

21   **Q.**    Is there a difference in your mind?

22   **A.**    There is a difference.  These records reflect what

23   reflexatron@gmail.com looked up on YouTube.  And the first time

24   it accessed what appears to be Arabic for the interview was

25   earlier in the morning.  This report is in regards to the Apple

REINKE - CROSS / FAKHOURY

1   MacBook Pro, and when the MacBook Pro accessed the YouTube

2   link.  I have no way of knowing if he was logged in as

3   reflexatron at that time on this laptop.

4   **Q.**   So you're basing it on your ability to read Arabic, then.

5   **A.**   No.  I'm just saying that based on this exhibit you're

6   showing me on the screen, and this exhibit you gave me to help

7   refresh my memory, they're not the same.  This is in relation

8   to the MacBook Pro.  And when whoever used the MacBook Pro

9   accessed what I think is the same YouTube link, this is when

10  reflexatron@gmail.com accessed the YouTube link.

11  **Q.**   Okay.

12  **A.**   So it seems like reflexatron accessed it very early in the

13  morning on June 5 -- or, on June 4.  And someone using a

14  MacBook Pro accessed it a little bit later on in the morning.

15  **Q.**   Let me retrieve my exhibit.  What do you mean by "very

16  early in the morning"?  What time are you talking about

17  specifically?

18  **A.**   I'm talking about UTC based on the YouTube --

19  reflexatron@gmail.com YouTube search history.

20  **Q.**   Right.  I'm talking about which line item are you talking

21  about?  And we can undue the zoom-in or you can look at the

22  paper exhibit.  If you can tell me the specific line number

23  you're referring to.

24  **A.**   Again, I can't read Arabic.  So which line are you

25  referring to?

1  **Q.**   I'm asking you.  You're saying that there's an indication

2  that there's an extra viewing on the YouTube search result

3  history.  And I'm asking you which line item are you talking

4  about?

5  **A.**   That's not what I'm saying.

6  **Q.**   Then what are you saying?

7  **A.**   You provided me a 302 that references information that was

8  obtained from the MacBook.

9  **Q.**   Okay.

10  **A.**   And on that MacBook, had a time that you had asked me if

11  that time was reflected on the YouTube search history.  And I

12  don't see it.

13  **Q.**   You don't see --

14  **A.**   I see the time that you were asking about on the MacBook

15  302 you handed me.

16  **Q.**   Okay.  So the time on the MacBook -- let's do it this way.

17  This 302 is your analysis of the MacBook image, right?

18  **A.**   Correct.

19  **Q.**   And based on your analysis of the MacBook image -- that's

20  Mr. Shafi's MacBook, right?

21  **A.**   That's correct.

22  **Q.**   Based on your analysis of Mr. Shafi's MacBook, this video

23  was viewed at 8:28 a.m. UTC time based on your review of the

24  MacBook, right?

25  **A.**   Correct.

REINKE - CROSS / FAKHOURY

1  Q.  And there's an entry in this exhibit, 138, at line 118,

2  that a video on YouTube was accessed at 8:28 a.m. UTC time.

3  Right?

4  A.  Correct.

5  Q.  Okay.  Now, you're saying there's an additional item on

6  the YouTube search record that is not on this (indicating),

7  right?

8  A.  No.  I'm saying I don't know what that Arabic is for

9  8:28:01 UTC on June 5.

10 Q.  Okay.  Now we're all on the same page.  Okay.  Thank you

11 for clarifying that.  Based on your review of the MacBook, the

12 video was viewed at 8:28 a.m. UTC.  Right?  Just so we're all

13 on the same page.

14 A.  Correct.

15 Q.  I'm sorry that took a long time.  All right.

16     Now, 8:28 a.m. UTC is what time Pacific Time?

17 A.  8:28 UTC would be 1:28 in the morning Pacific Time.

18 Q.  So about 1:30 a.m.?

19 A.  Correct.

20 Q.  Now, we heard excerpts from the phone call between

21 Mr. Shafi and Mr. Karim.  That was Exhibit 6, and the

22 transcript is Exhibit 22.  And you testified earlier today that

23 that phone call started at about 2:40 in the morning Pacific

24 Time, right?

25 A.  I think I said approximately 2:30, but --

REINKE - CROSS / FAKHOURY

1  **Q.**   Okay.  2:30 a.m.

2  **A.**   Yes.

3  **Q.**   So shortly after this video was accessed, based on your --

4  based on your analysis of the MacBook.

5  **A.**   An hour after the MacBook accessed it, yes.

6  **Q.**   Now, we've been talking at length --

7        You can cancel that, Ms. Cruz.

8        We've been talking at length about these Google search

9  queries (indicating.)  And you've reviewed all these Google

10 search queries, right?

11 **A.**   I have.

12 **Q.**   And --

13 **A.**   Well, I want to say "have."  I attempted to.  There were a

14 lot of them, so I tried to focus on certain time frames more

15 than other time frames.

16 **Q.**   Okay.  And you obviously focused on certain phrases or

17 words more than other phrases, too, right?

18 **A.**   Correct.

19 **Q.**   Can you tell me when after June 5, 2015, Mr. Shafi did a

20 search for Mohammed al-Joulani?

21 **A.**   I did not see that in the records.

22 **Q.**   Can you tell me where in the records after June 5, 2015,

23 reflexatron@gmail did a search for the al-Nusrah Front on

24 Google?

25 **A.**   I don't believe there was one after that time.

1   Q.   Okay.  I'm going to turn your attention to page 2 of your

2   timeline.  There's an entry on May 21, 2014, for the term in

3   Arabic, *Jabhat al-Nusrah*, two times.  Do you see that?

4   A.   I do.

5   Q.   Can you tell me where in the Google records after May 21,

6   2014, there is a YouTube search for *Jabhat al-Nusrah* after this

7   day?

8   A.   I don't believe there is one.

9            MR. FAKHOURY:  Can I have a minute, Your Honor?

10           THE COURT:  You may.

11       (Pause.)

12           MR. FAKHOURY:  Thank you, Your Honor.  Sorry about

13   that.

14   BY MR. FAKHOURY:

15   Q.   Let's run through a couple more of these Google search

16   records.  You're aware that Mr. Shafi was enrolled at San

17   Francisco State University, was about to start classes there.

18   Right?

19   A.   I believe he was in a dialogue with San Francisco State

20   about potentially starting classes.  I don't know if he was

21   actually enrolled or not.

22   Q.   Okay.  And you're aware that there was quite a few Google

23   search records for San Francisco State University, right?

24   A.   I believe there's a few, yes.

25   Q.   A few?

1    **A.**    I don't have the exact number, but there are searches for

2    it, yes.

3    **Q.**    Okay.  Are any of those in your timeline?

4    **A.**    They are not.

5    **Q.**    Okay.  I want to turn now to June 8, 2015.  Why don't you

6    turn to that page of the timeline.

7    **A.**    Okay.

8    **Q.**    Now, that timeline indicates that Mr. Shafi had a phone

9    call with Saleem -- with Saleem Karim to discuss a dream he

10   had.  You see that entry?

11   **A.**    I do.

12   **Q.**    Okay.  Now -- and we've heard some excerpts from that

13   phone call, right?

14   **A.**    Correct.

15   **Q.**    Okay.  Now, that's a pretty lengthy phone call, right?

16   **A.**    To my knowledge, yes.

17   **Q.**    Okay.  I want to play a couple clips from those phone

18   calls.

19        **MR. FAKHOURY:**  Just in terms of planning purposes,

20   Your Honor, the total of the phone call clips I intend to play

21   are -- there's a number of clips, but they're pretty short.

22   They're about five or six minutes apiece.

23        **THE COURT:**  Okay.  Let's do a couple of them, then

24   we'll take a break.

25        **MR. FAKHOURY:**  Ms. Cruz, can you play clip number 4?

```
 1                 (Audio was played but not reported.)

 2           MR. FAKHOURY:  Okay.  Ms. Cruz, can you play clip

 3   number 5?

 4                 (Audio was played but not reported.)

 5   BY MR. FAKHOURY:

 6   Q.   Okay.  And can you see the Arabic translation chart from

 7   where you are?  I know it's -- okay.  I'm going to -- you know

 8   what?  I'll tell you what.  I have a paper copy.

 9           MR. FAKHOURY:  May I approach, Your Honor?

10           THE COURT:  You may.

11   BY MR. FAKHOURY:

12   Q.   Leave that one for the jury.  Fitnah means sedition,

13   right?  Or seduction, depending on the context, right?

14   A.   That's what the chart says, yes.

15   Q.   Let me take that because I need the cheat sheet, too.

16        Okay.

17        Ms. Cruz, can you play clip number 6?

18                 (Audio was played but not reported.)

19           THE COURT:  All right.  Is this a convenient time for

20   a break?

21           MR. FAKHOURY:  Sure.

22           THE COURT:  Ladies and gentlemen, we'll take our

23   second break and be back at 11:30.  Please remember the

24   admonitions.

25        (Jurors exiting the courtroom.)
```

```
 1              THE COURT:  Do you have an expectation with respect to
 2     whether we'll get to Mr. Vidino?  What should I tell the jury?
 3              MR. FAKHOURY:  I suspect we could start his direct.  I
 4     don't know how long Mr. Hasib has.  I don't have too much more
 5     on cross.  And I don't know, obviously, how long Dr. Vidino's
 6     direct will be.
 7              THE COURT:  All right.  So I'll keep them guessing.
 8     See what happens.
 9         Okay.  All right.  We'll be in recess until 11:30.
10                       (Recess taken at 11:17 a.m.)
11                    (Proceedings resumed at 11:32 a.m.)
12              THE COURT:  All right.  Please be seated, everybody.
13     Mr. Fakhoury.
14              MR. FAKHOURY:  Thank you, Your Honor.
15     BY MR. FAKHOURY:
16     Q.   Agent Reinke, we had just heard an audio clip that had two
17     Arabic words in it and I wanted to see if you knew what those
18     words meant because they're not on the glossary (indicating.)
19     So the first was (Arabic).  Do you know what that means?
20     A.   I do not.
21     Q.   Do you know what the word (Arabic) means?
22     A.   I do not.
23     Q.   And again, those aren't on the glossary, right?
24     A.   To my understanding, yes.
25     Q.   Yes, they're not --
```

1   **A.**   They're not on there.

2   **Q.**   Okay.

3        Ms. Cruz, can we play clip number 7, please?

4               (Audio was played but not reported.)

5          **MR. FAKHOURY:**  Okay.  Let's play clip number 8.  This

6   is also from the June 8 phone call.

7               (Audio was played but not reported.)

8          **MR. FAKHOURY:**  There is a long pause in the recording.

9   I'm sorry.

10              (Audio recording continuing.)

11         **MR. FAKHOURY:**  Okay.  And let's play clip number 9.

12         **MR. HASIB:**  I'm sorry.  Can we get the time that that

13   ended?

14       (Off-the-record discussion with Mr. Fakhoury)

15              (Audio was played but not reported.)

16  **BY MR. FAKHOURY:**

17  **Q.**   We heard on that call a reference to Yemen.  You remember

18  that?

19  **A.**   Yes.

20  **Q.**   And you know that Yemen is a country in the Middle East,

21  right?

22  **A.**   Correct.

23  **Q.**   And if you've reviewed the Google search data you know

24  that -- you know that there's a Google search for the cost of

25  living in Yemen, right?

1    **A.**   I do.

2    **Q.**   And that was on May 10, 2015, right?

3    **A.**   I don't know exact date, but I recall it being later on in

4    the records.

5    **Q.**   Okay.  That's not on your timeline, right?

6    **A.**   No.

7    **Q.**   Okay.  Now something that is on your timeline is on -- is

8    a call on June 18, 2015.  That's on page 11.  Do you see that?

9    **A.**   I do.

10   **Q.**   Okay.  I want to play a clip from that same phone call.

11         Ms. Cruz, can you play clip number 11?

12              **THE COURT:**  What's the exhibit number?

13              **MR. FAKHOURY:**  The audio exhibit is 6, and the

14   transcript exhibit is 22.

15              **THE COURT:**  Thank you.

16              (Audio was played but not reported.)

17              **MR. FAKHOURY:**  Okay, thank you.

18   **BY MR. FAKHOURY:**

19   **Q.**   I want to shift gears a little bit and talk about the map

20   that's been admitted as Trial Exhibit 33.

21         I'm sorry.  You're right.  That's Exhibit 114.

22         Ms. Cruz, can you pull that up?

23         Now, I believe it was Agent Sung who testified that he put

24   the map together.  Is that right?

25   **A.**   That's correct.

1   **Q.**   And now you're the case agent though, right?

2   **A.**   Correct.

3   **Q.**   And so did you have any involvement in the creation of

4   this map?

5   **A.**   Very little.  This map was created two, three, four weeks

6   ago while I was moving my family to South Dakota.  So Agent

7   Sung stepped in and helped out a fellow agent.

8   **Q.**   Sure.  Now he testified that the map had locations of

9   investigative interest on it.  Is that -- I believe that was

10  his testimony.  Do you recall that?

11  **A.**   Correct.  That sounds accurate.

12  **Q.**   And, obviously, item 7 up here on the very top of the map

13  is Istanbul, right?

14  **A.**   That's correct.

15  **Q.**   Now, location number 2 is Gaziantep in Turkey.  Are you

16  familiar with Gaziantep in Turkey?

17  **A.**   Just via Google searches and Google Map and Wikipedia.

18  **Q.**   Okay.  You're aware Gaziantep is actually a pretty large

19  city in Turkey, right?

20  **A.**   Yes.

21  **Q.**   Got about one, one and-a-half million people live in

22  Gaziantep?

23  **A.**   I think I saw half a million to a million.  But I'll take

24  your number.  Large city.

25  **Q.**   Big city.  Sure.  And you're aware it's about -- if you've

1   done some Google Map data, or looked at it on Google Maps, you

2   aware that Gaziantep's about 700 miles away from Istanbul,

3   right?

4   **A.**   That sounds accurate, yes.

5   **Q.**   Are you familiar with a city in Syria named Idlib?   Or

6   province?

7   **A.**   I am.

8   **Q.**   You are?

9   **A.**   Similarly to Gaziantep; Google searches, things of that

10   nature.

11   **Q.**   Where on this map is Idlib?

12   **A.**   I would have to -- it's not listed on the map, but from my

13   recollection it's in north central Syria.

14   **Q.**   Okay.   Perhaps we can go to page 2 of this exhibit.   Do

15   you see Idlib here?   For the sake of time I can just -- it's

16   kind of on the bottom left quadrant of the map.   Do you see

17   that there?

18   **A.**   I do.

19   **Q.**   Okay.   Now, you're aware that Idlib is sort of the home

20   base of the al-Nusrah Front.   Right?

21   **A.**   I don't know if I'd use that same terminology, but I know

22   that there's a lot of activity there for al-Nusrah Front,

23   correct.   Or there was.

24   **Q.**   Okay.   Now, Idlib's not marked on -- I'm sorry.   Strike

25   that.

1      Can you go to the first page, Ms. Cruz?

2      This now -- this map has this box here (indicating).  I

3  realize I'm just pointing and nobody can see where I'm pointing

4  to.  But there's this box here in kind of the left-hand side.

5  That's the locations that were deemed of investigative

6  interest, right?

7  **A.**   Correct.

8  **Q.**   And Idlip is not on that list, right?

9  **A.**   That's correct.

10  **Q.**   Can you point to me where in the timeline there's any

11  Google or YouTube search history for Idlip.

12  **A.**   On the timeline?

13  **Q.**   Yes.

14  **A.**   There's not any.

15  **Q.**   Now, if you've reviewed the Google search data, you're

16  aware that the reflexatron account did searches for a lot of

17  other locations, right?

18  **A.**   Yes.

19  **Q.**   Around the world.

20  **A.**   Yes.

21  **Q.**   And you've marked some of them, right?  Searches for

22  Mexico City and Gaziantep, right?

23  **A.**   Correct.

24        **MR. FAKHOURY:**  You can remove the map -- actually, I'm

25  sorry.  You can leave the map up.  My apologies.

1  **Q.**   Now, the Google search data shows that there were also

2  searches for Germany, for example, right?

3  **A.**   Correct.

4  **Q.**   Morocco, right?

5  **A.**   I don't know if I remember Morocco, but that's --

6  potentially.

7  **Q.**   Okay.  Oman, right?

8  **A.**   Possibly.

9  **Q.**   Dubai?

10  **A.**   All of these I'm not sure exactly where or if they are in

11  the records, but they possibly might be.  There's quite a few

12  records.

13  **Q.**   Possibly because it's -- theoretically could be?  Or

14  possible because you've reviewed the records and you have a

15  recollection of seeing those locations there but can't remember

16  a specific date or location on the exhibit?

17  **A.**   I have a recollection of seeing many different locations.

18  I just can't recall Oman or Morocco.

19  **Q.**   Okay.  On your timeline on -- there's entry on June 16 of

20  2015, right? about a phone call Mr. Shafi had with Saleem

21  Karim, right?

22  **A.**   There is.

23  **Q.**   Okay.  Now, you're aware that on that same day the

24  reflexatron account did a search for construction jobs in Saudi

25  Arabia.  Correct?

1   **A.**   I would have to look at the records, but I recall a search

2   query of that nature.

3   **Q.**   Okay.  Sure.  Well, let's do that.  Let's look through the

4   records.  It's Exhibit 137-005.  And specifically, Ms. Cruz, if

5   you could zoom in on lines -- maybe lines --

6   **A.**   168.  I see it there.

7   **Q.**   Okay.  Perfect.  So you see the search for construction

8   jobs in Saudi Arabia.  Right?

9   **A.**   I do.

10  **Q.**   Oh.  Kind of working backwards a little bit, if you go on

11  your time -- Oh.  And just so we're clear.  That search is not

12  on your timeline, right?

13  **A.**   That's correct.

14  **Q.**   Okay.  And now if you go backwards to June 10, 2015,

15  there's an entry for text message exchange with Mr. Karim.  Do

16  you see that on page 10?

17  **A.**   I do.

18  **Q.**   And you're aware that on that same day the reflexatron

19  account was doing searches for jobs related to being a civil

20  engineer or a planner.  Do you recall that?

21  **A.**   Again, I recall searches of that nature.  And I'm not sure

22  about June 10 or not.

23  **Q.**   Okay.  Why don't we take a look real quick at the exhibit.

24  It's 137-008.  And we're specifically -- maybe we could zoom

25  from line 250 all the way down to maybe 272.

1        These were the searches that you recalled reviewing,

2   right?

3   **A.**    Correct.

4   **Q.**    And none of that's on the timeline, right?

5   **A.**    No.

6   **Q.**    Just a few more questions.  I wanted to briefly revisit

7   the video of the interview with al-Joulani.  You recall which

8   video I'm talking about.  We had a discussion about the timing.

9   **A.**    I do.

10  **Q.**    There were a couple additional questions I forgot to ask

11  that I wanted to go back on.  And I think it may be helpful if

12  I can have you take a look at your report (indicating) and

13  refresh your recollection.

14  **A.**    Okay.

15         **MR. FAKHOURY:**  May I approach, Your Honor?

16         **THE COURT:**  You may.

17  **BY MR. FAKHOURY:**

18  **Q.**    So why don't you take a look at that and then let me know

19  when you have the contents set in your mind.

20         **THE COURT:**  Do you have a specific question that you

21  want him to be thinking about or --

22         **MR. FAKHOURY:**  About specific times the video was

23  accessed.

24         Actually --

25

1    BY MR. FAKHOURY:

2    Q.    So based on your analysis of the MacBook, the video was

3    accessed at 8:27:28 a.m. UTC, right?

4    A.    Correct.

5    Q.    And then there's a second entry for that video being

6    accessed 30 seconds later, correct?

7    A.    Correct.

8    Q.    And then there's a third entry for that video being

9    accessed four seconds after that second entry.

10   A.    Again, these times that the video was accessed via the

11   MacBook Pro, was via the MacBook Pro.

12   Q.    Right.  That's all I asked you.  Based on your analysis of

13   the MacBook Pro, you saw that the video was accessed at 8:27:28

14   a.m., correct?

15   A.    Via the MacBook Pro.

16   Q.    Okay.  And then at 8:28 a.m. on the dot, correct?

17   A.    Correct.

18   Q.    And then again at 8:28:04 a.m. on the MacBook Pro.

19   Correct?

20   A.    According to this report, yes.

21   Q.    Your report.  Right?

22   A.    Yes.

23   Q.    And then the video was accessed at 9:21:42 a.m. on the

24   MacBook Pro, right?

25   A.    On the MacBook Pro.

REINKE - CROSS / FAKHOURY

1   Q.   Right.  That's all I'm asking about.  So it's 9:21:42,

2   right?

3   A.   That's when the video was accessed on the MacBook Pro,

4   yes.

5   Q.   And then a second time at that same exact time, right?

6   A.   Yes.

7           MR. FAKHOURY:  May I approach and retrieve my exhibit?

8           THE COURT:  Sure.

9   BY MR. FAKHOURY:

10  Q.   Now, Mr. Shafi was arrested on July 3, 2015, right?

11  A.   That's correct.

12  Q.   Okay.  Ms. Cruz, can you pull up Exhibit 138-001?  And can

13  you zoom in on lines numbers 7 through 13?

14       Okay.  There are entries here on July 5, 2015, right?

15  A.   Correct.

16  Q.   And at that time Mr. Shafi was -- he did not have access

17  to his cell phone or email account, right?

18  A.   As far as I know.

19  Q.   Okay.  Do you know who did these searches?

20  A.   No, I have -- reflexatron@gmail.com.

21  Q.   That's true.  Let me rephrase it.  Do you know which

22  person did those searches?

23  A.   No.

24  Q.   Okay.

25           MR. FAKHOURY:  You can take that down.

1    **Q.**   Your timeline mentions a couple different organizations

2    like Hidaya and Islamic Relief and the -- a mosque in Boise,

3    Idaho.  Do you recall that?

4    **A.**   I do.

5    **Q.**   These are all, you know, mainstream Islamic charities and

6    nonprofits, right?

7    **A.**   Islamic Relief is.  The Hidaya Foundation, I'm not sure

8    how big their presence is.  But potentially, yes.

9    **Q.**   Can you show me where on the timeline after June 5, 2015,

10   there was any Google or YouTube searches for plane tickets to

11   Istanbul?

12   **A.**   I don't see any.

13   **Q.**   Okay.  How about for searches after June 5, 2015, for bus

14   lines in Turkey?

15   **A.**   I don't see any.

16   **Q.**   About hotel rooms in Turkey?

17   **A.**   There are none on there.

18   **Q.**   How about flights to Gaziantep?

19   **A.**   I don't believe that's on there, but let me check.

20        There's not one.

21   **Q.**   Okay.  How about for crossing borders?

22   **A.**   After June 5, correct?

23   **Q.**   Correct.

24   **A.**   There's not one.

25   **Q.**   How about for Syria?

1    **A.**   There's none on there.

2    **Q.**   How about for the al-Nusrah Front?

3    **A.**   I believe you already asked that one.

4    **Q.**   Sure.  I asked it again.

5    **A.**   I don't see it on there.

6    **Q.**   And how about Mohammad al-Joulani?

7    **A.**   It's not on there.

8         **MR. FAKHOURY:**  Have a minute, Your Honor?

9         (Pause.)

10         **MR. FAKHOURY:**  I have nothing further.  Thank you.

11         **THE COURT:**  All right.  Mr. Hasib.

12              <u>**REDIRECT EXAMINATION**</u>

13   BY MR. HASIB:

14   **Q.**   Good afternoon again, Special Agent Reinke.

15   **A.**   Good afternoon.

16   **Q.**   Let me start where Mr. Fakhoury just left off.  He was

17   asking you about some searches after June 5, 2015.  And I think

18   he asked you whether there were any searches for Gaziantep or

19   flights to Gaziantep or crossing borders after June 5, 2015.

20   Do you remember those questions?

21   **A.**   I do.

22   **Q.**   I think your answer was there were no searches of that

23   nature after June 5 of 2015.

24   **A.**   Correct.

25   **Q.**   Do those searches -- are those -- those searches reflected

**REINKE - REDIRECT / HASIB**

1  anywhere else on your timeline?

2  **A.**   They are.

3  **Q.**   Is there, for example, a search for Gaziantep airport on

4  your timeline?

5  **A.**   There is.

6  **Q.**   Can you just point the jury to where the Gaziantep airport

7  reference is in your timeline?  Let me direct your attention to

8  page 2.

9  **A.**   There are references to it on page 2 and page 9.

10  **Q.**   Is that where you're referring to directions to Istanbul

11  and directions to Gaziantep, Turkey?

12  **A.**   Correct.

13  **Q.**   The bottom of page 9?

14  **A.**   Correct.

15  **Q.**   Special Agent Reinke, the beginning of Mr. Fakhoury's

16  cross-examination he asked you about some surveillances and

17  some FBI interviews that did not occur -- I'm sorry -- that did

18  not appear on your timeline.  Do you remember those questions?

19  **A.**   I do.

20  **Q.**   Have you reviewed the surveillance logs and the

21  surveillance history over the course of this investigation?

22  **A.**   I have.

23  **Q.**   And is there any reason why those don't appear on your

24  timeline as significant events?

25  **A.**   Because they were not of relevant evidentiary value of

1  enough weight to put on here.

2          MR. FAKHOURY:  Sorry.  Objection to the

3  characterization.

4          THE COURT:  Overruled.  You asked the question.

5  BY MR. HASIB:

6  Q.  I think you can answer the question.  Why were they -- why

7  did you not include those surveillances on your FBI -- on your

8  timeline?

9  A.  Because typically when we conduct physical surveillance, I

10 would say 99.9 percent of them are innocuous; persons going

11 about their day.  Grocery store, driving for Uber, going to

12 school, doing the things that would be expected -- not that we

13 would expect, but just typical day-to-day life stuff.

14 Q.  And are you basing that on your experiences doing

15 surveillances in this case?  Or your general experience as an

16 FBI agent?

17 A.  I have not conducted any surveillance operations on this

18 particular case, but I'm basing that off of my multiple

19 surveillance shifts that I've gone on.

20 Q.  Did you review the surveillance logs that occurred in this

21 case?

22 A.  I have.

23 Q.  Mr. Fakhoury asked you some questions about a MacBook.

24 Did you review a forensic image of a MacBook in this case?

25 A.  I did.

1   **Q.**   And did you recover any items of investigative

2   significance to you from that MacBook?

3   **A.**   I did.

4   **Q.**   Did you also review forensic image of a Samsung Galaxy S4?

5   **A.**   I did.

6   **Q.**   Were those, both electronic devices, seized from the

7   residence of Mr. Shafi?

8   **A.**   Yes.  They were both seized on July 3, 2015.

9   **Q.**   Did you do any comparison as to the information that you

10  derived from the MacBook as opposed to the information you

11  derived from the Samsung Galaxy S4?

12  **A.**   I did.

13  **Q.**   What comparison did you do and what were the results of

14  that comparison?

15  **A.**   The items that were of evidentiary value to the case were

16  on both devices, for the most part.

17  **Q.**   Mr. Fakhoury asked you some questions about particular

18  messaging applications.  Do you remember those questions?

19  **A.**   I do.

20  **Q.**   I don't want you to go into any secrets of the FBI.  But

21  in general, are there applications that the FBI has trouble

22  intercepting or tracking?

23  **A.**   There are many, yes.

24  **Q.**   And if -- in your experience if an application, a

25  messaging application, is deleted from someone's phone, would

1    that show up on the forensic image of the phone when you

2    capture the phone?

3    **A.**   It would not.  So for instance --

4              **THE COURT:**  I think you've answered the question.

5              **MR. HASIB:**  Ms. Yee, can you pull up Exhibit 137-183,

6    Ms. Yee.  If you zoom in on the bottom third of that -- lower

7    down.  Lower down.  Lower down.  Sorry.  From about row 7810

8    down.

9    **BY MR. HASIB:**

10   **Q.**   Do you remember answering some questions about this part

11   of the Google spreadsheet with Mr. Fakhoury?

12   **A.**   I do.

13   **Q.**   And do you remember he asked you some questions about the

14   searches on August 22, 2004 (sic), regarding the formatting of

15   hard drive searches?

16   **A.**   I do.

17   **Q.**   Where in relation -- do you recall what date Adam Shafi

18   returned to the United States from Egypt and Turkey?

19   **A.**   August 20, 2014.

20   **Q.**   Do you see any searches reflected in that search history

21   from August 20 to August 22, 2014?

22   **A.**   I do not.

23   **Q.**   What's the first search that occurs on August 22, 2014?

24   **A.**   Reflexatron@gmail.com conducted a search for how to

25   restore a Mac with a password.

1   **Q.**   Special Agent Reinke, Mr. Fakhoury asked you some

2   questions about searches that were done for --

3       Scratch that, Your Honor.  Sorry about that.

4           **MR. HASIB:**  May I have the Elmo, Ma'am Clerk?

5       And Ms. Yee, if you could pull up Government Exhibit

6   7-003, the clip that you -- 7-003.  Don't play it just yet.

7   **BY MR. HASIB:**

8   **Q.**   Special Agent Reinke, do you recall hearing an audio a

9   moment ago about a conversation between Mr. Shafi and Mr. Karim

10  where they discussed Israel?

11  **A.**   I do.

12  **Q.**   And that was Government Exhibit -- that was Government

13  Exhibit 7?

14  **A.**   Yes.

15  **Q.**   And the transcript was Government Exhibit 23?

16  **A.**   That's correct.

17  **Q.**   Ms. Yee, if you could go ahead and play that clip, please.

18  Hold on a second.

19              (Audio was played but not reported.)

20  **Q.**   There is a discussion there about Syria, Special Agent

21  Reinke.

22  **A.**   There is.

23          **MR. HASIB:**  Your Honor, no further questions for

24  Special Agent Reinke.

25          **THE COURT:**  All right.

PROCEEDINGS

1          MR. FAKHOURY:  I have, like, one question.

2          THE COURT:  Go ahead, Mr. Fakhoury.

3                  **RECROSS-EXAMINATION**

4   BY MR. FAKHOURY:

5   **Q.**   You testified just now on redirect about a search for

6   Gaziantep on page 9 of your timeline.  Do you recall that?

7   **A.**   Correct.

8   **Q.**   And that's the search on May 31, 2015, right?

9   **A.**   Correct.

10  **Q.**   Okay.

11         MR. FAKHOURY:  That's all I wanted to ask, Your Honor.

12  Thank you.

13         THE COURT:  All right.  Agent Reinke, you're -- oh,

14  maybe not.

15      (Off-the-record discussion between counsel.)

16         MR. FAKHOURY:  The witness can be excused, Your Honor.

17  I think I mentioned an exhibit incorrectly and we're trying to

18  sort that out.

19         THE COURT:  Okay.  You can step down.  Thank you.

20         THE WITNESS:  Thank you, Your Honor.

21         MR. FAKHOURY:  Just wanted to clarify one thing in the

22  record, Your Honor.  I played a clip that I called clip 11.  I

23  had -- I referred to it as Exhibit 6, and the transcript as

24  Exhibit 22.  And the audio is actually Exhibit 9, and the

25  transcript is Exhibit 25.

1            THE COURT:  Okay.

2            MR. FAKHOURY:  Thank you.

3            THE COURT:  Thank you.

4            MR. HASIB:  Government calls Dr. Lorenzo Vidino to the

5    stand.

6            THE COURT:  Well, before we do that, let's go over to

7    the side for just a second.  And I don't need the --

8            A JUROR:  Can I go to the restroom?

9            THE COURT:  Yes.  Let's take a five-minute break right

10   now.  So we'll be in recess for five minutes.

11                   (Recess taken at 12:20 p.m.)

12              (Proceedings resumed at 12:25 p.m.)

13   (The following proceedings were held in open court, outside the

14   presence of the jury:)

15           MS. LaPUNZINA:  Your Honor, we just checked with the

16   expert witness and he changed his plans in the meantime.  So he

17   is available for Tuesday, and no longer available on Wednesday.

18   So I apologize.  I'm glad we checked.

19           THE COURT:  Yeah.  That's better.

20           MR. FAKHOURY:  That's fine with us.

21           THE COURT:  Shall we still follow the same timeline?

22   Which is to have him start on Tuesday morning?

23           MS. LaPUNZINA:  Yes, Your Honor.

24           MR. FAKHOURY:  (Nod affirmatively.)

25           MR. MATTHEWS:  (Nod affirmatively.)

1          **THE COURT:**  Great.

2       (The following proceedings were heard in open court in the

3    presence of the jury:)

4          **THE COURT:**  All right.  Please be seated, everybody.

5       Ladies and gentlemen, I have a Labor Day special for you.

6       I appreciate very much your flexibility in being able to

7    stay an extra hour, but because of timing and scheduling we're

8    going to let you go today now and then we'll come back on

9    Tuesday morning at 8:00.  And the lawyers were particularly

10   concerned that they wanted to make sure that you had some lunch

11   before you heard the next witness.  So we'll just let things go

12   as it is.

13      The admonitions are very important.  You have heard now a

14   lot of evidence, and I guess the first thing that I should say,

15   is this case is moving along quite well, and so you don't have

16   -- this case will certainly be resolved well within the time

17   frame that I told you on Monday.

18      And then the second thing is it's really important over

19   this Labor Day weekend, put this case to the side in your

20   minds.  Don't do any research, don't talk about it.  All of the

21   things that I've told you are just very important.  Because

22   you've heard a lot, but you haven't heard everything.  And it's

23   very important that you keep an open mind throughout the case.

24   There's more to come next week.  I promise you.  And until all

25   of the evidence is in, until the lawyers have had a chance to

1   tell you what they think you've heard and should know, until I

2   give you the instructions on the law, and until then you start

3   to talk with each other about what you've learned and what you

4   see and how you think the -- what you think the evidence shows,

5   you just don't want to jump the gun on that.  So that's very

6   important.

7         So with all of those admonitions I hope you have a

8   terrific weekend and that you come back at least by five

9   minutes before 8 on Tuesday morning when we'll continue.

10  Thanks very much.  Have a good weekend.

11        (The jury exiting the courtroom.)

12  (The following proceedings were held in open court, outside the

13  presence of the jury:)

14        **THE COURT:**  All right.  Please be seated, everybody.

15  I don't know whether there's -- I gave you my initial thoughts

16  about the jury instructions and I don't know whether anybody

17  wants to say anything now, whether you want to reserve and we

18  can meet again on Tuesday afternoon.  So what's -- what's your

19  pleasure?  And I'll start with the defense because --

20        **MR. FAKHOURY:**  Certainly Your Honor, I appreciate

21  that.  It would be my request if we could hold off until

22  Tuesday.  Obviously we got the Court's tentatives.  I didn't

23  actually have a copy of the instructions.  I scrambled to get

24  some.  So if I could at least have a little bit of time to

25  think it through and make a record that would be my request if

1    it's okay with the Court.

2         THE COURT:  That's fine.

3         MS. LaPUNZINA:  We, as well.  We don't have a copy

4    with us in the courtroom, Your Honor, so we'd prefer to have

5    until Tuesday afternoon to take a look at what we requested

6    compared to what Your Honor indicated.  And we'd be in a better

7    position to comment.

8         THE COURT:  Okay.  So do agree on the verdict form if

9    you can by Tuesday afternoon.  And then my thought would be --

10   depending on how much argument that there is on it, and you can

11   tell me that in the morning, we could either do it right after

12   court at 1:00 or it would have to lag after my case management

13   conferences, so more like 3:00.  But we should do it --

14   definitely do it on Tuesday.

15        MS. LaPUNZINA:  Thank you, Your Honor.

16        MR. MATTHEWS:  Thank you, Your Honor.

17        THE COURT:  Everybody have a good weekend.

18        MS. LaPUNZINA:  Your Honor, we have one more issue.

19   If we could please ask for the time being if the last sidebar

20   we had, which preceded a stipulation relating to the calls, if

21   we could ask that be placed under seal right now until I

22   confirm whether or not any further order of the Court is

23   necessary to protect that record.

24        THE COURT:  Okay.  Yes.

25        MR. HASIB:  I think whether Mr. Hasib should be

**PROCEEDINGS**

1    reprimanded by the Department of Justice.

2            **THE COURT:**  Well, better you than me.  But, yes, we'll

3    put that under seal and then see what we need.

4            **MS. LaPUNZINA:**  We'll look into it Your Honor.

5            **MR. FAKHOURY:**  Thank you, Your Honor.

6            **THE COURT:**  Thank you all.

7        (Court adjourned at 12:30 p.m.)

8                        ---oOo---

**CERTIFICATE OF REPORTER**

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, October 16, 2018

_____/s/Vicki Eastvold_____

Vicki Eastvold, RMR, CRR
U.S. Court Reporter