**Volume 5**

**Pages 572 - 752**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )        **NO. CR 15-582 WHO**
                                 )
Adam Shafi,                      )
                                 )
          Defendant.             )
_____)

                        San Francisco, California
                        Tuesday, September 4, 2018

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          United States Attorney's Office
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:  **S. WAQAR HASIB, ESQ.**
                        **ELISE LAPUNZINA, ESQ.**


For Defendant:          Office of the Federal Public Defender
                        1301 Clay Street, Suite 1350N
                        Oakland, CA  94612
                  BY:  **HANNI M. FAKHOURY, ESQ.**
                        **JEROME E. MATTHEWS, ESQ.**



Reported By:  Vicki Eastvold, RMR, CRR
              Official Reporter

## I N D E X

Tuesday, September 4, 2018 - Volume 5

| **PLAINTIFF'S WITNESS** | **PAGE** | **VOL.** |
|---|---|---|
| **VIDINO, LORENZO** | | |
| (SWORN) | 582 | 5 |
| Direct Examination by Ms. LaPunzina | 582 | 5 |
| Cross-Examination by Mr. Fakhoury | 621 | 5 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **KEENAN, MATTHEW** | | |
| (SWORN) | 649 | 5 |
| Direct Examination by Mr. Matthews | 649 | 5 |
| Cross-Examination by Ms. LaPunzina | 655 | 5 |
| **SHAFI, NOAH** | | |
| (SWORN) | 657 | 5 |
| Direct Examination by Mr. Matthews | 657 | 5 |
| Cross-Examination by Ms. LaPunzina | 665 | 5 |
| **LARSEN, MADELINE** | | |
| (SWORN) | 668 | 5 |
| Direct Examination by Mr. Matthews | 668 | 5 |
| Cross-Examination by Ms. LaPunzina | 691 | 5 |
| Redirect Examination by Mr. Matthews | 699 | 5 |
| **SAGEMAN, MARC** | | |
| (SWORN) | 700 | 5 |
| Direct Examination by Mr. Fakhoury | 700 | 5 |

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 22 | | 643 | 5 |
| 136 | | 589 | 5 |
| 144 | | 576 | 5 |
| 1012 | | 675 | 5 |
| 1016 | | 679 | 5 |
| 1018 | | 672 | 5 |
| 1020 | | 709 | 5 |

1   **Tuesday - September 4, 2018**                    **7:52 a.m.**

2                   **P R O C E E D I N G S**

3                        **---000---**

4   (The following proceedings were held in open court, outside the

5   presence of the jury:)

6          **THE COURT:**  All right.  Let's get going.

7       Good morning, Mr. Shafi.

8          **MR. HASIB:**  Good morning, Your Honor.

9          **THE COURT:**  Okay.  Two things.  The first is the

10  Cellebrite software extraction report.  And as I indicated a

11  moment ago off the record, it seems to me that the foundation

12  was properly laid by Agents Miller, Posadas, and

13  Thirumalainambi.  And the objection was that it was a police

14  report.  I don't agree with that analysis.  It seems much more

15  like a record from a phone company that doesn't include any

16  discretionary insights regarding an investigation.  And there

17  hasn't been a dispute over its accuracy.

18      The exhibit that was offered was Exhibit 144 which was a

19  subset of the text on that phone, which was I think part of

20  Exhibit 139.  If the defense wants to offer to move 139 or, you

21  know, the entirety of the texts into evidence instead of the

22  subset that the government offered, I would do that because

23  it's a more complete document.  But if not, I'll admit 144.

24          **MR. FAKHOURY:**  I think, Your Honor, obviously without

25  waiving our objection, our preference would be 144, the smaller

1    subset, to come in rather than 139, I think was the number.

2         **THE COURT:**  Okay.

3         **MR. HASIB:**  Yeah.  We're on board with that, Your

4    Honor.

5         **THE COURT:**  All right.  So 144 will be admitted into

6    evidence over objection of the defense.

7         **MR. FAKHOURY:**  Thank you, Your Honor.

8       (Trial Exhibit 144 received in evidence)

9         **THE COURT:**  Then the second thing is the motion to

10   compel which the government filed.  And my pre-trial order

11   requires parties to give advance notice of their witnesses just

12   a day before, just 2:00 p.m. the day before, and that's for the

13   orderly administration of justice.  It's to be fair to both

14   parties.  And I understand that the defense decided on its own

15   not to provide that notice.  And I don't understand that.

16        **MR. FAKHOURY:**  Well, Your Honor, I think -- first of

17   all, let me make clear.  It's obviously not our intention to

18   willfully disregard the Court's orders, and we've absolutely

19   tried our best to follow each and every order that the Court

20   has set forth, including in the pre-trial order and all the

21   other orders that the Court has issued in the course of the

22   case.  So to the extent the Court feels we were being --

23   flagrantly attempting to disregard or acting in bad faith, that

24   is not our intention.

25        Our intention was -- the way we read the pre-trial order

1   was there were several defense obligations in terms of

2   producing exhibits, for example.  And those conditions -- those

3   obligations were conditioned on -- consistent with the

4   defendant's right to an effective defense.

5       And it's our view -- and I understand the Court maybe

6   doesn't share that view -- but it's our view that in order to

7   effectively present a defense we are not obligated to produce

8   our witness list ahead of time.  We are obviously, under Rule

9   16, required to produce documents and exhibits which we intend

10  to use with our witnesses, which we've done.  Both on August 6

11  when the exhibits were due, as well as yesterday once we had

12  finalized which witnesses we intended to call.  We sent to the

13  government the exhibits that we intend to use today.  So there

14  should hopefully be no surprises.

15      We don't see anything in Rule 16 that requires us to

16  produce our witness list ahead of time.  And again, you know,

17  there's no bad faith on our part.  And to the extent the Court

18  feels that we were being -- willfully disobeying the Court's

19  order, that's obviously not our intention.  And I apologize if

20  that's the impression that was given off.

21      I think as Mr. Hasib --

22          **THE COURT:**  Still is, Mr. Fakhoury.

23          **MR. FAKHOURY:**  Well, I can -- I understand, Your

24  Honor.  And I will add that, you know, obviously if the Court

25  wants us to turn over our witnesses we're prepared to do that.

 1   And we will do that if that's what the Court orders us to do.

 2        **THE COURT:**  I ordered you to do that before,

 3   Mr. Fakhoury.  Now we're placed in the situation where we have

 4   Mr. Vidino, we have a jury that's here.  Mr. Vidino will

 5   finish, I suspect, before the end of the day, and you haven't

 6   told the government who the witnesses are.  And so do we have

 7   to take a break?  What are -- I mean, how is this -- well, it's

 8   not appropriate, and it's directly contrary to my order.

 9        **MR. MATTHEWS:**  Your Honor, I'm going to take some

10   responsibility for this as well.  This is something we

11   discussed at length and --

12        **THE COURT:**  I don't -- fine.  You can both fall on the

13   sword.  So now I've got to figure out what to do about this.

14        **MR. FAKHOURY:**  Well, two things, Your Honor.  Number

15   one, I don't see there being any delay.  I anticipate we'll

16   finish our case today.  Number two, just to make a record on

17   this, you know, the -- it is for this reason why the government

18   gets a rebuttal case.  And that's where they can respond to

19   things that they're unable to respond to on the fly in the

20   defense case.

21        In any event, it is very clear the Court wants a witness

22   list produced, and we will produce it to the government.  I

23   think we've made a record that we don't feel that we're

24   obligated to do it; but, again, if the Court wants us to do it

25   we'll do it.  So I have a list, I will produce it to Mr. Hasib

1    and Ms. LaPunzina right now.

2              THE COURT:  All right.  Why don't you do that.

3              MR. FAKHOURY:  Sure.

4              THE COURT:  And then the question is do you have the

5    capacity to examine these witnesses?

6              MR. HASIB:  So two of them I'm not sure I recognize.

7         (Off-the-record discussion between counsel.)

8              MR. HASIB:  Your Honor, so I've just looked at the

9    list.  Let me first just reiterate what we said at the end of

10   our motion.  We've had only the most professional and courteous

11   relationships with Mr. Fakhoury and Mr. Matthews.  We expect

12   that to continue.  We see them obviously in other cases.  So we

13   were not suggesting in any way they were acting out of bad

14   faith or anything of that nature.

15        I think I've been through enough trials in this district I

16   know what was going on last night.  It was attempt to sort of

17   make the government think on the fly a little bit and little

18   unprepared.  And, you know, I think that's what Your Honor's

19   order was intended to sort of avoid.

20        So here we are looking at a list of names, at least one,

21   two -- two of them I've never seen before.  We need a little

22   bit of time to figure out who these people are and do some

23   basic research on what we're going to cross-examine them about.

24        So I would ask what we suggested in our motion, which

25   is -- they gave us fair notice of Dr. Sageman who's going to be

1    called.  I saw him out in the court just now.  He's a very nice

2    man, by the way.  Call him first, and then give us at least a

3    little bit of time.  We have agents who are not testifying and

4    who can go and do whatever research we need to do at least, you

5    know, in the time that Dr. Vidino and Dr. Sageman are

6    testifying.

7        So give us that opportunity and I think we'll be prepared

8    to have Mr. Keenan, Mr. Shafi -- Mr. Noah Shafi -- Mr. Pinner

9    and the defense investigator testify.  But we got to have at

10   least a little bit of opportunity to dig around a little bit.

11       **THE COURT:**  So do you need Mr. Sageman to testify

12   after these witnesses?

13       **MR. FAKHOURY:**  It's our preference, but it is not

14   required, is how I would pitch it.  He could -- he could

15   theoretically testify first and that would not affect the

16   testimony from the other witnesses.  Again, it's our

17   preference.  We should have a right to call the case the way we

18   want to call it.  But, again, our preference is to have

19   Dr. Sageman go last.  But if the Court orders him to go first,

20   he'll go first.

21       **THE COURT:**  All right.  Well, if the government isn't

22   ready by the time that they rest, then Mr. Sageman should go

23   first.

24       **MR. FAKHOURY:**  Understood.

25       **THE COURT:**  And I thoroughly agree with you that you

1  should have the ability to put your witnesses on in the right

2  order and in the order that you prefer.  But -- and I also

3  think that I've been so impressed by the way that you've

4  presented your case and the way that you've worked together in

5  this case.  So I have high regard for the lawyers here.  But

6  I'm not happy about people who don't follow my orders.

7        (Off-the-record discussion with the deputy clerk.)

8        **MR. HASIB:**  One quick thing for the record.  Been

9  subject of some discussion before.  I notice Mr. and Mrs. Shafi

10  are in the audience.  We've been notified earlier today,

11  actually, but also by this list, that they are not going to be

12  witnesses.  Again, the government's very appreciative and

13  impressed with their dedication to be here.  We have no

14  objection to their being here as we've been advised they're not

15  going to be witnesses.

16        **THE COURT:**  Good.  All right.

17              (Recess taken at 8:03 a.m.)

18              (Proceedings resumed at 8:09 a.m.)

19     (The following proceedings were heard in open court in the

20  presence of the jury:)

21        **THE COURT:**  All right.  Please be seated, everybody.

22     Morning, ladies and gentlemen.  I hope you had a good

23  Labor Day weekend.  We're back here and the government is

24  presenting its next witness.

25        **MS. LaPUNZINA:**  The government calls Lorenzo Vidino.

1    **LORENZO VIDINO,**

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4        **THE CLERK:**  Go ahead and have a seat.  Make yourself

5    comfortable there, make sure you speak clearly into the

6    microphone for our court reporter, and a little bit slowly for

7    the court reporter.

8        Can you please state your full name for the record and

9    spell your last name.

10       **THE WITNESS:**  Sure.  Lorenzo Giuseppe Vidino.  That's

11   V-I-D-I-N-O.

12       **THE CLERK:**  Thank you.

13                       **DIRECT EXAMINATION**

14   BY MS. LaPUNZINA:

15   **Q.**   Good morning.

16   **A.**   Good morning.

17   **Q.**   Would you please tell the jury about your educational

18   background and a little bit about yourself?

19   **A.**   Sure.  Well, I grew up in Italy.  Might pick up on the

20   accent.  And I have a law degree from the University of Milan

21   in Italy.  I moved to the states and I basically acquire the

22   master degree and a Ph.D in international relations with a

23   focus on the Middle East from the Fletcher School at Tufts

24   University in Boston.

25   **Q.**   In between those programs or afterwards, did you have any

**VIDINO - DIRECT / LAPUNZINA**

1  work experience?

2  **A.**   Yes.  I did work.  Basically, been working on and off for

3  the last 20 years on terrorism-related matters.  I was a fellow

4  at a variety of institutions.  Was a fellow at the Harvard

5  University Kennedy School of Government, at the RAND

6  Corporation, at the United States Institute of Peace.  I spent

7  a few years in Europe working and teaching at the Polytechnic

8  in Zurich in Switzerland.

9  **Q.**   What has been the focus of our training?

10  **A.**   My academic training is basically on social sciences,

11  international relations, with a focus on political violence and

12  Middle Eastern affairs.  Basically, I've been studying

13  terrorism, radicalization, for the last 20 years.

14  **Q.**   If I could draw your attention to what you're currently

15  doing.  I believe you work at a program on extremism at George

16  Washington University?

17  **A.**   That's correct.  I founded the program on extremism in the

18  spring of 2015.

19  **Q.**   Would you please tell us what it is?

20  **A.**   It's a research outfit based out of the university.  What

21  we do, we're basically a small team of around eight full-time

22  employees and around a dozen research assistants, interns, that

23  do research on everything that has to do with extremism and

24  radicalization, mostly in the U.S.

25  **Q.**   Would you please explain to us what those two terms mean

1   and how you do your research?

2   **A.**   Sure.   I use them a lot.   Generally speaking, although

3   you're going to find different definitions given by different

4   scholars, radicalization is the process through which an

5   individual adopts an extremist world view, and that includes

6   also legitimizing the use of violence to achieve political

7   goals.   So it's how people become radical.   In some cases, they

8   make the leap into terrorism.   And terrorism is the action

9   through which people use violence to achieve a political goal,

10   basically.

11       So what we do at the center is we study how these

12   processes take place, how people -- mostly in the U.S. but not

13   only -- embrace extremist ideologies and engage in violence.

14   **Q.**   When you say you study it, how exactly do you do it?

15   **A.**   Well, we try to use different methods.   In a way, some

16   very academic, some slightly less orthodox from academic point

17   of view, closer in a way to journalism, if you will.

18       Our main focus is, let's say, *jihadist*-related motivated

19   radicalization in the U.S.   So ISIS, al-Nusrah, other groups,

20   and how Americans in particular have come to embrace the

21   ideology and mobilize whether that means carrying out attacks

22   in the United States or traveling to Syria and Iraq.

23   **Q.**   You used the term *"jihadist."*   Sorry to interrupt you.

24   But if you could please explain what you mean by *"jihadist."*

25   **A.**   Sure.   It's, basically, an extremist ideology that uses

1   and abuses the religion of Islam and cherry-picks certain

2   concepts to achieve a political goal.  It's fringe of a fringe

3   of a fringe of what is mainstream Islam and its political

4   ideology that makes violence against older enemies one of their

5   cornerstones.

6       So there are in the United States, like many other western

7   countries, a few individuals -- in the hundreds, a few

8   thousands -- that embrace this ideology.  What we do is we try

9   to study who these individuals are, what are the processes that

10  led them to embrace this ideology, and how they mobilize.  That

11  means how they try to join groups in the Middle East, how they

12  carry out attacks in the United States.

13      So, basically, all their actions from A to Z.  From the

14  moment they are not radicalized, they do not even know the

15  ideology, so how do they first get in touch with the ideology,

16  all the way to when they carry out an act of terrorism.

17  **Q.**   Going back to the original question which was how do you

18  do your research.  If you could please explain to us.

19  **A.**   Sure.  We use multi methods, as I said.  I would say

20  there's three big parts to what we do.  The first part is

21  trying to get as many documents as possible.  We're big

22  believer in primary sources.  Basically, we try to get court

23  records, we try to get indictments, we try to get all kind of

24  documents that pertain cases in the United States.  And we

25  analyze them, we study them.  So one big part is really working

1   on documents.

2       The second part is we try to integrate those written

3   records with interviews.  With meeting with people who are in

4   different ways involved in those cases.  That means traveling a

5   lot around the country and meeting with the FBI agents who

6   worked the cases, the defense lawyers, the individuals

7   themselves who are involved in these activities, when possible.

8   The families.  Journalists who have investigated the case.

9   Anybody who has some knowledge on the case.  And we try to put

10  that knowledge together with what comes from the documents.

11      The third part of what we do is we look a lot at online

12  activities.  Radicalization nowadays take place quite a bit on

13  the internet.  So we have a small team, two senior researchers

14  and six or seven junior researchers, that are basically on two

15  platforms online.  Twitter and Telegram.  Used to be Facebook.

16  Now less.  But basically monitoring, observing, that bubble, if

17  you will, of American English-speaking *jihadist* sympathizers.

18  Individuals which are active online discussing this ideology.

19      And from which -- it's from that bubble that many of the

20  individuals who have carried out attacks in the U.S. or

21  traveled to Syria come from.  So we try to put all these

22  different sources of information together and do analysis that

23  we, basically, then provide to policymakers, to law enforcement

24  agencies, and to the general public.  We work a lot with the

25  media.  We make, basically, everything we do public.  And we

1  believe a lot in public dissemination.

2  **Q.**    Have you testified in court before?

3  **A.**    Yes, I have.

4  **Q.**    Have you been qualified as an expert witness before?

5  **A.**    Yes, I have.

6  **Q.**    Approximately how many times have you testified as an

7  expert?

8  **A.**    This is my fourth time.

9  **Q.**    Do you get compensated for your expert testimony?

10 **A.**    I do.

11 **Q.**    How much do you get compensated for it?

12 **A.**    It's $250 an hour.

13 **Q.**    Have you been paid in connection with your testimony in

14 this case?

15 **A.**    Not yet.

16 **Q.**    How much do you expect to get paid in connection with your

17 testimony in this case?

18 **A.**    I didn't crunch the numbers.  Probably, I would say,

19 around $10,000.

20 **Q.**    Now, you just mentioned that you disseminate the

21 information from the program.  Would you please tell us about

22 the type of work you do aside from testifying in court as an

23 expert witness?

24 **A.**    Yeah.  We do, let's say, one part of the dissemination is

25 providing briefings and lectures to different audiences that

1    range from -- at the universities I go and lecture to a variety

2    of academic audiences.  To policymakers.  We give briefings to

3    different members of Congress on a regular basis.  I have

4    personally testified several times before both the Senate and

5    the House.

6         We provide those briefings also to a variety of law

7    enforcement intelligence agencies, whether in the United States

8    or abroad.  We also do a lot of work with the media.  So we are

9    often quoted in mainstream media ranging from *New York Times* to

10   PBS, CNN, as sources of information.

11        What we do is because we are very empirical basis, we're

12   very fact basis, our numbers, our analysis, are very frequently

13   used by media.

14   **Q.**   If you could please open your binder and go to tab 136.  I

15   believe this is your résumé, is that right?

16   **A.**   Correct.

17   **Q.**   Did you prepare this?

18   **A.**   I did.

19   **Q.**   And does it accurately summarize your educational

20   background, your professional experience, and all of your

21   publications?

22   **A.**   It does, yes.

23        **MS. LaPUNZINA:**  The government would move Exhibit 136

24   into evidence.

25        **MR. FAKHOURY:**  No objection.

1          **THE COURT:**  It's admitted.

2      (Trial Exhibit 136 received in evidence)

3          **MS. LaPUNZINA:**  The government offers Dr. Vidino as an

4  expert witness.

5          **MR. FAKHOURY:**  No objection.

6          **THE COURT:**  All right.  You may proceed.

7  BY MS. LaPUNZINA:

8  **Q.**  Dr. Vidino, you mentioned earlier you had researched

9  certain groups, and you mentioned al-Nusrah Front.  Would you

10  please tell us what the al-Nusrah Front is?

11  **A.**    Sure.  Al-Nusrah is a designated terrorist organization

12  that started, let's say, around the end of 2011, beginning of

13  2012, basically as an offshoot of what is now known as ISIS.

14      It's a very complicated story, but to make it short ISIS,

15  which at the time was simply known as ISI, Islamic State in

16  Iraq, had been operating in Iraq for a long time.  Basically

17  throughout the 2000s.  Second part of the 2000s.

18      In 2011, the Syrian civil war begins.  What we still --

19  what's still ongoing.  Civil conflict in Syria begins.  And

20  different groups start fighting the regime in Syria.

21      The Islamic State in Iraq, led by Abu Bakr al-Baghdadi,

22  decides it would be important for them to have a force fighting

23  in neighboring Syria.  Iraq and Syria have a long border.  And,

24  basically, since -- one man who had been a prominent leader of

25  ISI, of ISIS, in Iraq, a guy named Mohammad al-Joulani, sent

1    into Syria to lead a small group, a vanguard, of members of

2    ISIS to fight in Syria.

3        That group becomes, from the very beginning, very

4    effective on the ground in Syria.  It's a time where there's

5    many, many different militias fighting in a very uncoordinated

6    way in Syria to try to defeat the regime there.  Al-Nusrah

7    emerges as one of the best organized.  It's well-armed, it's

8    well-funded, and it's leaders are battle hardened.  They'd been

9    fighting for a decade in Iraq.  They know how to -- they know

10   insurgency.  They know how to do things.  They know how to

11   perform militarily.  So al-Nusrah emerges as one of the most

12   effective forces there.

13   **Q.**   You were just saying that they're well funded and they're

14   organized.  Would you please explain what you mean by that?

15   **A.**   Well, sure.  Starting off -- yeah, most of the other

16   forces in Syria were, as I said, somewhat improvised.  They

17   were a group of mostly Syrian citizens fighting against a

18   regime they wanted to overthrow.  They didn't have the

19   international connections that a group like ISIS, and therefore

20   al-Nusrah, had.  They could leverage the weapons, the donors,

21   the financial backers, that other *jihadist* groups globally has

22   had for a long time.  So they, basically, were able to rely on

23   funding coming mostly from the Middle East, from the Arab gulf

24   and, basically, rely on funds to allow them to buy off other

25   militia groups so that maybe other militia groups joined them

1  because they were, basically, the most powerful, the best

2  financed, and the ones with the most weapons.

3  **Q.**  Now, you mentioned that ISI and al-Nusrah were fighting

4  against a regime in Syria.  Which regime was that?

5  **A.**  Bashar al-Assad's Regime.

6  **Q.**  Now if you could go back a little bit and explain to us

7  how you know these details about how ISI was functioning and

8  how al-Nusrah was functioning.

9  **A.**  Well, sure.  It's a fairly well-known story.  First of

10  all, these groups themselves put out a lot of propaganda that

11  tells a lot of this dynamics.  Now, of course, one has to take

12  propaganda coming from these groups with a pinch of salt.

13      But at the same time there's a lot of other evidence

14  coming from different sources, whether it's governments; which

15  also again one has to take a pinch of salt.  There's a variety

16  of scholars who have written about these dynamics; the dynamics

17  of how ISIS established a presence in Syria.  And that presence

18  was al-Nusrah.  It's something that is, let's say, a well-known

19  fact.  Undisputed fact.

20  **Q.**  Now, you mentioned that the person who was sent on behalf

21  of al-Nusrah was al-Joulani?

22  **A.**  Al-Joulani, correct.

23  **Q.**  What is his full name?

24  **A.**  Mohammad al-Joulani.

25  **Q.**  And is he referred to as the leader of al-Nusrah?

1    **A.**    Yes.  He's been the leader from day one.

2    **Q.**    Is a leader sometimes referred to also as an *emir*?

3    **A.**    An *emir*, yes.  That's the word in Arabic.

4    **Q.**    Where is al-Nusrah Front present in the world?

5    **A.**    Well, it's in, basically, most of the western and southern

6    parts of Syria.  Of course, since 2011 there's been many shifts

7    in the territory that al-Nusrah controls.  Nowadays there's a

8    battle taking place actually to dislodge al-Nusrah from the

9    region of Idlib.  But at some point it controlled fairly large

10   parts of western and southern Syria.

11   **Q.**    What are al-Nusrah Front's ideologies?

12   **A.**    The ideology is what I would generally refer, as using the

13   word I used earlier, sort of *jihadist* ideology.  It's an

14   ideology, but it's similar to the two groups that has strong

15   connections with ISIS and al-Qaeda.  It's part of this global

16   movement that basically adopts an almost identical ideology.

17   There's minor variations.

18        And the core beliefs of the ideology are that it is a duty

19   for all Muslims to create an Islamic regime.  And by "Islamic

20   regime" they mean a regime that strictly enforces Islamic law.

21   That any regime that does not rule by Islamic law -- and,

22   again, by a very strict interpretation of Islamic law -- is

23   illegitimate and is against god.  And that violence is

24   justified, and actually the best mean to achieve that goal of

25   establishing a regime.

1    And they argue at the individual level it's a duty for

2 everybody to fight in order to achieve that goal, and that

3 dying in the cause, dying in the process, is one of the biggest

4 honor, one of the biggest rewards, an individual Muslim can

5 have.

6    Now, obviously, this is very fringe in Islamic theology.

7 The vast, vast majority of Muslims would reject this ideology

8 and this mindset, but it is still a group, like ISIS, like

9 al-Qaeda, that has tractions in certain milieus.

10 Q.   What are the tactics employed by al-Nusrah Front in order

11 to effect those ideologies?

12 A.   Well, uses a variety of tactics that range from military

13 insurgency to what we would commonly refer to as terrorism.  As

14 I said, one of the reasons why we've been successful on the

15 ground on Syria is the fact that they had a decade of

16 experience in insurgency, paramilitary tactics.  So they pose a

17 very serious threat to the Syrian military.  At the same time

18 they use tactics like suicide bombings which are more properly

19 defined as close to terrorism.

20 Q.   Who is the most prominent influential figure of al-Nusrah

21 Front in the west, like as in America or western Europe?

22 A.   As a figure?  Al-Joulani for sure.  Al-Joulani embodies in

23 himself al-Nusrah.  He's the leader and most well-known

24 al-Nusrah member in the west and everywhere.

25 Q.   Now, you said that -- you described al-Nusrah as being a

1    fringe-fringe view of Islam.  How does al-Nusrah reconcile its

2    tactics with the five pillars of Islam?

3    **A.**   Well, it argues that what they're doing is not just

4    compatible with Islam and with the tenets of Islam, but they

5    are actually better than the vast majority of Muslims who don't

6    get Islam right, if you will.  They, basically, see themselves

7    as a vanguard of individuals who are following Islam in the

8    right way, while everybody else is not.  And they do follow

9    what are the five pillars of Islam, the core tenets of Islam.

10        They ascribe to what is a common belief in the *jihadist*

11   war, not just al-Nusrah, but other groups would have it, that

12   there's a sixth pillar of Islam which is *jihad*.  *Jihad* is a

13   word that can have different meanings, but the way they

14   interpret it is fighting.  Military fighting.

15   **Q.**   Do they incorporate also the other principles?  For

16   example, helping others doing charitable work?  How do they

17   incorporate that?

18   **A.**   Absolutely.  They are very strict in how they interpret

19   Islam.  They try to be very literalist and follow all the

20   tenets of Islam.

21        But in their view -- and of course many Muslims would

22   disagree with that -- but in their view doing charity is not

23   incompatible in the least to the other violent activities

24   they're carrying out.  If anything, they're actually not only

25   duties from god they absolve, but they're also strategically

1   part of what they're trying to do.

2        What al-Nusrah and other groups have been trying to do is

3   control part of territory and create a state.  They fully

4   understand that in order to do that there's a military

5   component, which means fighting and liberating territory and

6   conquering and seizing the territory; but they also need to win

7   popular support.  They're going to control a population, and

8   you control the population if you win their sympathy, if you

9   help them, if you show good governance.

10       So exactly like ISIS with some differences.  But they,

11  basically, try to merge the two sides; the one that uses

12  violence with the one that shows compassion, mercy, and good

13  governance.

14  **Q.**   Based on your research have you seen any common

15  characteristics in individuals who support al-Nusrah?

16  **A.**   Well, I think one thing that needs to be said, that there

17  is no common profile of individuals.  Let's leave the analysis,

18  let's limit it only to Americans who join al-Nusrah.  And

19  there's been quite a few cases.  There's no common profile in

20  terms of socioeconomic background, age, walks of life,

21  patterns.  It's a very diverse bunch.

22       You could obviously argue that these are people who

23  embrace a certain ideology.  There is a bit of a distinction

24  between al-Nusrah and I would say its competitor, if you will,

25  when it comes to recruitment, which is ISIS.

1    Al-Nusrah tends to be more deliberate in the way it

2  pursues its goals compared to ISIS.  ISIS is very showy, very

3  flamboyant, if you will.  The big videos that we've seen over

4  the last years of people being burned in cages, the Hollywood

5  style beheadings, the very brutal violence in some cases for

6  the sake of violence that ISIS uses is not the way *Jabhat*

7  *al-Nusrah* operates.  Al-Nusrah tends to be -- likes to fly

8  under the radar a bit more.  That doesn't mean they don't use

9  violence; they just don't glamorize it the way ISIS does.

10 **Q.**   Now, you've compared al-Nusrah to ISIS.  Does it have any

11 connections with al-Qaeda as well?

12 **A.**   Yeah.  It's again somewhat of a complex story.  But as we

13 said, al-Nusrah starts as an ISIS spinoff in Syria, basically.

14 What happens is that after al-Nusrah has this big success in

15 2012, beginning of 2013, al-Nusrah emerges as one of the most

16 powerful sources in Syria.

17    ISIS in Iraq, and its leader, Abu Bakr al-Baghdadi, want

18 to reclaim al-Nusrah, want to show the world al-Nusrah is part

19 of them.  So Baghdadi issued in April 2013 a statement

20 basically saying al-Nusrah is part of us, it's part of ISIS.

21    Al-Nusrah becomes resistant to that.  Joulani issues a

22 counter statement basically claiming the organization's

23 independence from ISIS and pledging allegiance to al-Qaeda.

24    It's around that time, so April 2013, that basically in

25 this global *jihadist* movement and this big jungle of

1  organizations that embrace this same ideology -- but of course

2  have somewhat different tactics and different perspectives --

3  there's a big split between ISIS on one side and al-Qaeda on

4  the other.  Al-Nusrah is sort of the reason why the two

5  organizations start fighting.  Al-Nusrah pledges allegiance to

6  al-Qaeda, becomes part of al-Qaeda.

7  **Q.**   Can you tell us what al-Qaeda is?

8  **A.**   Al-Qaeda is, until ISIS emerged, was the most powerful,

9  important *jihadist* terrorist organization.  It is the

10  organization that carried out the September 11, 2001, attacks

11  and many other attacks throughout the world in the last 20

12  years.

13  **Q.**   Where is al-Qaeda present?

14  **A.**   It has sort of its headquarters, if you will, its center

15  of gravity, between Afghanistan and Pakistan, but it has a

16  presence, its global affiliates, in many different parts of the

17  world.

18  **Q.**   Who is the current leader of al-Qaeda?

19  **A.**   Ayman al-Zawahiri, who had long been the right-hand man to

20  Osama bin Laden.  Once bin Laden died, al-Zawahiri became the

21  leader.

22  **Q.**   Who was al-Qaeda's most prominent, influential figure in

23  the west?

24  **A.**   There's difference, but I think -- unquestionably, Anwar

25  al-Awlaki had been traditionally, I would say, since at least

1  2002, 2003, the most influential voice for English language

2  speakers for individuals who embrace *jihadist* ideology.

3  **Q.**   Why was that?

4  **A.**   Al-Awlaki was -- he was -- until he died, was a very, very

5  prominent speaker for a variety of reasons.  First of all, he

6  was able to mix a very deep knowledge of Islamic theology, of

7  Arabic sources.  He was mother tongue Arabic speaker, but at

8  the same time he was by lingual.  He had grown up -- he was

9  born in the states.  He spent many years in the United States.

10  He was Yemeni-American citizen.

11      So he had this ability as a very gifted speaker to mix

12  these very sophisticated knowledge of the Quran, of different

13  Islamic texts, of Arabic poetry, with stuff that is the

14  day-to-day life of somebody who lives in the west.  So in the

15  same sentence he would tell you about a 12th century Islamic

16  scholar and how that relates to you if you worked the night

17  shift at Burger King.  That's kind of the way al-Awlaki was so

18  good in the way of having an impact on second, if not third

19  generation individuals born in the west, converts, people who

20  maybe didn't have a good knowledge of Arabic.

21      Add to that that he was a very gifted speaker, very

22  catchy, if you will.  And at the same time was one of the very

23  first clerics, idealogues, that understood the importance of

24  the internet.  So already in the early 2000s you would find

25  hundreds and hundreds of his lectures and articles on a variety

1   of platforms online.  And that still today that should be

2   fairly easy to find, al-Awlaki's material online.

3   **Q.**   So does he have the same impact after his death as he did

4   while alive?

5   **A.**   I would say -- difficult to quantify, but probably even

6   more.  Al-Awlaki became a martyr.  He was killed by the U.S.

7   government in a drone strike.  So in a way in that world, that

8   means achieving martyrdom.  That, you know, brings even greater

9   honor.  And his lectures are still very much available.  He's

10  still considered by people who, basically, are English first

11  language speakers the most influential idealogue.  And in a

12  sense, even the distinction between al-Qaeda and ISIS that I

13  was mentioning earlier, al-Awlaki was a leader in al-Qaeda, and

14  an idealogue in al-Qaeda, but ISIS reveres him, as well.  One

15  of the training camps that ISIS used to run in Syria was called

16  Camp al-Awlaki.  Al-Awlaki is extremely influential throughout

17  the *jihadist* world.

18  **Q.**   Have you ever heard him referred to as Sheikh Anwar?

19  **A.**   "Sheikh" is a title, honorary title, that is given to

20  people of importance.  So Sheikh Anwar would be very common for

21  al-Awlaki, yes.

22  **Q.**   Now, during the course of your research that you said

23  you've studied these three groups, approximately how many cases

24  of each have you studied?  Is there one more prominent than the

25  other?

1  **A.**   Well, there's been around 120 arrests of individuals

2  linked to ISIS, al-Nusrah, al-Qaeda over the last five years.

3  There's a few cases which are somewhat borderline, individuals

4  who are interested in both groups.  I would say probably the

5  split off is 60/40.  60 percent individuals who are linked or

6  interested in ISIS, 40 percent al-Nusrah.  That's more or less.

7  **Q.**   Do the three groups endorse violence in the same way?

8  **A.**   In very similar ways.  I would say there's some minor

9  distinctions.  As I said earlier, al-Nusrah is slightly more

10  deliberate.  Tries at least publicly to portray itself as not

11  as indiscriminate in its use of violence as ISIS is.  As I

12  said, it's ISIS the group that puts out these very gory videos

13  of beheadings and so on.  Al-Nusrah's videos are also extremely

14  violent, but it's not violence for the sake of violence.  It's

15  somewhat more nuanced.

16  **Q.**   You mentioned earlier the term "radicalization."  As a

17  result of your research have you found any commonalities in

18  individuals who have become radicalized?

19  **A.**   Well, as I said earlier, there's no common profile.

20  Different age ranges, different socioeconomic backgrounds,

21  different ethnic profiles, males and females.  It's really

22  impossible to draw a common profile.

23       There are, I would say, patterns when it comes to the

24  radicalization process, how individuals become radicalized.

25  Again, each trajectory is different, but you can find

1  similarities, patterns, in how people do so.

2  **Q.**   Can you please explain what that is?

3  **A.**   Yeah.  Well, you have, I would say, a small percentage of

4  individuals, and if we're limiting this analysis just to the

5  United States.  Of course, each country would have different

6  dynamics.  But in the United States, I would say you have a

7  relatively small percentage of people radicalized

8  independently.  That are individuals who are simply online.

9  They don't -- they're not part of any community and they have

10  this sort of independent radicalization process.

11      Most cases what you will find is a small group of

12  like-minded individuals.  In many cases, they've known each

13  other for quite some time, whether they're related to one

14  another, whether they went to school together, whether they

15  grew up in the same neighborhood.  Small group, three, four,

16  five individuals.  Some cases there's sort of a more

17  charismatic individual that attracts the others.

18      And they start this radicalization process which operates

19  independently from organizations like al-Nusrah or ISIS.  It's

20  not like al-Nusrah or ISIS send people to the United States to

21  radicalize them.  What happens is that these organizations put

22  out big, big amounts of propaganda and individuals who are

23  radicalized become consumers of that propaganda.

24      And so group dynamics ensue, and sort of group of friends

25  start talking about this propaganda, start consuming the

1  propaganda, and then eventually some mobilize, take the next

2  step, which means doing something.  Going from words to action.

3  **Q.**  As a result of your research, are you familiar with the

4  means by which people mobilize?

5  **A.**  Yes, I am.

6  **Q.**  And mobilize in connection in al-Nusrah Front.  If you

7  could please explain.

8  **A.**  Sure.  Well, mobilization takes generally two different

9  routes.  One is carrying out attacks in the United States, the

10  other one means traveling to a place outside the United States

11  to join one of these groups.

12      When it comes to al-Nusrah, the dynamic has been for the

13  most part traveling to Syria to join, or to try to join, the

14  organization.  There's --

15  **Q.**  How do people travel to Syria, based on your research?

16  **A.**  Well, there's different ways.  Generally speaking, what

17  they do is they try to find a route which allows them to avoid

18  detection from law enforcement.  So generally -- of course, you

19  can't fly from the United States to Syria and join al-Nusrah.

20  Generally, the most common route is through Turkey.  Turkey has

21  a very long border with Syria and for a long time that border

22  has been fairly easy to cross, whether legally or illegally.

23      But most cases individuals would find somewhat indirect

24  ways to get to Turkey because travel in itself to Turkey can

25  raise some red flags.  And then from Turkey, generally one

1   arrives in Istanbul or one of the international airports in

2   Turkey, makes his or her way to the border towns on the Turkish

3   side and then makes its way to Syria.

4       Now there's different ways in which one does that based on

5   connections.  The way I often describe that is with an analogy

6   of airline traveling; there's first class, business class and

7   economy class.  And I'm not talking about the class you fly,

8   but I'm talking about how you join a group like al-Nusrah.

9       First class would mean that you have deep connections to

10  al-Nusrah.  Means you have prior knowledge, means you've been

11  around the block.  You are somebody that has been plugged into

12  that world for a long time, knows people who are inside.  You

13  show up there in Syria, you know what number to call, you know

14  where the group is, you're already somewhat part of that group.

15  **Q.**   How many people fall into that first class?

16  **A.**   In the United States you can count them on one hand.

17  There was one fairly famous case here in California.  Southern

18  California.  You can count them on one hand.

19      What is somewhat more common is the business class way of

20  going there.  Which means you radicalize on your own, you don't

21  have prior connections to al-Nusrah, but you manage somehow to

22  develop them before leaving the United States to travel -- to

23  go to Turkey and Syria.  And in many cases you build those

24  connections online, even though ISIS has been more open than

25  al-Nusrah in developing those connections online.  But through

1  social media there's many cases of individuals in the

2  United States that -- of course it takes some persistence.

3  People will vet you online.  But you manage to build your bona

4  fide credentials online and you get connections that will help

5  you cross from Turkey to Syria and make your way to al-Nusrah.

6       You generally will get a phone number, you'll get a name,

7  you'll get an address in Turkey.  You fly there, you call that

8  number.  It's a bit of a game.  It's, obviously, a secretive

9  organization.  But you'll eventually make your way.  And we've

10 seen quite a few cases of that.  I would say probably around

11 50 percent of cases would be business class flying, business

12 class traveling.

13      The other 50 percent would be what I would call as economy

14 class traveling.  Which means, basically, you don't have any

15 connection, whether because you couldn't establish one or you

16 didn't try to establish one.  You travel to Turkey and you ask

17 around.  And you -- in particular in 2012, 2013, 2014 -- at the

18 very beginning of the mobilization for Syria when it was fairly

19 easy to cross the border, there have been quite a few cases of

20 individuals were successful in establishing that connection

21 once arrived in Turkey.

22      It's a matter of being a bit street smart and lucky;

23 combination of the two.  You go around.  Of course, it's not

24 going to happen within the first hour you land in Istanbul or

25 wherever you are in Turkey.  But you go to the right mosque,

1    conservative mosque, and you look at people that might look

2    like they have knowledge or might be interested in -- there are

3    certain signs that point you to potentially that person being

4    knowledgeable about these dynamics.

5         Of course, a lot of the people involved in these

6    activities were Syrians, or anyway Arabs, which of course in

7    Turkey they do stand out just by language.  Because in Turkey,

8    Turkish is the language, so Arab would sort of stick out as a

9    language.

10        So there's been quite a few cases of people who have been

11   able to join *Jabhat al-Nusrah* by traveling economy and leaving

12   the United States without any prior connection to al-Nusrah and

13   establishing, being street smart and lucky, to establish that

14   connection once they've landed in Turkey.

15   **Q.**   Have you had an opportunity to review records and calls

16   and summaries of reports in connection with this case?

17   **A.**   I have.

18   **Q.**   And you've reviewed them prior to testifying today?

19   **A.**   Yes.

20   **Q.**   More specifically, did you listen to approximately 15

21   audio calls?

22   **A.**   I have.

23   **Q.**   And did you also have an opportunity to review Google and

24   YouTube search histories or summaries of them?

25   **A.**   Yes.

1  Q.   In general terms are you familiar with Mr. Shafi

2  purchasing one-way tickets to Turkey and not letting his family

3  know about his purchases or his trip?

4  A.   Yes, I have.

5  Q.   Are you also familiar with his statements to law

6  enforcement when he had encounters with them both in 2014 and

7  in 2015?

8  A.   Yes.

9  Q.   Would you please tell us based on your research whether or

10  not it's unusual to have an individual purchasing one-way

11  tickets like this without notifying friends or family at home?

12  A.   No, it's a fairly common -- common dynamic done by a lot

13  of people.  I would say to some degree a bit of a tactical

14  mistake because actually a one-way ticket attracts a bit more

15  attention from law enforcement, particularly if the destination

16  is Turkey.  But it's commonly done.

17       And the not notifying parents is a fairly common dynamic.

18  I would say many of the individuals who had left the

19  United States were fairly young.  The average age is around 21,

20  22.  And many of them, of course, living with their parents.

21  And the vast majority of cases they had to hide their intention

22  of traveling from their parents because they knew that the

23  parents did not consent.

24  Q.   Have you seen other cases where individuals who attempted

25  to travel were completely compliant with law enforcement when

1   they had law enforcement encounters?

2   **A.**   I would say it's a standard attitude.   I can think of a

3   few outliers of cases in which people were belligerent.   One

4   very famous case of somebody attacking the FBI with a knife.

5   But I would say vast majority of the cases people are fairly

6   calm and cooperative.

7        Now, whether what they tell the FBI or authorities is the

8   truth or not, that changes from case to case, obviously.   But

9   generally speaking, yes, fairly calm.

10  **Q.**   How is that calm behavior consistent with mobilization?

11  **A.**   Well, it can come simply from the idea that you don't want

12  to raise too much suspicion.   That you don't necessarily, in

13  some cases, see what you're doing as problematic.   There's been

14  cases in which people tell authorities, Yes, I want to leave

15  for Syria and I want to join a group because it's my duty as a

16  Muslim.   In some other cases, it takes just a bit of

17  preparation and being level-headed and cool and not -- without

18  giving away what you're really doing, but simply knowing a bit

19  your rights and knowing that not necessarily is going to be

20  something that will incriminate you.

21  **Q.**   Are you familiar with some of Mr. Shafi's electronic and

22  online searches?   For example, relating to media put out by

23  Anwar al-Awlaki and the information about al-Baghdadi?

24  **A.**   Yes.

25  **Q.**   And would you please explain to us how you're familiar

 1  with those works and what they mean?

 2  **A.**   Yeah.   Well, Anwar al-Awlaki, as I said earlier, was a

 3  very prolific idealogue.   He had hundreds and hundreds of hours

 4  of lectures which are widely available online.   I would say I'm

 5  hard-pressed to find a single case in the United States of

 6  somebody who was involved in *jihadist* activities being charged

 7  that did not possess some al-Awlaki material.   I mean,

 8  al-Awlaki was, is, and still is the idealogue for English

 9  speakers of the *jihadist* world.

10      Some of the lectures from the defendant's possession are,

11  I would say, some the most extreme that al-Awlaki produced.

12  Al-Awlaki had a very broad production.   Not everything that

13  al-Awlaki produced was directly advocating violence and *jihad*.

14  Many of the lectures were more about religion.   Always a very

15  conservative interpretation of it; always to some degree

16  conducive to the idea that Muslims should fight, *jihad*.   But

17  not all of them were strictly advocating -- directly advocating

18  that.   But some of the lectures that were in possession of the

19  defendant I think were definitely on the extreme side, if you

20  will.

21      *Constants in the Path of Jihad* was arguably one of the

22  most radical works by al-Awlaki.   It's the translation of a

23  book written by a very well-known al-Qaeda leader, Yusuf

24  al-Ayiri, who was the founder and the leader of al-Qaeda in the

25  Arabian peninsula, who wrote a book in Arabic, al-Awlaki

1    translated it into English.

2        But a bit of a loose translation where he interjected a

3    lot with his own commentary; again, making it more relatable

4    for a western audience.  And the theme of the book, basically,

5    in a nutshell, is that *jihad*, fighting, is a duty for all

6    Muslims.  That it's sort of a perennial duty -- "constants"

7    meaning *jihad* is constant.  It's for every time, every place,

8    all the time.

9    **Q.**   How did that series compare to *The Hereafter Series*?

10   **A.**   *The Hereafter* is more on the other side of the spectrum.

11   It's more religious.  It doesn't necessarily call directly for

12   violence.  The main -- basically, what the hours and hours of

13   lecture in *The Hereafter*, what they do is they -- in them

14   al-Awlaki explains what happens when a Muslim dies.  Whether he

15   goes to paradise, goes to hell, what is the process of the

16   soul, and all those things.

17       There is an underlying theme when you put it in context

18   with some of the other lectures by al-Awlaki that if you don't

19   obey all the commandments of Islam, you're going to -- you're

20   not going to paradise, you're going to hell.

21       I think if you put that in context with the other writings

22   by al-Awlaki, where al-Awlaki says *jihad*, fighting, is a

23   commandment, it's mandatory for all Muslims, then you see that

24   you come to the perception that if you don't fight, if you

25   don't join *jihad*, you're going to hell.  You're not going to be

 1  able to go to paradise.

 2  **Q.**   Are you familiar with his searches relating to *jihad*,

 3  Islamic State, Taliban, Zawahiri, ISIS?

 4  **A.**   Yes.

 5  **Q.**   What are those indicative of, based on your experience?

 6  **A.**   I would say it's fairly standard practice for individuals

 7  who are in the process of radicalizing to basically look for

 8  more information on a variety of concepts -- individuals,

 9  groups -- linked to the *jihadist* world.  So the sources used

10  are different, in some cases are more mainstream-use outlets,

11  in some other cases is more sources leaning clearly from --

12  coming from *jihadist* propaganda.

13  **Q.**   Are you also familiar with Mr. Shafi's searches relating

14  to the special interview of the *emir* of *Jabhat al-Nusrah*,

15  al-Joulani, that was featured on Al Jazeera?

16  **A.**   Yes, I am.

17  **Q.**   Would you please tell us what you know about that

18  interview?

19  **A.**   That interview was somewhat famous.  Was an interview that

20  Al Jazeera, which is the largest TV station in the Arab world,

21  transnational TV station in the Arab world, broadcast between

22  the last week of May and the first week of June 2015.  It was

23  very criticized, that interview, first of all, because it was

24  aired on such a prominent TV channel and because it was judged

25  by many to be very much of a softball interview in which the

1   interviewer, who's sort of the Larry King or the Anderson

2   Cooper of journalism in the Arab world, Ahmed Mansour, a very

3   famous journalist.

4   Q.   And this was a two-part interview?

5   A.   Two-part interview.  Like two hours, basically.  Treated

6   Joulani pretty much as a head of state in a way that it

7   elevated al-Nusrah to a very different level.  And that was

8   sort of while al-Nusrah was trying to do strategically was to

9   portray itself as different from ISIS.

10        ISIS, in al-Nusrah's perception -- or at least the image

11   they tried to project -- was that ISIS were the real

12   extremists, the crazy ones, the ones that behead and burn

13   people alive, ultra-violent, ultra-sectarian.  We, al-Nusrah,

14   are the more reasonable one; we're fighting to defend the

15   Syrian people, we're more moderate and so on and so forth.

16        And in a way, that interview was elevating al-Nusrah to

17   that level because it would be like having that interview prime

18   time on, let's say, CBS or NBC or ABC, but with very soft

19   questions.

20   Q.   During that approximately two-hour long interview, did

21   Mr. al-Joulani explain the ideologies and the tactics of

22   al-Nusrah Front as a terrorist organization?

23   A.   Yeah, many times, basically.  That's what most of the

24   interview was about.  He was -- he discussed many issues from

25   the tactics that the groups used.  Particularly at the

1  beginning gets into the details of what's happening on the

2  battlefield, what the next moves will be.  Spoke quite a bit

3  about the strategic vision of al-Nusrah, the ideology, what the

4  final goal of the organization would be.  It talked quite a bit

5  about the relationship with the west.  It talked about the fact

6  that they -- both him, Joulani, and the interviewer, Mansour --

7  thought that it was a bit unfair that the United States had

8  designated the al-Nusrah as a terrorist organization.  Really

9  was a very broad interview in which many of the aspects of

10  al-Nusrah's ideologies, strategy, and goals were outlined very

11  clearly.

12  **Q.**   Did you have an opportunity to listen to the call between

13  Mr. Shafi and Mr. Saleem Karim on June 5, 2015?

14  **A.**   I had.

15  **Q.**   And this was a call at approximately 2:41 in the morning

16  California time?

17  **A.**   Yes.

18  **Q.**   And in that call Mr. Shafi describes this two-hour long

19  interview that he watched relating to Mr. al-Joulani, is that

20  right?

21  **A.**   Correct.

22  **Q.**   Are his statements to his friend, Saleem Karim, consistent

23  with what you know about that Al Jazeera interview of

24  Mr. al-Joulani?

25  **A.**   Yes, very much so.

1  **Q.**   Now, are you also familiar with Mr. Shafi's searches

2  relating to directions to Gaziantep, Turkey; SFO to Istanbul;

3  crossing Syrian border illegally; am I on the no-fly list?

4  Have you seen similar searches in other cases and what were

5  they indicative of based on your experience?

6  **A.**   Yeah, that's extremely common.  Again, I'm hard-pressed to

7  find cases in which individuals who are attempting to travel to

8  join different groups don't really do the same thing.  Which

9  is, basically, looking first of all whether they can fly or

10  not.  Whether they're on the no-fly list.  Particularly if

11  anybody has had an encounter with the FBI or they feel, whether

12  rightly or not, but they are under FBI surveillance.  They know

13  about the no-fly list so they will look for ways to find out

14  whether, you know, getting on an airplane will be problematic

15  or not.

16       And equally, if not more common, is the idea of

17  researching different ways to get into Turkey to avoid

18  detection.  So one part of it is purely the mechanics of it.

19  Just familiarizing yourself with the geography of the place,

20  where you cross the border.  But obviously, here we're talking

21  about individuals who are looking for -- it's not your regular

22  road trip, not your regular holiday traveling.  So it's a

23  border, but it's supposedly secured.  Obviously, it wasn't.

24  But clearly, you have to avoid detection in order to get there,

25  so it's very common to look at indirect ways to get to Turkey,

1    as I was saying earlier.  And then you look at all possible

2    ways to cross illegally.  So that kind of research is extremely

3    common.

4    **Q.**   Is that one step in the path of mobilization of taking

5    movement to --

6    **A.**   Preparing for your trip.  Just the logistics of the travel

7    is one of the main things that one can do it in a more

8    deliberate and sophisticated way, one less sophisticated way.

9    But it's extremely common.

10   **Q.**   Have you seen the picture recovered from Mr. Shafi's phone

11   which is *Shaheed*, Status:  Pending?

12   **A.**   I have.

13   **Q.**   What is the significance of that photo based on your

14   research?

15   **A.**   Well, *shaheed* is the word that means -- means different

16   things in Arabic, but it means martyr.  It's the status you

17   achieve when you die fighting *jihad*, fighting for the cause of

18   God.  Or at least that's what they believe in sort of the

19   *jihadist* world.  That's what *jihadist* ideology tells you.  I

20   would interpret *"Shaheed,* Status:  Pending" as something

21   written by somebody who is aspiring to that status and is

22   working to achieve that status.

23   **Q.**   Now, you mentioned the meaning of words in Arabic.  As a

24   result of listening to the calls, perhaps with the aid of the

25   transcripts, did you notice that there's a recurrence of the

1   use of certain words in Arabic in those conversations that

2   Mr. Shafi has with his friends and family?

3   **A.**   Sure.

4   **Q.**   Do you speak Arabic?

5   **A.**   I don't.  Very poorly.

6   **Q.**   Do you know what some of these words mean notwithstanding

7   not speaking Arabic?

8   **A.**   Yeah, of course.  Most of the language used is the

9   standard language that people interested in *jihadist* ideology

10  use.  I would say probably 70, 80 percent of people who have

11  joined or tried to joined al-Nusrah or ISIS in the states do

12  not speak Arabic, are not Arabic speakers.  They will use some

13  jargon, some key words that are in Arabic, but they don't speak

14  Arabic.

15  **Q.**   If you could please turn to tab 33 in your binder.  And

16  I'm going to put up the exhibits.

17       So if you could please look at Exhibit No. 33 which is

18  also being shown to the jury.  If you could please tell us

19  whether or not there are any of those, I guess, buzz *jihadi*

20  words, as you would say?

21  **A.**   Yeah, quite a few of them.  *Bay'ah* is fairly common.  It's

22  a pledge of allegiance that one does to a group.  So it's one

23  of the things that aspiring recruits do, is they decide to

24  pledge allegiance, to give *bay'ah*, to a leader of an

25  organization.  Whether you do it to ISIS or al-Nusrah, that's

 1   one choice.

 2       *Dunya* is a word that is commonly used.  I think the

 3   defendant used it fairly often.  Yeah, I think that's a fair

 4   translation:  Worldly concerns.  I think in a lot of the

 5   defendant's conversations that's used in a way to say that

 6   people shouldn't -- a good Muslim shouldn't concern himself too

 7   much with *dunya*, with worldly concerns, but should be more

 8   invested in what comes in the afterlife and to please god in

 9   the afterlife.  So abandoning *dunya*, abandoning worldly

10   possessions in your day-to-day life, to achieve something

11   greater.

12       There's quite a few of them.  *Emir* would be -- There's one

13   other one.  The concept of *hijra*, which was used by the

14   defendant in a couple of circumstances.  *Hijra* translated

15   migration.  There's, of course, a mainstream Islamic concept is

16   what the prophet Mohammad did when he left Mecca to go to

17   Medina to establish the first community, the first Muslim

18   community.

19       But in sort of the *jihadist* world, *hijra* is often

20   interpreted as the migration from un-Islamic lands -- in this

21   case the United States -- to go to join a pure Islamic society.

22   In this case, would be joining groups like al-Nusrah or ISIS in

23   Syria.  It's a common concept that it's -- and it was brought

24   up by the defendant a couple of times that Anwar al-Awlaki

25   makes that extensively.  It's a sin, it's prohibited, to true

1    Muslims, as some individuals think of themselves, to live in a

2    non-Islamic society.  To live surrounded by infidels.  It's a

3    duty for them to then go, leave that land, so do migration, do

4    *hijra*, and join a pure Islamic society.

5        It's the concept the vast majority of the people who leave

6    the United States and join these groups use:  I'm doing *hijra*

7    and joining al-Nusrah, joining ISIS.

8        There's more.  *Kuffar, kufr*.  You know, the term commonly

9    used to refer to infidels.

10        Can go on.  There's *shaheed* which we discussed earlier as

11    martyr.  That's a concept that is obviously something to be

12    achieved.  Becoming a *shaheed*, in *jihadist* ideology, is the

13    highest honor.  One dies fighting *jihad* dies in the path of

14    god.  So that allows it to achieve paradise.

15        We can go on one by one, if you want.

16    **Q.**   No.  That's okay.  Thank you.  We've heard the words

17    already.

18        Have you also heard Mr. Shafi's statement on a call with

19    his friend on June 30, after he was stopped at the airport,

20    that he decided that if he found his passport he was meant to

21    travel?

22    **A.**   Yes.

23    **Q.**   And are you familiar with a text message he sent -- or

24    earlier in the year -- saying that Sheikh Anwar gave him

25    directions?

1    **A.**    Yes, I have.

2    **Q.**    During the course of your research, have you learned of a

3    role that dreams play in a person's path to radicalization?

4    **A.**    Yes.  It's a fairly common concept.  You'll find quite a

5    bit of academic literature about the importance of dreams in

6    the *jihadist* milieu.  I can think of many examples of

7    individuals who were at the highest levels of the *jihadist*

8    world.  It's very well known that Mullah Omar, the former

9    leader of the Taliban, gave as an explanation for many of the

10   policy decisions which he had.  For example, the idea of

11   hosting Osama bin Laden in Afghanistan.  He often explained

12   that he was doing that because he had a dream that told him to

13   do so.

14          So it's a fairly common concept.  And we see it in our

15   research in many individual cases in the United States of

16   individuals that talk about dreams they have had, whether they

17   received direct orders, recommendations on a course of action,

18   or it's their interpretation of less direct dreams.  But they

19   talk about dreams as one of the driving forces, in a way it's a

20   sign, it's a way that god talks to them through dreams.

21          Fairly common -- fairly famous case of an individual that

22   carried out terrorist attack in Texas a couple of years ago who

23   had been, basically, part of this *jihadist* bubble for at least

24   ten years.  He had been involved, been consumer of propaganda,

25   but never really acted, never made the passage from words to

1   action.  At some point he said he had a dream.  He had a dream

2   of a woman wearing a full veil, *niqab*, smiling at him.  Or,

3   with the eyes.  You know, being sweet eyes to him.

4       And that -- he interpreted that as the virgins of paradise

5   calling him.  And within two months he decided, after ten years

6   of just sort of being all words and no action, he decided to

7   carry out the terrorist attack.  And in his writings he quoted

8   that dream as the main drive that led him to that passage.

9   It's a fairly common dynamic.

10  **Q.**   Based on your review of the records in this case, the text

11  messages, the calls, the search histories, the travel plans, do

12  you have an opinion as to whether or not the evidence in this

13  case is consistent with radicalization?

14  **A.**   I would say extremely consistent, as a lot of the dynamics

15  are fairly common.

16  **Q.**   Do you have an opinion on whether or not the evidence in

17  this case is consistent with mobilization?

18  **A.**   Very much so.

19  **Q.**   And if you could please summarize the basis for your

20  opinion.

21  **A.**   Just when put in relation with the hundreds of cases we

22  look at in the United States.  I also do similar work in

23  different European countries.  It basically fits, even though

24  of course there are differences from case to case, it fits many

25  of the patterns.  From sort of the group dynamics when it comes

1    to radicalization; from the level of knowledge on certain

2    dynamics; from how that knowledge is acquired; what the sources

3    of knowledge, whether it's the ideological knowledge,

4    al-Awlaki, finding out more about groups and their tactics and

5    ideology; or the knowledge on mobilization on logistics, how to

6    travel, how to join certain groups; to the actions taken to

7    mobilize.  I would say very extremely consistent with patterns

8    we observe.

9    **Q.**   Are there any particular statements that are particularly

10   significant to you in forming your opinion in this case?

11   **A.**   There's quite a few, I would say.  There's a constant

12   concern I see on the part of the defendant that his inaction,

13   the not going, the not joining, would be something that will

14   cost him in the face of god.  That basically would -- it would

15   be sinful for him not to travel and not to join these groups.

16       So different statements.  When he talks about, you know,

17   his fear of being before god with no blood on my books and no

18   scars on my face.  It's a very common concept which al-Awlaki

19   popularizes, which is very common in *jihadist* ideology, which

20   is extremely common with all individuals that mobilize.  That

21   living -- again, we go back to the concepts of *dunya* -- living

22   your daily life full of privileges and, you know, nice, cushy

23   life while Muslims are killed and you're not doing anything

24   about it will cost you dearly in the afterlife.  It's a sin and

25   will cost you dearly in the afterlife.

```
 1          That's extremely common.  And you do see in the
 2   defendant's behavior in many cases, whether it's conversations
 3   that he has on the phone or with an inmate that he visits, in
 4   many circumstances he expresses that.
 5          MS. LaPUNZINA:  One moment, Your Honor.
 6      (Pause.)
 7          MS. LaPUNZINA:  I have no further questions.  Thank
 8   you, Dr. Vidino.
 9          THE WITNESS:  Thank you.
10          THE COURT:  Thank you.  Mr. Fakhoury?
11          MR. FAKHOURY:  Thank you, Your Honor.
12                    CROSS-EXAMINATION
13   BY MR. FAKHOURY:
14   Q.   Good morning, Dr. Vidino.
15   A.   Good morning.
16   Q.   You testified that you're the director of the George
17   Washington University center on extremism.
18   A.   Program on extremism.
19   Q.   Program on extremism.  And you mentioned that that program
20   does work collaboratively with law enforcement, correct?
21   A.   Correct.
22   Q.   You provide trainings for law enforcement.
23   A.   Yeah.  Workshop.  We don't get paid.  But, yes, we --
24   whenever we're called to do training, of course we do it.
25   Q.   Sure.  And you mentioned in your direct testimony that a
```

**VIDINO - CROSS / FAKHOURY**

1  major part of your research involves reviewing what you called

2  primary sources.  Do you remember that?

3  **A.**   Correct.

4  **Q.**   So that would be -- I think you mentioned court documents

5  in criminal cases.  Correct?

6  **A.**   Correct.

7  **Q.**   So that would include, let's say, FBI reports.

8  **A.**   Correct.  When available.

9  **Q.**   Transcripts from court proceedings.

10  **A.**   Correct.

11  **Q.**   Criminal complaints or indictments that are filed.

12  **A.**   Yes.

13  **Q.**   Pleadings that are filed by the government in a criminal

14  case.

15  **A.**   Correct.

16  **Q.**   Now, you testified that your opinion regarding Mr. Shafi

17  is derived from your review of the evidence in this case,

18  correct?

19  **A.**   Yes.

20  **Q.**   And you've received evidence from the prosecutors in this

21  case to review, correct?

22  **A.**   Yes.  Correct.

23  **Q.**   And I think you mentioned 15 phone calls, for example.

24  Right?

25  **A.**   Correct.  Yes.

1    **Q.**   And you reviewed those 15 phone calls, right?

2    **A.**   Yes.

3    **Q.**   Did you review any other phone calls beyond those 15 phone

4    calls?

5    **A.**   No.  I've reviewed what was provided to me.

6    **Q.**   Okay.  You mentioned some Google and YouTube searches that

7    you reviewed.  Did you review the entirety of Mr. Shafi's

8    Google and YouTube search history from 2014 or 2015?

9    **A.**   No, I have not.

10   **Q.**   You were asked a question about a photo on Mr. Shafi's

11   phone, this "Status:  Shaheed pending" photo.  Did you review

12   any other photos that were on Mr. Shafi's phone?

13   **A.**   On the phone, I don't believe so.

14   **Q.**   You mentioned that this is, I believe, the fourth time

15   you've testified as an expert witness?

16   **A.**   Correct.

17   **Q.**   Have you ever testified on behalf of a criminal defendant?

18   **A.**   I have not.

19   **Q.**   Now, you also testified about the role of dreams in some

20   of your research and some of the folks that you've studied.  Do

21   you remember that testimony?

22   **A.**   Sure, yes.

23   **Q.**   Now, you're not a psychologist, right?

24   **A.**   I am not.

25   **Q.**   You're not a psychiatrist?

**VIDINO - CROSS / FAKHOURY**

1   **A.**   I'm not.

2   **Q.**   You're not a neuroscientist.

3   **A.**   I'm not.

4   **Q.**   You never interviewed Mr. Shafi, did you?

5   **A.**   I have not.

6   **Q.**   Is this your first time seeing him in person?

7   **A.**   Yes.

8   **Q.**   I want to shift back to the GW program on extremism.  Now,

9   your center is focused mostly on ISIS and ISIS-related

10   mobilization in the United States, correct?

11   **A.**   *Jihadist* in general.

12   **Q.**   Okay.  Has the program written any reports about the

13   al-Nusrah Front specifically?

14   **A.**   On al-Nusrah specifically, no.

15   **Q.**   Your program produced a report called "The Travelers."

16   I'm sure you're familiar with that report?

17   **A.**   Of course.

18   **Q.**   My understanding is the center produced the report,

19   although you didn't write it.  Correct?

20   **A.**   Of course.

21   **Q.**   Of course, though, you supervised the writing of that

22   report.

23   **A.**   Correct.

24   **Q.**   And in that report -- and you can correct me if I've got

25   it wrong -- that report profiled approximately 64 individuals

1  from the United States who left the United States and actually

2  made it to Syria to fight for a group.

3  **A.**   Correct.

4  **Q.**   Okay.  Now, it's my understanding that of the people you

5  profiled in that -- or, the center profiled in that report

6  under your -- in your report, 83 percent of those people linked

7  up with ISIS, correct?

8  **A.**   Correct.

9  **Q.**   And the remaining 17 percent linked up with all other

10 groups fighting within Syria.

11 **A.**   Correct.

12 **Q.**   And there are obviously more groups than just ISIS and

13 al-Nusrah Front operating in Syria, correct?

14 **A.**   Yeah.  Although I would say the vast majority of Americans

15 join one of the two.

16 **Q.**   Okay.  But again, 83 percent of the folks profiled in that

17 report joined ISIS.

18 **A.**   Yes.

19 **Q.**   I wanted to ask you a few questions about Anwar al-Awlaki.

20 Now, you testified that not all of his lectures are violent or

21 extremist, correct?

22 **A.**   Correct.

23 **Q.**   And, in fact, he was a conservative but, you know, at

24 least I guess you could call it maybe a mainstream Islamic aman

25 in the United States at least in the late 1990s, let's say.

1  **A.**   Yeah.  I would say at least in the 2000s I think I would

2  have a different assessment.  When it comes to the '90s, yes,

3  That's fair.

4  **Q.**   Sure.  And after 9/11, in fact, he was interviewed by

5  mainstream news organizations like the *New York Times*, for

6  example, in articles discussing sort of the 9/11 attacks and

7  that sort of thing.  Is that right?

8  **A.**   Yes.  Correct.

9  **Q.**   You testified that you can -- it's pretty easy to get

10  Anwar al-Awlaki lectures online, right?

11  **A.**   Yes.

12  **Q.**   You can get them on YouTube?

13  **A.**   Still now, yes.

14  **Q.**   And you can easily download them on the internet.

15  **A.**   Fairly easily.

16  **Q.**   And I assume you yourself, you've listened to his lectures

17  for your research.

18  **A.**   I have.

19  **Q.**   Do you have the lectures saved on your computer?

20  **A.**   Huh?

21  **Q.**   Do you have any of his lectures saved on your computer?

22  **A.**   I don't.

23  **Q.**   I want to shift gears and talk a little bit more about

24  ISIS and the al-Nusrah Front within Syria.

25       Now, you testified that around 2013 there was somewhat of

 1   a split between ISIS and the al-Nusrah Front.  Do you recall

 2   that?

 3   A.   Correct.  Yes.

 4   Q.   And al-Baghdadi wanted to take credit for al-Nusrah's

 5   success on the battlefield, al-Nusrah pledged allegiance, or

 6   whatever you want to call it, to al-Qaeda, correct?

 7   A.   Correct.

 8   Q.   Now, that happened around 2013 according to your

 9   testimony, right?

10   A.   April.  April 2013.

11   Q.   Okay.  Now, by 2015, ISIS and al-Nusrah Front were

12   essentially at war with each other.  Is that a safe thing to

13   say?

14   A.   Yes.  Very much so.

15   Q.   In fact, you've written in some of your literature that

16   they were in a fratricidal war against each other, correct?

17   A.   Correct.

18   Q.   In 2015 ISIS had significantly more territory within Syria

19   than the al-Nusrah Front, correct?

20   A.   Correct.

21   Q.   My understanding is by that time ISIS's capital, if you

22   will, to kind of use a shorthand there, was in the city of

23   Raqqah in Syria.

24   A.   Correct.

25   Q.   And ISIS also had a large sort of base of operation in the

1    Aleppo governorate. Correct?

2    **A.**    Less.

3    **Q.**    Less than Raqqah.

4    **A.**    Yes, for sure.

5    **Q.**    Now, in 2015 the al-Nusrah Front had some territory within

6    Syria as well, right?

7    **A.**    Correct.

8    **Q.**    You testified I think it was southern and western Syria.

9    Right?

10   **A.**    Correct.

11   **Q.**    You mentioned in your testimony this Idlib.  In the news

12   recently there's some discussion of Idlib, right?

13       Okay.  Now, you're aware that in early June of 2015,

14   al-Nusrah took control, essentially, of the Idlib governorate,

15   right?

16   **A.**    Yes.

17   **Q.**    Ms. Cruz, can you pull up Exhibit 114, please?  This has

18   been admitted into evidence.

19       I'm going to show you a map that's been admitted into

20   evidence.

21            **MR. FAKHOURY:**  May I publish to the jury, Your Honor?

22   This has been admitted.

23            **THE COURT:**  Sure.  Go ahead.

24   BY MR. FAKHOURY:

25   **Q.**    Do you see a map there on the screen in front of you?

**VIDINO - CROSS / FAKHOURY**

1  **A.**   Yes.

2  **Q.**   And do you -- I know you can't really -- it's a little

3  hard to do this, but we're going to try our best.

4      Do you see Idlib referenced in that box of locations that

5  says "ID and location"?  Is Idlib on that list?

6  **A.**   No.

7  **Q.**   Could you just generally describe where Idlib would be

8  located on this map?

9  **A.**   Not too far from Aleppo, basically.

10  **Q.**   Okay.  Ms. Cruz, can you go to the next page, please?

11      Could you identify where Idlib is on this map?

12  **A.**   Not too far.  Basically, if you go -- well, how do I do

13  it?

14  **Q.**   I know it's a little hard.

15  **A.**   Well, if you go southwest from Aleppo, you're almost on

16  it.  Almost on it.  Oh, you're on it.

17      Yeah.  You were.

18  **Q.**   We have a bigger cutout.  Let's try it that way.

19  **A.**   Anyway, if you take a highway south of Aleppo -- there you

20  go.  You take that.

21  **Q.**   So we've zoomed in here on where Idlib is, then, correct?

22  **A.**   Correct.

23  **Q.**   You can take that down, Ms. Cruz.  Thank you.

24      Now by 2015, in addition to the fact that ISIS had more

25  territory than the al-Nusrah Front, ISIS had a lot more

1   fighters or members, however you want to describe them, than

2   the al-Nusrah Front as well.  Is that correct?

3   A.   Yes.  That's the common assumption.  Probably fair, yes.

4   Q.   Is it -- I've seen, you know, some reports -- and you can

5   correct me if I'm wrong -- that in 2015 ISIS had between 30 and

6   50 thousand members, or whatever you want to call them, in

7   Syria.  Does that sound about right to you?

8   A.   Yes.  Those are the numbers given by the United Nations

9   That's a fair number.

10  Q.   And the Nusrah Front in 2015 had about 5,000 fighters.

11  A.   Probably.  Yes, much smaller force, for sure.

12  Q.   You testified a little bit about Gaziantep in Turkey.

13  Now, obviously, the Syrian civil war created a significant

14  refugee crisis.  You're aware of that, obviously?

15  A.   Yes.

16  Q.   And obviously, a lot of Syrians were displaced and many of

17  them tried to make their way into Turkey, right?

18  A.   Giant refugee population in Turkey.

19  Q.   Gaziantep itself has a giant refugee population, right?

20  A.   Very big.

21  Q.   Now, you testified a little bit about some of the

22  differences in tactics between ISIS and al-Nusrah.  I

23  understand that their ideology's probably essentially the same,

24  right?

25  A.   Correct.

VIDINO - CROSS / FAKHOURY

1    Q.   But in your words, ISIS is a little bit more showy, right?

2    A.   Right.

3    Q.   And al-Nusrah is a little bit more deliberate, right?

4    A.   Correct.

5    Q.   And that's -- you testified about that being the case with

6    respect to their approach to violence, for example.

7    A.   Correct.

8    Q.   Now it's also true with respect to their recruitment

9    approach, right?

10   A.   Not -- the propaganda side of it, yes.  I think when it

11   comes to recruitment the one difference I would say is that

12   al-Nusrah, with major exception, tended to be somewhat more

13   conservative in who they let in.  ISIS was really, especially

14   in 2013-14, accepting everybody.  Al-Qaeda was slightly more

15   selective -- sorry -- al-Nusrah was slightly more selective.

16   With major exceptions, though.

17   Q.   Sure.  So when you just explained a second ago you said

18   ISIS would take anyone.

19   A.   Almost.

20   Q.   Almost anyone.  You mean by that -- and if you don't, tell

21   me -- you mean by that that anybody who claims to be a member

22   of ISIS, or does an act in support of ISIS, they get to be

23   considered part of ISIS, right?  Is that a safe way to say it?

24   A.   Well -- no, not necessarily.

25   Q.   Okay.

**VIDINO - CROSS / FAKHOURY**

1  A.   I would say that works for people who carry out attacks in

2  the west.  The way it's worked for the last few years is many

3  people who have carried out attacks in the west, they had no

4  operational connection whatsoever to ISIS, but ISIS is very

5  happy to claim that attack and to claim it.  And so of whom

6  they had no knowledge whatsoever until the day carried out the

7  attack was a soldier of the caliphate, was a member of ISIS.

8       That's a different thing from traveling to Syria and

9  joining ISIS.  Yes, it was a fairly open group, particularly in

10  the beginning of the conflict.  But it's not like you and I

11  could show up and simply say, Hi, we want to join, and we would

12  join.  There would still be some selection, some vetting

13  process.  I would say different from the ultra selective group

14  at, let's say, al-Qaeda was in the 2000s.  So that was a bit of

15  a change.  But -- yeah.

16  Q.   Okay.  So to clarify, if somebody wanted to join ISIS in

17  Syria, regardless of how permissive ISIS is in latching on to

18  individuals who do attacks, if you actually got to their

19  territory there would be a vetting process?

20  A.   Yes.  Correct.

21  Q.   And your testimony is also that with respect to al-Nusrah

22  they were even more conservative than ISIS in that regard?

23  A.   Generally speaking, yes.

24  Q.   You testified a little bit about the use of online tools

25  and the use of the internet by groups like both ISIS and

1   al-Nusrah Front.  And you testified that the center, the GW

2   Center, actually has individuals who are studying the platforms

3   of Twitter and Telegram, right?

4   **A.**   Correct.

5   **Q.**   You know, we've heard some references to Telegram in this

6   trial but sounds like you know it probably a little bit better

7   than everybody else given your research.  Can you explain what

8   exactly Telegram is?

9   **A.**   Telegram is an app that anybody can download on their

10   phone.  It uses end-to-end encryption, meaning that it's very

11   difficult for law enforcement to know what goes on, what

12   conversation's going on.  Basically, the way it works, there

13   are channels inside Telegram and you join a certain channel.

14   To join some you have to have the green light from the people

15   who administer that channel.  And, basically, it works in a way

16   like -- sort of like a chat room, but slightly more

17   sophisticated and more encrypted chat room.

18   **Q.**   Okay.  And why does the GW Center have individuals or

19   researchers looking at these programs like Twitter or

20   telegraph?

21   **A.**   Sure.  Because that's probably one of the best ways in

22   which one studies a certain community.  Radicalization happens

23   both online and offline.  But the online component is a fairly

24   big one.  So we're not intrusive, we're not active on this

25   platform, we don't engage other places.  Other research centers

1  do that.  We don't for a variety of reasons.  But we passively

2  monitor what happens, the conversations that happen.

3      It's important to get a pulse of a certain community which

4  is by definition, by nature, very secretive.  We try to get a

5  sense of what they're talking about, how people talk about

6  certain issues, how they react to world events, what the

7  dynamics of that community are.

8  **Q.**  And by "community," you're referring to a community of

9  individuals who are sympathetic to these groups.

10 **A.**  Correct.  Works as any other community of cigar

11 *aficionados*, or antique cars you find people who coalesce on a

12 certain platform to talk about their interests.  Obviously, in

13 this case, it's *jihadist* ideologies.

14      **THE COURT:**  Is this a good time to take a break?

15      **MR. FAKHOURY:**  Sure.

16      **THE COURT:**  We'll take our first break.  We'll be back

17 at quarter of 10.  So please remember the admonitions.

18                  (Recess taken at 9:32 a.m.)

19                  (Proceedings resumed at 9:46 a.m.)

20      **THE COURT:**  All right.  Please be seated, everybody.

21     Mr. Fakhoury?

22      **MR. FAKHOURY:**  Thank you, Your Honor.

23 **BY MR. FAKHOURY:**

24 **Q.**  Dr. Vidino, before we broke we were discussing online

25 tools like Twitter and Telegram?

1   **A.**   Correct.

2   **Q.**   Now, you testified that in addition to these sort of

3   online communication tools, the groups are very good about

4   putting out propaganda like videos and that sort of thing.

5   **A.**   Correct.

6   **Q.**   And, in fact, the groups put out sort of like travel

7   guides on how to reach their territory or join the group.  Are

8   you familiar with some of those?

9   **A.**   Some do, yes.  ISIS, mostly.

10  **Q.**   I'm sorry?

11  **A.**   ISIS, mostly, has done that.

12  **Q.**   You're familiar ISIS has a travel guide called *Hijra to*

13  *the Islamic State*.  Right?

14  **A.**   Yes.

15  **Q.**   That's like a 50-page PDF report that kind of gives you

16  step-by-step instructions on how to -- recommendations on how

17  to reach their territory.

18  **A.**   Yes.

19  **Q.**   And that guide actually has a list of Twitter contacts

20  within it for people who are interested in reaching the

21  territory.  Sort of like here are people you can reach out to

22  online who may be able to help you get across.

23  **A.**   Yes.

24  **Q.**   Now in your research, you've testified and written about

25  the fact that typically -- oftentimes what happens is you see

1    people migrate from open communication platforms into more

2    encrypted communication platforms.  Do you recall that?

3    A.    Correct.  Yes.

4    Q.    So -- and correct me if I'm wrong -- but here's an easy

5    example of that, in my view.  And you can correct me if I'm

6    wrong.  But an open communication platform would be like

7    somebody using Facebook or using a regular email program.

8    Would that be safe to say?

9    A.    Facebook.  Facebook.

10   Q.    Facebook?  Okay.  And then to migrate their communication

11   from an open platform like Facebook into one of these more

12   encrypted platforms like Telegram, for example?

13   A.    Correct.  Or the ones where you have direct messaging

14   one-to-one.  More encrypted.  Snapchat or Wickr or Silent

15   Circle.

16   Q.    KIK?

17   A.    KIK.  Absolutely.

18   Q.    Now, I believe you testified that when it comes to a

19   concept like radicalization, there isn't really an accepted

20   definition of what that term means, right?

21   A.    Correct.  Like terrorism.  You're always going to have

22   debates on exactly what the elements are.  I think there's a

23   core aspect most people can agree on, but there's no commonly

24   accepted definition.

25   Q.    And it's pretty hard to do scientific method research on

1    these concepts, right?  You can't create a control group or you

2    can't tinker with variables to see if that changes the outcome.

3    A.    Well, I would say obviously there's a -- it is a social

4    science.  Obviously, you don't have the same level of

5    precision, the empirical data is not as easy to have as for

6    medical experiments, for example.  Obviously, it's more

7    difficult.  Control group is more difficult to obtain, so on

8    and so forth.  But that doesn't mean there's no methodology in

9    how the studies are done.

10   Q.    Sure.  Now, you've written radicalization is a complex and

11   highly individualized process.  Right?

12   A.    Correct.

13   Q.    And you've written that it's actually poorly understood,

14   right?

15   A.    Correct.

16   Q.    And you've also written that there's essentially no single

17   explanation for why a person would radicalize.  Right?

18   A.    Absolutely.

19   Q.    You've also testified there's no one profile of who is

20   susceptible to radicalization, right?

21   A.    Correct.

22   Q.    It could be -- I think you testified sort of any

23   demographic is at risk.

24   A.    That's the cases we've seen in the United States.  It's

25   really from the 15 year old to the 55 year old; from the Ph.D.

```
 1   student to the high school dropout, petty criminal.
 2   Q.   And sort of related to that you testified about acquiring
 3   knowledge through different sources.  And again correct me if
 4   I'm wrong.  But you testified that people can -- who under your
 5   methodology are radicalized can obtain their news from a
 6   mainstream news press or from a more propaganda-looking type of
 7   news source.  Right?
 8   A.   Correct.  And generally, it's all of the above.
 9   Q.   Okay.  Now, you testified that radicalization and
10   mobilization are distinct concepts, right?
11   A.   Yes.
12   Q.   Not everyone who radicalizes mobilizes, right?
13   A.   Correct.
14   Q.   And vice versa.  Right?
15   A.   That's more debatable.  Definitely clear, but not
16   everybody that embraces radical ideas, including an acceptance
17   of violence, will then make the leap into action.  There's a
18   line of thinking that also postulates that people who have
19   mobilized haven't really accepted radical ideas.  I think
20   That's more debatable.
21   Q.   Okay.  Now, would you say it's safe to say that there are
22   more people who have radicalized ideas than there are people
23   who act on them?
24   A.   Yes.  That's a correct assumption.
25   Q.   By a significant margin?
```

VIDINO - CROSS / FAKHOURY

1    **A.**   Difficult to say.  I think it's a fair statement to make.

2    **Q.**   Okay.  Now, you testified about -- using a travel analogy

3    about first class, business class, and economy class.  And I

4    wanted to talk a little bit about that.

5         And it sounds like in terms of with respect to the

6    al-Nusrah Front, specifically, there are essentially no

7    first-class type travelers.

8    **A.**   No, there are a couple.

9    **Q.**   I'm sorry.  That in the United States there are only a

10   handful.

11   **A.**   A handful, yes.  Very prominent case in San Diego.

12   Someone was very well connected.  But, yes, it's anecdotal.

13   Really a handful of cases, people who have those

14   long-established connections.  First-class, yes.

15   **Q.**   Okay.  The second category was what you called business

16   class, right?  And that was individuals who developed their

17   connections to the group before they leave the United States.

18   Right?

19   **A.**   Correct.

20   **Q.**   And by "connections to the group," you mean they're

21   reaching out to facilitators or recruiters or somebody who can

22   help get them into the territory in Syria.

23   **A.**   Correct.  It's getting into the territory and getting into

24   the group.  Because it's not just about crossing the border

25   from Turkey to Syria, it's also -- it's even more getting

1   accepted by the group.  So it's the two of them, yeah.  And you

2   have a fair amount of people in the United States that manage

3   to establish those connections online through the platforms

4   that you were mentioning earlier.  You establish that

5   connection.  It could be stronger, it could be weaker.

6   Generally, you get a phone number, you get a name.  You kind of

7   got to work it a bit.  Once you get to Turkey you still get

8   vetted quite a bit.  But you don't leave without any kind of

9   knowledge of what's going to happen once you get there.  You

10  have at least a hook, some kind of connection.

11  **Q.**   Now, you just testified that there's a difference between

12  getting into Syria and getting -- you know, becoming a member

13  or part of the group on the ground.

14  **A.**   Correct.

15  **Q.**   And you've talked a little about a vetting process.  I'm

16  curious.  Can you kind of explain to us what this vetting

17  process generally consists of?

18  **A.**   To some degree a bit difficult empirically, because of

19  course the information we have is fairly limited on what

20  happens there.  It's easier to know what happens here.  Once

21  you get into Syrian territory you have to rely on the few

22  stories that have been told by people who left.  And we

23  interviewed some people who -- returnees, people who went to

24  Syria to fight, and came back.

25      Basically, some of those individuals were tested for --

1    basically interrogated by recruiters from these groups.  They

2    were asked where they're from, they were given a variety --

3    they were not trusted from the beginning.  They were put in

4    sort of processing facilities, if you will, where they were

5    undergoing training, they're undergoing indoctrination.  But it

6    was very clear that the organization was still keeping an eye

7    on them and not letting them completely into the group.

8    Q.    Okay.  And there are -- are you aware of individuals who

9    started that vetting process but have not been accepted into

10   the group after they've started that process?

11   A.    Those cases people got killed because they were suspected

12   of being spies.  And they were killed.  Of course, the

13   information gets a bit fuzzy once you get to that -- there are

14   many reports of people who did not pass the vetting, and in

15   most cases rejection there means you're seen as a spy and you

16   get killed.

17   Q.    Now, the third category you talked about was this economy

18   class traveler where -- and you testified that they don't have

19   the connection at the time that they travel.  Right?

20   A.    Right.

21   Q.    Now, it's my understanding that, from your testimony, that

22   they may travel to Turkey, let's say, but while they're in

23   Turkey they are going to have to create that connection to go

24   through that vetting process.  Right?

25   A.    Correct.

1  **Q.**  Okay.  So it's not like there's any way to avoid the

2  vetting process.

3  **A.**  To get into the group, no.  At some point you have to have

4  some kind of vetting, of course.

5            **MR. FAKHOURY:**  Can I have a minute, Your Honor?

6       (Pause.)

7            **MR. FAKHOURY:**  I have no further questions.  Thank

8  you, Dr. Vidino.

9            **THE COURT:**  Thank you.  Any redirect?

10           **MS. LaPUNZINA:**  Nothing further, Your Honor.

11           **THE COURT:**  All right, Dr. Vidino.  You're excused.

12  Thank you.

13                   (Witness excused.)

14           **MR. HASIB:**  Your Honor, the government is about to

15  rest its case.  The one thing I'd like to bring to the Court's

16  attention is the exhibit that we talked about this morning,

17  Exhibit 144.  I'd like an opportunity to publish that to the

18  jury.  Simply put it on the Elmo and turn through the pages,

19  unless Your Honor requires us to call a witness.  We can put

20  Special Agent Reinke back up there.  But like permission to

21  show Exhibit 144 to the jury.

22           **THE COURT:**  So ladies and gentlemen, two things.  One,

23  back towards the beginning of the case the list of

24  translations, Exhibit 33, I had conditionally admitted.  And I

25  am now fully admitting that so that you can use it during the

1  course -- if you end up listening to any of the recordings.  I

2  think it would be helpful.

3      It doesn't -- it is specifically the words that were used

4  on the recordings.  It doesn't deal with words that may be in

5  the rest of the exhibits.

6      But, anyway, Exhibit 33 is in evidence.

7      (Trial Exhibit 33 received in evidence)

8          **THE COURT:**  And then on Friday -- Thursday or

9  Friday -- you heard evidence on Exhibit 144 which is the texts

10  that Mr. Hasib is about to show you.  And those I'm now -- I

11  have admitted into evidence.

12      So go ahead, Mr. Hasib.

13          **MR. HASIB:**  There are ten pages.  I'll go through each

14  one of them.

15      First, Exhibit 144-001.

16      Next, Exhibit 144-002.

17      And next, Exhibit 144-003.

18      And next, Exhibits 144-004, 5 and 6.  That's 4 and 5 on

19  the screen now.

20      And moving down to Exhibit 6.

21      And then Exhibits 7 and 8.  144-7 and 8.

22      Turning to 144, Exhibit 9.

23      And lastly, 144-Exhibit 10, which is a long series, so

24  I'll show the top half and then the bottom half, Your Honor.

25      And then we have the bottom of that page, Your Honor.

1          And with that, Your Honor, the government rests.

2              THE COURT:  All right.

3              MR. FAKHOURY:  Could we have a quick sidebar, Your

4     Honor?

5              THE COURT:  Yes.

6          (The following proceedings were heard at the sidebar:)

7              MR. FAKHOURY:  As we were going through that exhibit,

8     it occurred to me that, number one, there's Arabic on it as to

9     who those text messages were sent to.  And so we just had all

10    this testimony from Dr. Vidino about contacts with -- the need

11    to make contacts.  And those text messages are with -- at least

12    I think the majority of them are with Saleem Karim and Abdul

13    Karim Niazi.  And there were text messages with one other

14    individual.  And as far as we've seen from the evidence, and

15    there's been no allegation by the government otherwise, none of

16    those individuals are members of al-Nusrah or any other

17    terrorist organization or have any contact with those groups.

18         So I think that there needs to be some -- maybe some --

19    probably what we should have done is had a live witness so we

20    can cross-examine or get that point across.  I think we should

21    try to address that.

22             THE COURT:  Okay.  Do you want to stipulate to those

23    facts that the communications are with people in the

24    United States who were not connected with al-Nusrah?

25             MR. HASIB:  I think we are absolutely prepared to

1    stipulate that the texts were with Abdul Qadar Niazi, Saleem

2    Karim, who I think are the two people -- are co-conspirators.

3    The third person involved in those text messages is someone

4    name SA.  His initials are SA.  I think Court gave a limiting

5    instruction when Special Agent Reinke was on the stand.  Those

6    were admissible only to show the contexts of Mr. Shafi's

7    replies.  I think we've already addressed this.

8        As for the fact they're written in Arabic, it is what it

9    is.  That's the exhibit that we offered.  I'm stuck with the

10    fact that, you know, the names -- Mr. Fakhoury and I can

11    probably read them, but the jury won't be able to.  I'm just

12    going to have to argue it at closing this is what Special Agent

13    Reinke testified to.

14        **MR. FAKHOURY:**  But is there any problem for you to

15    stipulate now given that we've just gone through this document

16    that are -- the Arabic written, who the texts are with?

17        **MR. HASIB:**  No.  We'll stipulate.  I'm sorry, Your

18    Honor.

19        (Off-the-record discussion between Mr. Hasib and Ms.

20    LaPunzina.)

21        **MR. HASIB:**  With -- yeah.  We'll stipulate that those

22    three individuals are the ones that are in these text messages.

23    Abdul Qadar Niazi, Saleem Karim, and the third person named SA.

24        **THE COURT:**  All right.  Does that satisfy?

25        **MR. MATTHEWS:**  As long as it's clear that SA is not a

1   member of some known terrorist organization.

2          **MR. HASIB:**  Yes.  Third person in the United States

3   was not a co-conspirator, known only as SA.

4          **MR. FAKHOURY:**  The second thing, Your Honor, just for

5   the record, we do make a motion under Rule 29 since the

6   government has rested.  And then I'm happy to address it if the

7   Court wants.

8          **THE COURT:**  No.  I was going to deem it made.  And if

9   there's anything you want to do for the record we can do it

10  after --

11         **MR. FAKHOURY:**  No, that's fine.  And then the third

12  issue is just -- so now it's our case, and I wanted to know

13  what the order.

14         **MR. MATTHEWS:**  What we did is I provided notes on all

15  the witnesses.  They have the names already.  And to assist

16  them, due diligence on the witness, we provided notes on the

17  witnesses prior.  If that helps.  Because we would like to try

18  to do it in order if possible.

19         **MS. LaPUNZINA:**  It helps, thank you.  We're not quite

20  ready to go forward with them.

21         **THE COURT:**  How much time do you need?  Because I

22  could take an early break now and give you, you know, 20

23  minutes or something.  Half an hour.

24         **MS. LaPUNZINA:**  I was going to ask for 30, Your Honor.

25         **MR. MATTHEWS:**  That would be great.  We created the

 1    issue.   That would be fine.

 2              THE COURT:   Thank you.

 3              MS. LaPUNZINA:   Thank you.

 4              MR. HASIB:   We'll stipulate.

 5              THE COURT:   We'll put the stipulation on.

 6         (The following proceedings were heard in open court:)

 7              THE COURT:   Our fabulous new technology is keeping

 8    this noise machine on for the moment.   We're rebooting the

 9    system and we'll be with you momentarily.

10         Mr. Hasib, given what we're doing why don't we --

11         Ladies and gentlemen, despite the white noise that you're

12    hearing, we're about to -- there's a stipulation that the

13    parties have entered into, and then I'm going to give you an

14    early break of half an hour before the defense begins its case.

15         But Mr. Hasib, the stipulation.

16         No.   The stipulation before the break that we just

17    discussed.   With respect to Exhibit --

18              MR. HASIB:   144.

19              THE COURT:   And speak very loudly.

20              THE CLERK:   I should be able to turn it off in a

21    second.

22              MR. HASIB:   Best laid plans of mice and men, Your

23    Honor.   Perhaps it would be best if we took the break then read

24    the stipulation.

25              THE COURT:   All right.   Ladies and gentlemen -- can

1    everybody hear me?

2        (Some jurors indicating in the negative.)

3        **THE COURT:**  Ladies and gentlemen, can you all hear me

4    now?  Okay.

5        The prosecution has rested its case.  Now it's time for

6    the defendant to put on its case, and this is a good time to

7    take a break so that we can reorder the courtroom.

8        So we're going to take a 30-minute break now, and then the

9    defense is putting its case on.  As you might anticipate, the

10    case is moving along with good speed.  So you can use these 30

11    minutes to your best advantage, which means don't talk about

12    the case.  Don't communicate in any way about this.  The case

13    is -- a lot of evidence has been presented to you.  There's

14    still more to come.  Very important that you keep an open mind

15    through this entire process.

16        But with that we'll take a 30-minute break and be back at

17    quarter of 11.

18                    (Recess taken at 10:15 a.m.)

19                (Proceedings resumed at 10:47 a.m.).

20        **THE COURT:**  All right.  Please be seated, everybody.

21        Mr. Hasib, the stipulation.

22        **MR. HASIB:**  Yes, Your Honor.  The parties have entered

23    into a stipulation that Government Exhibit 144, which was just

24    published to the jury, contains texts -- or, text messages

25    between the defendant and Abdul Qadar Niazi, the defendant and

```
 1   Saleem Karim, and the defendant and a person in the

 2   United States known as Shershah Aryobi.

 3       With that Your Honor, the government rests.

 4           MR. MATTHEWS:  Yes.  The defense calls Matt Keenan.

 5                   MATTHEW KEENAN,

 6   called as a witness for the Defendant, having been duly sworn,

 7   testified as follows:

 8           THE CLERK:  Please state your full name for the record

 9   and spell it for the court reporter.

10           THE WITNESS:  Matthew Lewis Keenan.  M-A-T-T-H-E-W,

11   L-E-W-I-S, Keenan, K-E-E-N-A-N.

12                   DIRECT EXAMINATION

13   BY MR. MATTHEWS:

14   Q.   Morning, Mr. Keenan.

15   A.   Good morning.

16   Q.   Let's begin with a little bit about you.  Where do you

17   live?

18   A.   Beautiful, exotic Fremont, California.

19   Q.   And how old are you?

20   A.   25.

21   Q.   Are you studying anything?  Or are you out in the

22   workforce right now?

23   A.   I'm currently enrolled at San Jose State in the rec

24   therapy program.

25   Q.   Can you briefly describe what the rec therapy program is?
```

1    **A.**   I'm training to become a certified rec therapist, which is

2    similar to PT or OT, but more of a focus on recreation-building

3    function and stuff like that after injuries and such.

4    **Q.**   Okay.  You used a couple of abbreviations.  Am I correct

5    that PT is physical therapy and OT would be occupational

6    therapy?

7    **A.**   Yes.

8    **Q.**   Do you know Mr. Adam Shafi?

9    **A.**   I do.

10   **Q.**   Where did you meet?

11   **A.**   High school.  We first had a few classes together in

12   freshman year.  That's when I really got to know him.  I knew

13   him a little bit in junior high, but classes in high school.

14   **Q.**   And was that at Mission High School?

15   **A.**   Yes.

16   **Q.**   Where is Mission High School located?

17   **A.**   Fremont, California.

18   **Q.**   About what year were you freshman in high school with

19   Mr. Shafi?

20   **A.**   I graduated in 2011.  So quick math.  2007.

21   **Q.**   And did you have any classes together?

22   **A.**   Yes.  We had PE and health.

23   **Q.**   And did you remain a classmate or fellow student of

24   Mr. Shafi after high school?

25   **A.**   Yes.

1   **Q.**   And where was that?

2   **A.**   Ohlone College.  We both went there.  I didn't have any

3   classes with him, but --

4   **Q.**   Okay.  Ohlone College is a community college?

5   **A.**   Yes.

6   **Q.**   Is that a Fremont, as well?

7   **A.**   Yes.

8   **Q.**   Did you have any occasion at any time to engage in any

9   outdoor activities with Mr. Shafi?

10   **A.**   I went on several backpacking trips with Adam.

11   **Q.**   Let me focus on the first trip.  When was the first trip

12   that you went on a backpacking trip with him?

13   **A.**   2012.

14   **Q.**   And where did you go?

15   **A.**   We did the Skyline-to-Sea Trail.  Starts in the Santa Cruz

16   mountains, goes down to the beach.

17   **Q.**   And how many people were involved in this particular

18   camping episode?

19   **A.**   There was four of us on that trip.

20   **Q.**   How long were you out camping?

21   **A.**   Three days.

22   **Q.**   And how did it work out?

23   **A.**   It was a good learning experience.  One of our first

24   backpacking trips.  We kind of ran out of water, got a lot of

25   blisters, that kind of thing.

1  Q.  In terms of equipment were you well prepared?

2  A.  Not really.  Not too well prepared.

3  Q.  Did you learn how to become well prepared after that trip?

4  A.  Yeah, a few.  Took a few times, but --

5  Q.  Was Mr. Shafi well prepared for the trip?

6  A.  On that trip I would say he was about as equally

7  unprepared as the rest of us.

8  Q.  Okay.  Then you said there was a second trip, is that

9  correct?

10  A.  Yes.

11  Q.  And when did you guys take that trip?

12  A.  Sometime in 2013 we went to Big Sur, the Sykes Hot

13  Springs.

14  Q.  Big Sur, that's the area south -- or, just north of

15  Monterrey?

16  A.  Yeah.  It's off of Highway 1.

17  Q.  When I said "you guys," how many --

18  A.  Four of us again.

19  Q.  Was it the same four as on the previous --

20  A.  I believe so, yeah.

21  Q.  Okay.  We need to make sure that we don't talk over each

22  other so the court reporter can get it down.

23      So just so the record's clear, the same four people went

24  on the trip to Big Sur as were on the previous trip that you

25  mentioned in 2012.  Correct?

1    **A.**    Correct.

2    **Q.**    And were you better prepared for the second trip?  The one

3    to Big Sur?

4    **A.**    Yes.

5    **Q.**    Did you have occasion to take a trip after that?

6    **A.**    Yes.  We -- it was a duo trip.  So, Henry Coe.  Me and

7    Adam went.

8    **Q.**    I'm sorry.  That was Henry Coe?

9    **A.**    Henry Coe, which is east of Gilroy.

10   **Q.**    And what is Henry Coe?

11   **A.**    It's a state park.  Very large state park east of Gilroy.

12   **Q.**    Mr. Keenan, I'm going to show you an exhibit that's

13   already in evidence.

14        Counsel, this is Exhibit 64, I believe.  And it's Bates

15   number AS-97.

16        Ms. Cruz, if you would please publish that?

17            **MR. MATTHEWS:**  Approach the witness, Your Honor?

18            **THE COURT:**  Yes.  Go ahead.

19   **BY MR. MATTHEWS:**

20   **Q.**    Mr. Keenan, please take a look at this exhibit and tell me

21   if you recognize any items in this picture from the previous

22   trips that you may have taken with Mr. Shafi and your friends.

23   **A.**    Yes.  So I recognize this pot.

24   **Q.**    Okay.  Let's slow down a little bit because you can't

25   point to a screen.  So when you say "pot," are you speaking of

1  a container with a top in the lower left-hand side of the

2  photo?

3  **A.**  Yes.  The aluminum pot in the lower left-hand side.

4  **Q.**  Okay.  What else do you recognize from a previous trip

5  with Mr. Shafi?

6  **A.**  I recognize the whistle with the yellow lanyard.

7  **Q.**  Okay.  Anything else?

8  **A.**  The cup with the -- looks like some tea in it.

9  **Q.**  So that would be a tea bag?

10  **A.**  Yes.

11  **Q.**  And that's the black cup that's just above what looks like

12  a flat plastic container that says "canteen" on it?

13  **A.**  Yes.

14  **Q.**  Now, there is an item immediately to the right of that

15  cup.  Do you know what that item is?

16  **A.**  Yeah.  It's a water filter.  One of our fellow backpacking

17  friends would bring a LifeStraw.  That was his preferred

18  filter.

19  **Q.**  And the canteen below it, what can you tell us about that

20  canteen?

21  **A.**  Well, that was -- we were always looking into good ways to

22  store water.  Because our first trip we actually ran out of

23  water.  So that's just a -- you know, pack flat, looks like a

24  liter-capacity water bottle.

25  **Q.**  Thanks.  Now, when was the last time that you actually saw

1    Mr. Shafi?

2    **A.**    I believe it was 2014 during the Henry Coe trip.

3    **Q.**    Okay.  And have you had any further communication with him

4    after that?

5    **A.**    No.

6    **Q.**    At any point in 2014 did you move out of the area?

7    **A.**    Yes.  I moved up to Humboldt for school.

8    **Q.**    Okay.  And when did you move?

9    **A.**    It was spring semester of 2014.  So I actually took some

10   time off between then to travel in New Zealand.

11   **Q.**    I know that I asked you whether you'd seen Mr. Shafi since

12   then.  Have you had any further communication or any form of

13   communication whatsoever with Mr. Shafi after 2014 after you

14   moved out of the area?

15   **A.**    Not that I can recall, or anything notable.

16          **MR. MATTHEWS:**  Very well.  No further questions, Your

17   Honor.

18          **THE COURT:**  All right.  Any cross-examination?

19          **MS. LaPUNZINA:**  Yes, Your Honor.

20                     <u>**CROSS-EXAMINATION**</u>

21   BY MS. LaPUNZINA:

22   **Q.**    Good morning.

23   **A.**    Good morning.

24   **Q.**    Your testimony this morning about Mr. Shafi is based on

25   your relationship with him when you were in school, is that

1  right?

2  **A.**    Yes.

3  **Q.**    And your relationship with him on a few backpacking trips,

4  is that right?

5  **A.**    Correct.

6  **Q.**    Were any of the other people who were on the backpacking

7  trip with you, were they Saleem Karim or Abdul Qadar Niazi?

8  **A.**    No.

9  **Q.**    Those weren't two of the four people who went backpacking

10  with you?

11  **A.**    No.  Not with all of us.

12  **Q.**    And you've had no contact whatsoever with Mr. Shafi since

13  your hiking trip in Henry Coe park in the spring of 2014.

14  **A.**    Correct.

15  **Q.**    So you know nothing about his thought process since the

16  last time you guys went backpacking together.

17  **A.**    Yes.

18          **MS. LaPUNZINA:**  I have no further questions.  Thank

19  you.

20          **THE COURT:**  All right.

21          **MR. MATTHEWS:**  No redirect, Your Honor.  And he may be

22  excused.

23          **THE COURT:**  Okay, Mr. Keenan.  Thank you.

24                  (Witness excused.)

25          **MR. MATTHEWS:**  Your Honor, the defense calls Noah

1    Shafi.

2                              **NOAH SHAFI**,

3    called as a witness for the Defendant, having been duly sworn,

4    testified as follows:

5             **THE CLERK:**  Please be seated.  And if you would please

6    state your full name for the record and spell it for the court

7    reporter.

8             **THE WITNESS:**  Noah Shafi.  N-O-A-H, S-H-A-F-I.

9                        **DIRECT EXAMINATION**

10   BY MR. MATTHEWS:

11   **Q.**   Morning, Mr. Shafi.

12   **A.**   Good morning.

13   **Q.**   Let's begin with a little bit of your background.  What

14   kind of work do you do?

15   **A.**   I'm a software engineer.

16   **Q.**   And for how long have you been a software engineer?

17   **A.**   For six years.

18   **Q.**   And where do you presently work?

19   **A.**   I work at a company called Get Together.

20   **Q.**   And what does Get Together do?

21   **A.**   Get Together is a mobile app that facilitates people

22   getting together in real life.

23   **Q.**   During your six-year tenure, for want of a better word, as

24   a software engineer, is most of what you've been doing related

25   to developing applications?

NOAH SHAFI - DIRECT / MATTHEWS

1   **A.**   Yes.

2   **Q.**   Mobile applications?

3   **A.**   Mobile and web.

4   **Q.**   Are you related to Adam Shafi?

5   **A.**   I am.

6   **Q.**   And how are you related?

7   **A.**   I'm his cousin.

8   **Q.**   What side of the family would you be a cousin on?

9   **A.**   My dad's side.

10  **Q.**   And who is your father?

11  **A.**   Omar Shafi.

12  **Q.**   And he is the brother of whom?

13  **A.**   Of Sal Shafi.

14  **Q.**   When you say "Sal Shafi," are you speaking of Salama Shafi

15  who is Mr. Shafi's father?

16  **A.**   Yes.

17  **Q.**   As a cousin, I can safely assume that you're pretty

18  familiar with Mr. Shafi's family because of your extended

19  family as well, correct?

20  **A.**   Yes.

21  **Q.**   How many siblings does Mr. Shafi have?  And I'm assuming

22  -- when I say "Mr. Shafi," I'm speaking about Adam Shafi.

23  **A.**   Okay.  He has four siblings.  Right?

24  **Q.**   One of his brothers is Ramsey?  Is that correct?

25  **A.**   Yes.

**NOAH SHAFI - DIRECT / MATTHEWS**

1   **Q.**   Another one is Ismail, sometimes called Izze?

2   **A.**   Yes.

3   **Q.**   He has a younger brother named Gabriel, sometimes referred

4   to as Goo-Goo?

5   **A.**   Yes.

6   **Q.**   And a sister -- I believe her name is Nora, correct?

7   **A.**   Yes.

8   **Q.**   I want to focus your attention on the summer of 2014, kind

9   of late June, early July.  Do you have that time period in

10   mind?

11   **A.**   Yes.

12   **Q.**   Where were you living at that time?

13   **A.**   I was living with my parents in Lafayette.

14   **Q.**   And were you out of school.

15   **A.**   Yes.  It was summer break.

16   **Q.**   Okay.  Where were you in school at the time?

17   **A.**   I was at UC Berkeley.

18   **Q.**   Were you working?

19   **A.**   I was working on a personal project that summer.

20   **Q.**   What was the personal project?

21   **A.**   It was a web app that was, basically, like a stub hub type

22   of thing where you could sell tickets for events online.

23   **Q.**   Do you write the codes for any of the apps that you're

24   developing?

25   **A.**   Yes.

1   Q.   When I say "codes," I mean computer codes.

2   A.   Yeah, yeah.

3   Q.   How long have you been coding?

4   A.   I've been coding for six years.

5   Q.   As a cousin of the family, do the families interact quite

6   a bit?

7   A.   Yeah.

8   Q.   You've had a number of occasions to go to Mr. Shafi's

9   family house, and vice versa, and engage in, you know, events

10   and dinners and things of that sort?

11   A.   Yes.

12   Q.   During the course of these family interactions, did it

13   come to your attention at some point that Adam Ramsey and --

14   excuse me -- Adam Shafi and Ramsey Shafi were interested in

15   learning about coding?

16   A.   Yes.

17   Q.   Did they at any time visit your parents' house to get some

18   instruction?

19   A.   Yes, they did.  That summer of 2014.

20   Q.   And when you say "that summer," are you speaking in the

21   late June, early July time frame?

22   A.   Yes.

23   Q.   All right.  Did they come to you for the purpose of

24   learning that coding?

25   A.   Yeah.

1  **Q.**   Now, explain a little bit about how one would go about

2  teaching it.  What do you do?

3  **A.**   Well, most of it is, you know, googlable.  So you -- there

4  are certain sites where you can go and start and get going.

5  And then after that, you kind of got to -- well, for them, they

6  came to me so I was able to teach them, as well.  But a lot of

7  it is certain sites where you can start learning and, you know,

8  googling things when you get stuck.

9  **Q.**   All right.  When you teach coding, is there a preference

10  as to the type of hardware that you learn on or teach on?

11  **A.**   Well, yes.  And especially in this instance.  If -- for

12  me, someone who knows how it works on a Macintosh, a Mac

13  computer, teaching them is a lot more helpful for having a Mac

14  computer.  And also, Mac is generally the standard for coding,

15  especially in the bay area.

16  **Q.**   When you say Mac, Macintosh, or MacBook, you're referring

17  to the computers that are made by Apple?

18  **A.**   Yes.

19  **Q.**   So you said at some point that Mr. Shafi and his brother,

20  Ramsey, showed up at your house for their first lesson, I

21  guess.

22  **A.**   Yes.

23  **Q.**   Did they come with Macs or did they come with PC's?

24  **A.**   They came with PC's.

25  **Q.**   Once you learned they had come with PC's instead of Macs,

1  did you give them any feedback on the whole PC versus Mac

2  learning experience?

3  **A.**   Yeah.  I told them it would probably be a little bit

4  harder to get going on the PC, but we could try.  And we did

5  try at first with the PC's.

6  **Q.**   Okay.  So you at first try to do your coding instruction

7  on the PC's that Mr. Shafi and his brother Ramsey brought to

8  the house, correct?

9  **A.**   Yeah.

10 **Q.**   How did it work?

11 **A.**   The progress was incremental and it was a lot harder.  So

12 at some point we decided to -- I had some old MacBooks and we

13 decided to try to get those out to -- for them to start

14 learning on those instead.

15 **Q.**   Who did the old MacBooks belong to?

16 **A.**   One of them was mine and one of them was my sister's.

17 **Q.**   What's your sister's name?

18 **A.**   Alia Shafi.

19 **Q.**   Was she at home during this particular time period?

20 **A.**   She was not at home at that specific time.

21 **Q.**   I'm sorry.  When I say "that time period," I'm talking

22 about early summer, late June, early July, when you were giving

23 instruction to Mr. Shafi and his brother, Ramsey.

24 **A.**   She was living at home, yeah, during that time.  But --

25 yeah.

**NOAH SHAFI - DIRECT / MATTHEWS**

1  **Q.**    Did both of these old Macs work?

2  **A.**    No.  One of them did not work.  The other one did.  The

3  one that did not work was mine.

4  **Q.**    When you said it did not work, can you describe to the

5  jury what you mean?

6  **A.**    It just wouldn't turn on.  We plugged it in.  The computer

7  hadn't been booted up in awhile.  When we tried to turn it on,

8  it just wouldn't turn on.

9  **Q.**    Did you attempt to boot up Alia's Mac?  Your sister's?

10  **A.**    Yes.

11  **Q.**    Did that one work?

12  **A.**    That one would turn on.

13  **Q.**    Were you able to gain access to it when once you got it to

14  turn on?

15  **A.**    We were not actually able to get into the computer because

16  there was a password that we didn't know.

17  **Q.**    So could you describe for the jury what steps you took to

18  try and get into Alia's MacBook even though it was password

19  protected?

20  **A.**    Well, first thing we did was to try to google how we can

21  get into this MacBook not knowing the password.

22  **Q.**    Sorry to interrupt you.  But what kind of search term

23  would you use when you said you googled to try to get into the

24  MacBook?

25  **A.**    Yeah.  Well, so we would say probably how to get into a

1    MacBook without -- with a -- with a password you don't know.

2    Yeah.

3    **Q.**   And did any of the Google search returns assist you in

4    actually successfully gaining access to that MacBook?

5    **A.**   No.

6    **Q.**   Did you at any time following that lesson give Alia's

7    MacBook to Ramsey and/or Mr. Shafi -- Adam Shafi -- to let them

8    try to see if they could do it?

9    **A.**   Yes, I did.

10   **Q.**   And did Mr. Shafi -- Adam Shafi -- and his brother,

11   Ramsey, return to your house for a further lesson at some

12   point?

13   **A.**   Yeah, they did.

14   **Q.**   Going back to the family relationship, you're familiar

15   with all the family members from being a relative yourself,

16   correct?

17   **A.**   Yes.

18   **Q.**   And you're familiar with your Uncle Sal?  Salama?

19   **A.**   Yes.

20   **Q.**   The families get together a lot?

21   **A.**   Yes.

22   **Q.**   And over the course of the relationship between the

23   families, were you in a position to get to know Mr. Shafi --

24   when I say "Mr. Shafi" I'm referring to Sal -- well?

25   **A.**   Yes.

1  Q.   Based on what you know of him, his reputation, he's into

2  computers and computer science, correct?

3  A.   Yes.

4  Q.   That's something he wanted his family and children to be

5  conversant with, as well.

6  A.   Very much so.

7  Q.   Based on understanding of Mr. Shafi -- that is, Sal

8  Shafi -- would he have supported the purchase of MacBooks for

9  Adam Shafi and Ramsey Shafi?

10  A.   Most definitely.

11       MR. MATTHEWS:   I have no further questions, Your

12  Honor.

13       Give me one second.

14       THE COURT:   All right.

15       MR. MATTHEWS:   Thank you.

16       THE COURT:   Okay.

17       MS. LaPUNZINA:   Just one moment, Your Honor.

18                   CROSS-EXAMINATION

19  BY MS. LaPUNZINA:

20  Q.   Good morning.   Sorry.   I'm taking a minute to get my

21  papers together.

22       So you're very close with your cousin, Adam Shafi, right?

23  A.   Yes.

24  Q.   Are you still close with him?

25  A.   Yeah.   I go visit him when I get the chance.

NOAH SHAFI - CROSS / LAPUNZINA

1  **Q.**  And after you taught Adam Shafi and his brother, Ramsey,

2  how to code or started teaching them how to code, did you stay

3  in touch with them after that time frame?  Late June, early

4  July, 2014?

5  **A.**  Yes.

6  **Q.**  Are you familiar with a trip, the family trip, that they

7  took to Egypt shortly -- very shortly after they met with you

8  probably?  Is that right?

9  **A.**  Yes.

10 **Q.**  Was it within a matter of a couple weeks?

11 **A.**  I'm not 100 percent sure.

12 **Q.**  But you're familiar they went to Egypt --

13 **A.**  Yeah.

14 **Q.**  -- as a family in July?

15 **A.**  Yeah.

16 **Q.**  Are you familiar with the fact that Mr. Shafi left his

17 family and went on a solo trip to Turkey while he was on that

18 trip?

19 **A.**  Yes.

20 **Q.**  Are you aware that he hadn't told his family he was going

21 to Istanbul, Turkey, during that trip?

22      **MR. MATTHEWS:**  Your Honor, this is beyond the scope, I

23 believe.

24      **THE COURT:**  Sustained.

25

1    **BY MS. LaPUNZINA:**

2    **Q.**   So you explained that you were teaching Adam and Ramsey

3    how to code in the summer of 2014, and you let them use two --

4    you and your sister's old Macs?

5    **A.**   Yes.

6    **Q.**   And one of them didn't work, which was yours, but your

7    sister's worked but had some -- they had some trouble accessing

8    it.  Is that right?

9    **A.**   Yes.  Yes.

10   **Q.**   Did you talk to them about buying laptops?

11   **A.**   Yeah.

12   **Q.**   And are you aware that, in fact, in July -- or, around

13   that time frame they did, in fact, go buy laptops at the Mac

14   store?

15   **A.**   Yes.

16   **Q.**   So they each had their own at that point?

17   **A.**   Yes.

18        **MS. LaPUNZINA:**  No further questions, Your Honor.

19        **THE COURT:**  Thank you.  Any redirect?

20        **MR. MATTHEWS:**  He may be excused, Your Honor.

21        **THE COURT:**  Mr. Shafi, thank you.

22        (Witness excused.)

23        **MR. MATTHEWS:**  Your Honor, the defense calls Madeline

24   Larsen.

25

1          **MADELINE LARSEN,**

2    called as a witness for the Defendant, having been duly sworn,

3    testified as follows:

4          **THE CLERK:**  Be seated.  And please state your full

5    name and spell it for the court reporter.

6          **THE WITNESS:**  My name is Madeline Larsen.  It's

7    M-A-D-E-L-I-N-E.  Larsen, L-A-R-S-E-N.

8                    **DIRECT EXAMINATION**

9    **BY MR. MATTHEWS:**

10   **Q.**   Good morning, Ms. Larsen.

11   **A.**   Good morning.

12   **Q.**   By whom are you employed?

13   **A.**   I'm employed by the Federal Public Defender Office.

14   **Q.**   And how long have you been employed by the Federal Public

15   Defender's Office?

16   **A.**   21 years.

17   **Q.**   What is your job position?

18   **A.**   I'm an investigator in the office.

19   **Q.**   Could you, before you get into that, could you give us a

20   little bit about your educational background?

21   **A.**   I have a bachelor's in social anthropology from Stanford.

22   **Q.**   Do you have any license, investigator credentials?

23   **A.**   I'm a licensed private investigator, and I have been

24   licensed since 1996.

25   **Q.**   When you say "licensed," you've been licensed -- is that

1   by the state of California?

2   **A.**   Yes.  By the state of California.

3   **Q.**   Are you the investigator assigned to this case?

4   **A.**   Yes, I am.

5   **Q.**   Are you the lead investigator, as it were, assigned to

6   this case?

7   **A.**   Yes, I am.

8   **Q.**   All right.  So if we were going to do a little role

9   reversal here, you'd be like the defense version of Special

10  Agent Reinke who is the case agent for the government?

11  **A.**   One might say that.

12  **Q.**   How long have you been working on this case?

13  **A.**   About one year.

14  **Q.**   And are you familiar with the documents that the

15  government has produced to the defense prior to the inception

16  of trial?

17  **A.**   Yes, I am.

18  **Q.**   As far as the trial itself is concerned, you have been

19  here throughout the entire course of the trial?

20  **A.**   Yes, except for a few sessions when I stepped out.

21  **Q.**   And that included the selection of the jury?

22  **A.**   Correct.

23  **Q.**   The testimony of all the government's witnesses except for

24  the times when you stepped out?

25  **A.**   Correct.

LARSEN - DIRECT / MATTHEWS

1   Q.   And the cross-examination of the government's witnesses?

2   A.   Yes.

3   Q.   You listened to all the testimony.

4   A.   Uh-huh.

5   Q.   You've had an opportunity, have you, to observe what

6   exhibits have been introduced into evidence?

7   A.   Yes, I have.

8   Q.   And some of those exhibits included items seized during

9   the search of the Shafis' residence in Fremont.  Correct?

10  A.   Yes, that's correct.

11  Q.   So you listened to the testimony regarding that search.  I

12  believe there were a number of agents that participated.  But

13  were you here for the testimony of the agents that conducted

14  the search of the Shafis' residence?

15  A.   Yes, I was.

16  Q.   Did you in particular hear the testimony of Special

17  Agent -- I believe it's Mansuy is how you pronounce it?

18  A.   I did.

19  Q.   Do you recall that he introduced into evidence photographs

20  of the evidence that was seized from the Shafis' residence?

21  A.   Yes.

22  Q.   I believe during the course of their testimony one of the

23  agents mentioned that they seized items of investigative

24  interest.  Are you familiar with that term?

25  A.   Yes, I am.

LARSEN - DIRECT / MATTHEWS

1   **Q.**   You stated earlier that you reviewed the documents

2   produced by the government.   Correct?

3   **A.**   Correct.

4   **Q.**   Okay.   I would like you to open the exhibit binder and

5   look for Defense Exhibit 1018.

6   **A.**   Okay.

7   **Q.**   Okay.   Do you recognize that?

8   **A.**   Yes, I do.

9   **Q.**   Are you familiar with it?

10  **A.**   I am.

11  **Q.**   And these appear to be some handwritten notes from a note

12  pad seized from the Shafis' residence?

13  **A.**   Yes.   That's correct.

14  **Q.**   Now, this exhibit reflects how many pages?

15  **A.**   Two.

16  **Q.**   Okay.   And what are the Bates numbers on those pages?

17  **A.**   AS-621 and AS-622.

18       **MR. MATTHEWS:**   Now, counsel, I'm referring to the

19  exhibit that I gave you.   I think it's also Government Exhibit

20  64-90.

21  **Q.**   So the exhibit I gave you reflects two pages from that

22  note pad, correct?

23  **A.**   Yes.

24  **Q.**   And these two pages were the same two pages produced by

25  the government to the defense prior to trial?

LARSEN - DIRECT / MATTHEWS

1    **A.**    Yes.

2    **Q.**    Okay.

3             **MR. MATTHEWS:**  Your Honor, I move this Exhibit 1018

4    into evidence.

5             **THE COURT:**  Any objection?

6             **MS. LaPUNZINA:**  No, Your Honor.

7             **THE COURT:**  All right.  It's admitted.

8        (Trial Exhibit 1018 received in evidence)

9    **BY MR. MATTHEWS:**

10   **Q.**    This AS-621 and -- thank you.  So AS-00621, which is

11   presently on the screen, is the single page of this note pad

12   that the government introduced in its case in chief.  Is that

13   correct?

14   **A.**    Yes.  That's correct.

15   **Q.**    Would you please now look at the second page, which is

16   AS-00622.

17        And Ms. Cruz, would you please publish that?

18        So this is a page that the government did not enter into

19   evidence during its case in chief, is that correct?

20   **A.**    That's correct.

21   **Q.**    Would you please read the items listed on this particular

22   page?

23   **A.**    It says:  Phone charger, converter (2), Egypt keys, dental

24   floss, Musuliya, water bottle, dates, book of -- and I can't

25   pronounce it, it's an Arabic term.  And another Arabic term at

LARSEN - DIRECT / MATTHEWS

1   the bottom.

2   **Q.**   If I understand your testimony, the third item listed on

3   this particular exhibit is Egypt keys, correct?

4   **A.**   That's correct.

5   **Q.**   Speaking of Egypt, did you have an opportunity to travel

6   to Egypt during the course of your investigation in this case?

7   **A.**   Yes, I did.

8   **Q.**   Where did you go?

9   **A.**   I traveled to Cairo and to two small villages outside of

10  Cairo.

11  **Q.**   And at the time that you were in Egypt, did you learn or

12  come across information that the Shafis had a residence there?

13  **A.**   Yes, I did.

14  **Q.**   Did you have a chance to go to the residence?

15  **A.**   Yes, I did.

16  **Q.**   Would you describe the building that the residence is

17  located in and where it is?

18  **A.**   The building is one of nine in a series of high-rise

19  apartment buildings that are located right near the Ain Shams

20  University near the Faculty of Law and the Faculty of Medicine.

21  It's in northeastern Cairo.

22  **Q.**   And where is the Shafis' residence within the building?

23  **A.**   I believe it's on the 13th floor.

24  **Q.**   While you were in Egypt doing your investigation, did you

25  have the opportunity to meet any members of the Shafi family?

LARSEN - DIRECT / MATTHEWS

1    **A.**    Yes, I did.

2    **Q.**    Who did you have a chance to meet?

3    **A.**    I met Adam Shafi's maternal grandparents.  I met his

4    uncles Amr, Usama, and Magdy on his mother's side.  I met his

5    uncle, Abdul, and a cousin, Ashraf Shafi.  I met other cousins

6    who lived in the villages, Ahmed al-Saidi, Anwar and their

7    families.  I met a couple of other cousins also.

8    **Q.**    You mentioned Uncle Usama.

9    **A.**    Yes.

10   **Q.**    Did Uncle Usama live in Cairo or elsewhere?

11   **A.**    No.  Usama al-Henafi lives in Mecca in Saudi Arabia.

12   **Q.**    With the exception of the uncle, Usama, did most of the

13   rest of the people you met live in Cairo?

14   **A.**    Yes.

15   **Q.**    Were they living there in 2015?

16   **A.**    Yes, they were.

17   **Q.**    Ms. Larsen, would you please open your exhibit binder to

18   Defense Exhibit 1012.

19   **A.**    Yes.

20   **Q.**    Tell me if you recognize the four photographs that are

21   part of this exhibit.

22   **A.**    Yes.  These are four photographs that I took.

23   **Q.**    Okay.  And you took them while you were in Egypt?

24   **A.**    Yes.

25   **Q.**    And having examined all four of these photographs, are

1   they representations of the actual photographs you took?

2   **A.**   Yes, they are.

3   **Q.**   These are true and correct copies of those?

4   **A.**   Yes, they are.

5          **MR. MATTHEWS:**   Your Honor, I move Exhibit 1012 into

6   evidence.

7          **MS. LaPUNZINA:**   Objection.   Relevance grounds.

8          **THE COURT:**   Overruled.   They'll be admitted.

9       (Trial Exhibit 1012 received in evidence)

10          **MR. MATTHEWS:**   Thank you, Your Honor.

11   **BY MR. MATTHEWS:**

12   **Q.**   Ms. Cruz, would you please publish Bates No. 5491-FPD.

13       Okay.   Ms. Larsen, take a look at this photograph and

14   would you just briefly describe for the jury who these people

15   are?

16   **A.**   On the left seated you have Omer Mansoor.   He's a maternal

17   uncle of Adam Shafi.   Then you have Adam Shafi's grandfather.

18   His mother is in the yellow blouse sitting on the arm of the

19   chair.   His grandmother is seated.   And his uncle, Usama, is

20   sitting on the right-hand side of the picture.

21   **Q.**   Thank you.   Would you please now turn to Exhibit 5492.

22       And Ms. Cruz, if you would publish that document.

23       Okay.   Would you describe for the jury what this picture

24   is of?

25   **A.**   This is the high-rise apartment building that the Shafis'

LARSEN - DIRECT / MATTHEWS

1  residence is in.

2  **Q.**   And would you now turn to Exhibit 5489 -- excuse me.  The

3  same exhibit number, but Bate's No. 5489.  And do you recognize

4  this photograph?

5  **A.**   Yes, I do.  This is the living room in the Shafi

6  apartment.

7  **Q.**   While we're at it, how is the apartment appointed and how

8  is it physically laid out?

9  **A.**   It's a two-story apartment.  It has a living room and a

10 kitchen, dining room, and another kind of common area on the

11 first floor.  And on the second floor are a number of bedrooms.

12 It's nicely furnished, it's clean.

13 **Q.**   When you say two-story, is the first story connected to

14 the second story by an interior staircase?

15 **A.**   Yes, it is.

16 **Q.**   And the staircase is within the apartment?

17 **A.**   Yes.

18 **Q.**   Lastly, would you please look at Bates No. 5490.

19      And Ms. Cruz, if you would publish that.

20      And it's pretty obvious, but would you just state for the

21 record what this is?

22 **A.**   This is the kitchen in the Shafi apartment.

23 **Q.**   Please take that down.

24      I want to shift gears and come back to the United States

25 for a moment.  Did you have occasion to serve a subpoena on the

1    San Mateo County Sheriff's Office?

2    **A.**   Yes, I did.

3    **Q.**   What was the subpoena for?

4    **A.**   It was requiring them to produce a police report reporting

5    the theft of a laptop from Adam Shafi from the Istanbul

6    airport.

7    **Q.**   How did you learn there was a police report?

8    **A.**   It was actually in the -- there was a reference to it and

9    a copy of it in the mailbox files that were provided by Google

10   that we received in discovery.

11   **Q.**   Why was a subpoena sent to San Mateo County Sheriff's

12   Office?

13   **A.**   The report was originally filed as an online report

14   through the San Francisco Police Department.  San Francisco

15   Police Department routed it to the San Francisco Airport

16   Division.  The San Francisco Airport Division is in San Mateo

17   County, and so the report became the property or the

18   responsibility of the San Mateo County Sheriff's Department.

19   **Q.**   Did the San Mateo County Sheriff's Department respond to

20   the subpoena?

21   **A.**   Yes, they did.

22   **Q.**   Would you please turn your binder to the exhibit tab 1016.

23   **A.**   Okay.

24   **Q.**   Take a look at those, and would you tell me whether these

25   are the documents that the San Mateo County Sheriff's Office

1   produced in response to the subpoena you served?

2   **A.**   Yes, they are.

3   **Q.**   On page Bates No. 5494, do you see a declaration from the

4   custodian of records?

5   **A.**   My Bates No. is 5495.

6   **Q.**   I'm sorry.  What did I say?

7   **A.**   5494.

8   **Q.**   I'm sorry.  5495.  Correct.  And is that a certificate of

9   authenticity and a declaration by the custodian of records?

10  **A.**   Yes, it is.

11  **Q.**   Does it indicate that the records were kept in the regular

12  course of business by a person with the duty to keep them?

13  **A.**   Yes.

14       **MR. MATTHEWS:**  Your Honor, I move Exhibit 1016 into

15  evidence.

16       **MS. LaPUNZINA:**  Objection, Your Honor.  Hearsay.  It's

17  a police report containing information which is hearsay.

18       **MR. MATTHEWS:**  Your Honor, this is being offered to

19  prove -- well, number one, it's in response to the subpoena.

20  It's also offered to buttress the statement Mr. Shafi made to

21  the agents that have questioned him on a number of occasions

22  that his laptop was, in fact, stolen.  And this shows why he

23  made that report.

24       **THE COURT:**  Yeah.  I'll allow it.

25       **MR. MATTHEWS:**  Thank you.

1        (Trial Exhibit 1016 received in evidence)

2    **BY MR. MATTHEWS:**

3    **Q.**   Would you turn to the page which is identified by Bates

4    No. 5497.

5        Ms. Cruz, would you please bring that up?

6        This particular page at the top says San Francisco Police

7    Department Airport Bureau.  Is that correct?

8    **A.**   That's correct.

9    **Q.**   And then the first entry under that is Property, correct?

10   **A.**   That's correct.

11   **Q.**   All right.  Would you please read what appears in the

12   description of the property described?

13   **A.**   It says "laptop."

14   **Q.**   And to the right of that is another field that says Serial

15   Number.  Would you please read into the record what that serial

16   number is?

17   **A.**   CPWM47D3DTY3.

18   **Q.**   Okay.  And over to the right of that it says Make and

19   Model.  Would you read into the record what that is?

20   **A.**   It says Apple/MD101LL/A.

21   **Q.**   Below that, over to the left again, is the Owner.  Who is

22   described as the owner of this particular laptop?

23   **A.**   Adam Shafi.

24   **Q.**   And just to move things along, below Mr. Shafi's name, the

25   status of the laptop is given.  What does it say?

**LARSEN - DIRECT / MATTHEWS**

1    **A.**    It says "stolen."

2    **Q.**    Would you please turn to the document Bates No. 5498.

3        Ms. Cruz, if you would please publish that.

4            **MS. LaPUNZINA:**  Your Honor, we object to this page in

5    particular based on hearsay.

6            **THE COURT:**  And ladies and gentlemen -- and I'm

7    looking specifically at the narrative portion.  That is not

8    admitted as speaking to the truth of the matter, but it is --

9    so it's not hearsay.

10       And with respect to that, go ahead.

11           **MR. MATTHEWS:**  Thank you, Your Honor.

12   **BY MR. MATTHEWS:**

13   **Q.**    Ms. Larsen, would you -- just at the top to make sure that

14   we're on the same page here, take a look at the second field

15   down where it says Persons Listing?

16   **A.**    Uh-huh.

17   **Q.**    Do you see an email address there?

18   **A.**    I do.

19   **Q.**    What is the email address?

20   **A.**    Reflexatron@gmail.com.

21   **Q.**    And then below in the narrative section, would you please

22   read that?  At the very bottom?

23   **A.**    I was resting with the laptop next to me in the

24   international airport in Istanbul, Turkey, while en route to

25   San Francisco.  When I woke up, the laptop was gone.  When the

1    incident was reported to the authorities at the airport, they

2    replied that there was nothing they could do.  I then had to

3    catch my flight.

4           **MR. MATTHEWS:**  Okay.  Thank you.

5        You can take that down, Ms. Cruz.

6    **Q.**  Okay.  Let's shift gears again.  You sent out a number of

7    subpoenas in this case, correct?

8    **A.**  Yes, I did.

9    **Q.**  Did one of them go to American Express?

10   **A.**  Yes, it did.

11   **Q.**  And what did the subpoena seek?

12   **A.**  The subpoena required them to produce documents regarding

13   a purchase protection claim that Adam Shafi filed regarding the

14   loss of the laptop because it was still within the time frame

15   that allowed him to recover the purchase price of that laptop.

16   **Q.**  How did you learn about the fact that Mr. Shafi had a

17   purchase protection plan under American Express?

18   **A.**  Again, there were documents and emails, communications,

19   between Mr. Shafi and American Express; and also between

20   Mr. Shafi and his father, Sal Shafi, that were in the emails

21   provided by Google in response to the government's search

22   warrant.

23   **Q.**  Did American Express respond to the subpoena?

24   **A.**  Yes, they did.

25   **Q.**  Would you please open your binder to the tab under 1019.

LARSEN - DIRECT / MATTHEWS

1  **A.**    Okay.

2  **Q.**    And just take a moment to take a look at that.

3  **A.**    Okay.

4  **Q.**    Okay.  Would you turn to the document Bates No. 5535.

5  **A.**    My Bates numbers start at 5456.

6  **Q.**    Do you have a 5535?

7  **A.**    I do not.  Let me see.  Oh, I do.  I take it back.  It's

8  very last page.  It was out of order.  I apologize.

9  **Q.**    Okay.  And that page says Certificate of Authenticity of

10  Business Records?

11  **A.**    Yes, it does.

12  **Q.**    Is it signed?

13  **A.**    Yes, it is.

14  **Q.**    Is it notarized?

15  **A.**    Yes, it is.

16  **Q.**    And does it state -- or, aver that the records were made

17  at or near the time of the occurrence of the matters contained

18  in the statements by a person with knowledge of those matters?

19  **A.**    Yes, it does.

20  **Q.**    Does the certificate of authenticity also state that the

21  records were kept in the course of regularly conducted business

22  activities?

23  **A.**    Yes.

24         **MR. MATTHEWS:**  Your Honor, I move Exhibit 1019 into

25  evidence.

1          **MS. LaPUNZINA:**  The government objects to certain

2     pages within those records which contain hearsay.  While the

3     record may have been kept in the ordinary course of business by

4     American Express, the document itself was not made by American

5     Express and does not reflect an activity of American Express.

6          So in particular, the government objects to pages numbered

7     FPD-005468, 5469, as well as pages 5484 and 5485 and 5486.

8          **MR. MATTHEWS:**  Brief response, Your Honor?

9          **THE COURT:**  Let me look at it first, please.

10         **THE WITNESS:**  I wonder if I could ask for a glass of

11    water.

12         **THE COURT:**  You may.

13         Mr. Matthews, your response.

14         **MR. MATTHEWS:**  Yes, Your Honor.  Number one, if the

15    Court looks closely at Exhibit 5468 -- let's start there -- I

16    believe it says American Express in the upper left-hand corner

17    as well as the upper right-hand corner.  All we're trying to

18    establish here is that a claim was filed.  It's not being

19    offered to prove the truth of what's stated within the claim

20    form itself.  But the relevance that the claim was filed for

21    reimbursement, that's a matter that's been testified to

22    already, I believe, in the government's case and is inexorably

23    connected to the police report that was filed as a necessary

24    predicate to file a claim.  Police report's already in

25    evidence.

 1           THE COURT:  Ms. LaPunzina.

 2           MS. LaPUNZINA:  We have the same objection, Your

 3   Honor.  I don't recall any evidence in the government's case

 4   with respect to this claim at all.  The government stands by

 5   the fact that it contains hearsay.  If the defense point is

 6   that he filed a claim for a stolen laptop, that point's been

 7   made.

 8           THE COURT:  And that's the point that I was waiting

 9   for.  So I do think that the point's been made.  These pages

10   are hearsay, I think.  And the fact that he filed -- he made a

11   claim with American Express has been established.

12   BY MR. MATTHEWS:

13   Q.   Let me ask it this way.  Ms. Madeline -- excuse me --

14   Ms. Larsen, did you learn from any other source about the

15   filing of this particular claim?

16   A.   Yes, I did.

17   Q.   What source was that?

18   A.   That was from the emails that were contained in the

19   response to the search warrant.  I think it was Government

20   Exhibit 36, I think.

21           MR. MATTHEWS:  Okay.  Your Honor, given that, I think

22   she's allowed to testify based on her recollection of what was

23   in the emails if the government's introduced this.

24           THE COURT:  I disagree with respect to specific

25   documents that you have in front of me right now.

1        **MR. MATTHEWS:**  Okay.  So just so the record's clear,

2  we're accepting that it's been established that Mr. Shafi did

3  in fact file a claim irrespective of what's contained in here.

4        **THE COURT:**  That's been the evidence.

5  **BY MR. MATTHEWS:**

6  **Q.**   All right.  Well, let's turn for a moment to computers.

7  You heard the testimony of Mr. Noah Shafi about him instructing

8  Ismail and -- excuse me -- Ramsey and Adam Shafi regarding

9  coding.  Were you here for that testimony?

10  **A.**   Yes, I was.

11  **Q.**   So there's been some testimony about the purchase of Apple

12  MacBook laptops both I believe in the government's case and in

13  the defense case so far.  Correct?

14  **A.**   That's correct.

15  **Q.**   Did you during the course of your investigation serve a

16  subpoena on Apple?

17  **A.**   Yes, I did.

18  **Q.**   And what did that subpoena seek?

19  **A.**   That subpoena sought information regarding two Apple

20  MacBooks; the one that was purchased July 3, 2014, and that was

21  stolen from Mr. Shafi in the Istanbul airport, and then a

22  laptop that was purchased on October 23, 2014, which is the

23  laptop which the government seized on July 3, 2015, and which

24  remains in -- I guess information that has been talked about

25  here.

LARSEN - DIRECT / MATTHEWS

1  **Q.**   Did Apple respond to that subpoena?

2  **A.**   Yes, they did.

3  **Q.**   What did they respond with?

4  **A.**   They provided a certificate of authenticity and a

5  spreadsheet with five tabs of information regarding those two

6  laptops.

7  **Q.**   When you say "spreadsheet," would that be what's commonly

8  referred to as an Excel spreadsheet?

9  **A.**   Yes.

10  **Q.**   Excel being the Microsoft software for spreadsheets.

11  **A.**   Right.

12  **Q.**   Please open your binder to exhibit tab 1017.  I believe

13  government's got a copy of this as well.  Take your time.  Take

14  a look at that and let me know whether this is the spreadsheet

15  Apple produced in response to the subpoena.

16  **A.**   Yes.  This looks like all of it.

17  **Q.**   Okay.  And would you take a look at the document which has

18  been Bate stamped 5515.

19  **A.**   Uh-huh.

20  **Q.**   Is that a business record certification of the Apple,

21  Incorporated, custodian of records?

22  **A.**   Yes, it is.

23  **Q.**   Is it signed?

24  **A.**   Yes, it is.

25  **Q.**   And does the certification aver that the records produced

 1   are the original, or duplicate of the original, records in the

 2   custody of Apple?

 3   **A.**   Yes, it does.

 4   **Q.**   And these records were made at or near the time of the

 5   occurrence of the matters set forth in the records?

 6   **A.**   Yes, it does.

 7   **Q.**   And the records were kept in the course of regularly

 8   conducted activity?

 9   **A.**   Yes.

10        **MR. MATTHEWS:**  Your Honor, I move Exhibit 1017 into

11   evidence.

12        **MS. LaPUNZINA:**  No objection.

13        **THE COURT:**  It's admitted.

14      (Trial Exhibit 1017 received in evidence)

15   **BY MR. MATTHEWS:**

16   **Q.**   Okay.  Ms. Larsen, so during the course of your work did

17   you investigate and learn the terminology used on Apple

18   spreadsheets?

19   **A.**   Yes, I did.

20   **Q.**   Including the abbreviations?

21   **A.**   Yes.

22   **Q.**   Would you take a look at Bates No. 5516.

23        Ms. Cruz, if you would publish that.

24        Okay.  You see the row that says 8?

25   **A.**   Yes.

1   **Q.**   And it says Description?

2   **A.**   Correct.

3   **Q.**   And immediately beneath that, in row 9, would you read

4   into the record what that says?

5   **A.**   MacBook Pro, 13-inch, Mid 2012.

6   **Q.**   Then over in the next column, Column B, do you see a

7   heading that says Serial Number?

8   **A.**   Yes, I do.

9   **Q.**   And would you read that serial number into the record?

10  **A.**   CPWM47D3DTY3.

11  **Q.**   Have you seen that serial number before?

12  **A.**   Yes, I have.

13  **Q.**   Where?

14  **A.**   It's the serial number in the report filed regarding the

15  theft of the laptop.

16  **Q.**   And to the immediate right of serial number, do you see

17  the purchase date?

18  **A.**   Yes, I do.

19  **Q.**   Okay.  And what is the purchase date listed?

20  **A.**   July 3, 2014.

21  **Q.**   Ms. Cruz, would you please take that down and publish

22  Bates No. 5519.

23       Okay.  Ms. Larsen, would you describe what this exhibit is

24  -- or, excuse me -- this particular page of Exhibit -- whatever

25  exhibit it is.  1017.

LARSEN - DIRECT / MATTHEWS

1  **A.**   This tab on the spreadsheet is what's called the device

2  registration tab, and it contains information that's captured

3  by Apple when a new computer or device is connected to an

4  iCloud or an Apple ID.

5  **Q.**   When you say iCloud, what are you referring to?

6  **A.**   Apple's iCloud system.  So, for instance, if you have a

7  machine and you log into your Apple account, your Apple ID

8  account, it registers the number of devices that you're using.

9  For instance, if you've tried to share your data with a lot of

10  your friends, you reach a limit that says you have five devices

11  connected to this Apple ID, you're not allowed to have more

12  connected.  Apple keeps track of that information.

13  **Q.**   So look on row 15 of this particular page.

14  **A.**   Okay.

15  **Q.**   And what does that indicate is the serial number?

16  **A.**   That's the same serial number as the laptop that was

17  stolen in the Istanbul airport.

18  **Q.**   What's in column D?

19  **A.**   Column D is the date the registration was received.  And

20  it's in -- for row 15 it is August 28, 2017.

21  **Q.**   And what is -- if you would turn to page 5520.

22       And Ms. Cruz, would you swap that out for 5519 for 5520?

23       Explain what this is.

24  **A.**   The spreadsheet captures the information when -- this tab

25  of the spreadsheet captures the information when the device is

1   registered.  So on the page we just looked at that has the

2   serial number, the date the device was registered; on this page

3   we have the information about the individual who registered the

4   device.

5        So we have, again, the description of the device in the

6   Column F.  The part number, which is the model of the laptop.

7   We have the user ID which is the unique ID that Apple assigns

8   to an individual link to an iCloud account.  It's a numerical

9   value.  Then you have the name H. Burak Berkiten and an email

10  address, and the name prefix, which is Bay.

11  **Q.**   And then if you look over in Column R where it says mail

12  address, what do you see?

13  **A.**   I see it says -- I can't pronounce it.  It says Erzene Mah

14  NO9 Izmir.

15  **Q.**   You familiar with any place in the United States called

16  Erzene Mah NO9?

17  **A.**   No, I'm not.

18  **Q.**   And again, this registration to iCloud took place in 2017,

19  correct?

20  **A.**   That's correct.

21  **Q.**   And that would have been after Mr. Shafi returned to the

22  United States from Istanbul in 2014.

23  **A.**   That's correct.

24  **Q.**   Very well.

25       **MR. MATTHEWS:**  Thank you, Your Honor.  I have no

**LARSEN - CROSS / LAPUNZINA**

1    further questions.

2            **THE COURT:**  All right.

3                        <u>**CROSS-EXAMINATION**</u>

4    BY MS. LaPUNZINA:

5    **Q.**   Good morning, Ms. Larsen.

6    **A.**   Good morning.

7    **Q.**   I don't have these electronically, but if we could still

8    stick with the Apple records, please, as you have before you.

9    **A.**   Okay.

10   **Q.**   So Exhibit 1017.  Defense Exhibit 1017.

11   **A.**   Uh-huh.

12   **Q.**   You were just walking us through some of these records,

13   and I've been trying to figure these out as well.  It's a

14   little difficult to see.  You have multiple pages that belong

15   to the same exhibit before you, is that right?

16   **A.**   That's correct.

17   **Q.**   So Mr. Matthews had you focus on the first page.

18   **A.**   Uh-huh.

19   **Q.**   Let me try to --

20           Ma'am clerk, if I could use the Elmo, please.

21           So line 9 is the laptop that was reported stolen, right?

22   **A.**   Yes.

23   **Q.**   So I just referred to as CPW.  Just so we can remember

24   which one we're talking about.

25   **A.**   That's fine.

1   **Q.**   And the product description is -- I don't know what all

2   these things mean, frankly, but it's 2X2 gigabyte.  Is that a

3   fair way to -- they can be distinguished different ways.  One's

4   2.5 2X2 gigabyte.  The other one is 2.6 gigahertz, 8 gigabyte?

5   **A.**   Yes.  They are different machines on the different lines.

6   **Q.**   Right.  So it's interesting if you track these through all

7   the different pages.  So we're, basically, following the

8   description of CPW, the laptop that's reported stolen.

9        So page 5519 that you were just looking at with

10  Mr. Matthews, this refers to lines 15 and 16 are the exact same

11  laptop.

12  **A.**   Yes.  That's correct.

13  **Q.**   And this relates to being registered two different dates

14  in 2017.

15  **A.**   Yes, that's correct.

16  **Q.**   This is information on the same laptop.

17  **A.**   Correct.

18  **Q.**   And if I follow, page 5520, we're still referring to that

19  same one laptop that was reported stolen.  So it's actually --

20  the last name Berkiten, last name Pektas.  You don't actually

21  know who these people are.  Right?

22  **A.**   No.  There are two entries for the same laptop.  It was

23  registered on two different occasions, and Apple captures each

24  date a device is connected.  So it was registered first in

25  August of 2017 by H. Berkiten, and then in October 2017 by

1  Volkan Pektas.  Both locations in Turkey.

2  **Q.**  So you were just asked to talk about the first line, but

3  these two lines, in fact, relate to the exact same laptop.

4  **A.**  Oh, yes, they do.

5  **Q.**  So if you could please look -- it's hard to follow these

6  pages.  But if you look at pages 5524 all the way through 5530.

7  So in particular, if you focus on 5530 we have that CPW laptop

8  again.  That's on the top.  The other laptop, which is the one

9  that was seized from Mr. Shafi's residence, is the one that's

10  listed below.  That's the C02 serial number?

11  **A.**  Yes.

12  **Q.**  Now, if you go to Column W, you see that associated with

13  that first one the CPW indicates the institution name is Home

14  School.  The second line, the one that was recovered from

15  Mr. Shafi, says San Francisco State University.

16  **A.**  That's correct.

17  **Q.**  Both say Customer First Name, Adam, correct?

18  **A.**  Yes.

19  **Q.**  Now, if you go to the next page, 5531, it now shows you

20  Customer Last Name, Shafi.  Customer Email.

21      So this top computer that we've been talking about as

22  having been reported stolen was actually registered -- the

23  Customer Email was Ramsey Shafi.

24  **A.**  Yes.  That's what's reported here.  The person ID,

25  however, to the right of that column, is Adam's person ID.

1   Q.   So it's clear that Adam Shafi bought these, right?

2   A.   That's my understanding.

3   Q.   And one of them was used by him and one of them was linked

4   to his brother, Ramsey Shafi's, email address according to the

5   records that you have before you.

6   A.   Yes.   It's my understanding that when there's an order by

7   multiple --

8   Q.   That's all I asked you.   Thank you.

9          MR. MATTHEWS:   She should be able to explain her

10  answer.

11         THE COURT:   You can ask on redirect.   She answered the

12  question.

13  BY MS. LaPUNZINA:

14  Q.   You've testified regarding the San Mateo police report and

15  the AMEX records which clearly reflect that there was a claim

16  made for a stolen laptop.   Now, the police report that you have

17  before you --

18  A.   Could you remind me of the exhibit number?

19  Q.   Yes.   It's 1016.

20       So this police report was filed with -- the page numbered

21  5496 is the San Francisco Police Department Airport Bureau

22  Incident Report, is that right?

23  A.   That's correct.

24  Q.   And this indicates that the theft of the stolen laptop was

25  reported on October 8, 2014.   Is that right?

1    **A.**    That's correct.

2    **Q.**    And the AMEX records that you were referring to

3    previously, which were Exhibits -- Exhibit 1019 --

4    **A.**    Uh-huh.

5    **Q.**    -- those -- you're familiar with those records, right?

6    **A.**    I am.

7    **Q.**    And they indicate that --

8          **MR. MATTHEWS:**  Your Honor, you've already ruled this

9    is hearsay.

10          **THE COURT:**  I have.

11          **MS. LaPUNZINA:**  I'm not asking a question about the

12    statement.

13          **THE COURT:**  I'm waiting for the question.

14          **MR. MATTHEWS:**  Very well.

15    **BY MS. LaPUNZINA:**

16    **Q.**    These records reflect that a claim was made of American

17    Express a bit earlier in time.  I think in September of 2014.

18    Is that right?

19    **A.**    Actually, the claim was originally filed online August 30,

20    2014.

21    **Q.**    With American Express?

22    **A.**    Yes.

23    **Q.**    What page is that, please?

24    **A.**    I'm not sure if that's reflected in this document, but

25    that was reflected in the emails.  Adam Shafi filed it and

1  received it and email response back giving him the claim

2  number.  And that's the same claim number reflected here.

3  **Q.**   The same claim number for an American Express claim?

4  **A.**   For the purchase protection claim.  So if you turn to --

5  let's see.  Where's the -- claim number appears on page Bate's

6  No. 5463, and it says Claim No. 720523.  That claim was

7  initiated on August 30.

8  **Q.**   And you're basing your statement that that claim was made

9  on August 30 based on what?

10  **A.**   Based on the emails that were contained in the emails

11  produced by Google pursuant to the government's search warrant.

12  **Q.**   So Mr. Shafi reported the theft of this laptop to American

13  Express in late August, and then pursued it with American

14  Express in writing, and then filed police reports in October of

15  2014.

16  **A.**   There was some back and forth in the email about whether

17  or not -- about the documentation he needed to provide.  And he

18  needed to file a police report.  So he eventually filed the one

19  online with the San Francisco Police Department, I think on

20  October 7.  I think that's the date.

21  **Q.**   So you're familiar with the fact that Mr. Shafi reports

22  that he tried filing a claim as soon as he was able to with the

23  authorities, but that he was told nothing could be done about

24  it?  Is that right?

25  **A.**   No.  He filed a claim on August 30, 2014, and then there

LARSEN - CROSS / LAPUNZINA

1    was some period of time before the claim was granted.

2    **Q.**    So he never told Officer Mon at the airport, when he was

3    interviewed on his return from Egypt with his family, that his

4    laptop had been stolen?

5    **A.**    I'm not familiar with what happened at the airport.

6             **MR. MATTHEWS:**   Your Honor, beyond the scope of

7    cross-examination.

8             **THE COURT:**   I'm not so sure that we are.  Overruled.

9    BY MS. LaPUNZINA:

10   **Q.**    I'm sorry what was your answer?  You're not --

11   **A.**    I've reviewed Officer Mon's report and I was present for

12   his testimony, but I don't know the full scope of everything he

13   said to Officer Mon at the airport.

14   **Q.**    It's clear in the testimony that you heard and the reports

15   that you've read that Mr. Shafi, just based on that

16   information, that Mr. Shafi never told him that his laptop had

17   been stolen.  He made mention about his cell phone being lost

18   or stolen, but not his laptop, is that right?

19   **A.**    He mentioned that -- I believe Officer Mon -- I'm

20   wondering if I could refresh my recollection by looking at

21   Officer Mon's report so that I don't misstate what's in the

22   report.

23             **MS. LaPUNZINA:**   One moment.

24        May I approach?

25             **THE COURT:**   You may.

1        **THE WITNESS:**  Thank you.

2      Okay.  Could you ask the question again?

3   **BY MS. LaPUNZINA:**

4   **Q.**   Does that refresh your recollection as to whether or not

5   Mr. Shafi told Officer Mon at the airport on August 20, 2014,

6   that his laptop --

7        **MR. MATTHEWS:**  Your Honor, I'm going to object to this

8   line of questioning.  She seems to be asking Ms. Larsen to

9   assess the credibility of Officer Mon.  I don't think that's

10  proper.

11       **THE COURT:**  What's your response to that?

12       **MS. LaPUNZINA:**  The defense has put on a fair amount

13  of evidence that the laptop was stolen and evidence relating to

14  claims and police reports associated with it.  And I'm trying

15  to elicit whether or not he, in fact, made a claim at the first

16  opportunity that he encountered law enforcement which is when

17  he returned to the United States, instead of waiting a period

18  of time before filing his claims.

19       **MR. MATTHEWS:**  Well, Your Honor, if the government

20  wants to establish that, they can re-call Officer Mon.

21       **THE COURT:**  I agree with you.  Sustained.

22       **MS. LaPUNZINA:**  May I approach?

23       **THE COURT:**  You may.

24  **BY MS. LaPUNZINA:**

25  **Q.**   So directing your attention now to Defense Exhibit 1018

**LARSEN - REDIRECT / MATTHEWS**

 1    which were the notes.  The hand -- the picture of handwritten

 2    notes that were taken during the search of Mr. Shafi's

 3    residence.

 4    **A.**    Yes.

 5    **Q.**    Do you know when these notes were made?

 6    **A.**    I do not.

 7         **MS. LaPUNZINA:**  One moment.

 8         (Pause.)

 9         **MS. LaPUNZINA:**  No further questions, Your Honor.

10         **THE COURT:**  Mr. Matthews?

11         **MR. MATTHEWS:**  One follow-up.

12              <u>**REDIRECT EXAMINATION**</u>

13    **BY MR. MATTHEWS:**

14    **Q.**    Ms. Larsen, would you please turn to Bate's No. 5477.

15    That's part of the American Express group of documents.

16         **THE COURT:**  Exhibit 1019.

17         **THE WITNESS:**  Yes.

18    **BY MR. MATTHEWS:**

19    **Q.**    Ms. LaPunzina just asked you a couple of questions about

20    the date that Mr. Shafi filed the claim.

21    **A.**    Correct.

22    **Q.**    Is that date apparent on this document?

23    **A.**    Yes.

24    **Q.**    In the first line?

25    **A.**    Yes, it is.

 1   Q.   What's the date?

 2   A.   August 30, 2014.

 3        MR. MATTHEWS:  One moment, Your Honor.

 4        (Pause.)

 5        MR. MATTHEWS:  That's it, Your Honor.  Thank you.

 6        THE COURT:  All right.  Anything further?

 7        MS. LaPUNZINA:  Nothing further.  Thanks.

 8        THE COURT:  Thank you, Ms. Larsen.

 9                   (Witness excused.)

10        MR. FAKHOURY:  Your Honor, we call Dr. Marc Sageman.

11                        **MARC SAGEMAN**,

12   called as a witness for the Defendant, having been duly sworn,

13   testified as follows:

14        THE CLERK:  Be seated.  And if you would please state

15   your full name for the record and spell it for the court

16   reporter.

17        THE WITNESS:  Sure.  My name is Marc S. Sageman.  Marc

18   is spelled with a C.  And Sageman is spelled S-A-G-E-M-A-N.

19        MR. FAKHOURY:  Thank you, Your Honor.

20                   **DIRECT EXAMINATION**

21   BY MR. FAKHOURY:

22   Q.   Just about good afternoon, Dr. Sageman.  How are you?

23   A.   I'm fine.

24   Q.   What is your occupation?

25   A.   I'm retired.

**SAGEMAN - DIRECT / FAKHOURY**

1  **Q.**   And what field are you retired from?

2  **A.**   Where do you want to start?

3  **Q.**   Well, why don't we start at the very beginning.  Where did

4  you go to college, sir?

5  **A.**   I went to Harvard.

6  **Q.**   And when did you graduate?

7  **A.**   1973.

8  **Q.**   Did you do anything to further your education after that?

9  **A.**   Yes.

10  **Q.**   And what was that?

11  **A.**   I did an M.D. and Ph.D. at the same time as an M.D./Ph.D.

12  fellow at New York University.

13  **Q.**   And when did you graduate from New York University?

14  **A.**   Well, I graduate several times.  I got my master's degree

15  in political sociology in 1977.  I got my M.D., my medical

16  degree, my medical doctorate, in 1979.  And I got my Ph.D. in

17  political sociology in February of 1982.

18  **Q.**   And after you graduated where did you go next?

19  **A.**   I first did residency in pathology, and then two years

20  later I joined the U.S. Navy as a flight surgeon.

21  **Q.**   How long were you in the Navy for?

22  **A.**   I was there for -- on active duty I was there for three

23  years.

24  **Q.**   And after the Navy, where did you go to work?

25  **A.**   I joined the Central Intelligence Agency.

1  Q.   How long did you work for the Central Intelligence Agency?

2  A.   I was there for seven years.

3  Q.   What was your role at the CIA?

4  A.   I was a case officer.

5  Q.   What does that mean?

6  A.   A case officer is your operative.  I've always been a

7  practitioner, whether physician or a case officer.  It's really

8  the fellow who handles spies, who runs wars.  It's stuff on

9  James bond, basically.

10 Q.   Was there a specific area you served when you were in the

11 CIA?

12 A.   Yes.  I was Near East and South Asia specialist.  That was

13 the division.  They assign you a division.  So I was Middle

14 East and South Asia.

15      And while doing that, I was assigned to the Afghan task

16 force where I initiated a lot of unilateral program with

17 *mujahideen* fighting the Soviets at the time in Afghanistan.

18 Then I was sent to Islamabad to run the program I had started

19 in Washington D.C.  And so I was on the Afghan issue for about

20 three years from 1986 to 1989.

21 Q.   When did you leave work for the -- when did you leave the

22 CIA?

23 A.   I left two years later in 1991.

24 Q.   And where did you go after that?

25 A.   I went back to civilian life.  I went back to medicine.

SAGEMAN - DIRECT / FAKHOURY

1  So I did one year of internship in medicine, in internal

2  medicine, at the University of Pennsylvania.  And then did a

3  three-year residency in psychiatry.

4  **Q.**   Were you ever qualified as an expert witness on forensic

5  psychiatry?

6  **A.**   Yes.  I became a forensic psychiatrist -- I think my

7  senior year of residency a friend of mine called me and asked

8  me if I could testify in court on one of the post office mass

9  murderer -- you know, going postal -- in New Jersey.  I did

10 that, and from then I became a forensic psychiatrist and I

11 testified maybe a dozen, 20 times.

12 **Q.**   Okay.  Now in the mid 1990s, did you become a member of a

13 study group at the University of Pennsylvania?

14 **A.**   Yes.  I joined what was called the Solomon Asch institute

15 -- the Solomon Asch Center for the Study of Ethno-Political

16 Conflict.  That just meant that we were studying political

17 violence throughout the world.

18 **Q.**   Now you've used the word "political violence."  Are there

19 other terms for that concept, that are commonly used or

20 commonly heard?

21 **A.**   Civil war, war, insurgency, terrorism, political violence.

22 **Q.**   And how long did you stay at the University of

23 Pennsylvania at the Solomon Asch Center?

24 **A.**   Until 2005, until I moved to Washington D.C.

25 **Q.**   Okay.  And when you moved to Washington D.C. in 2005, what

SAGEMAN - DIRECT / FAKHOURY

1  did you start to do then?

2  **A.**   I became a consultant for the government for various

3  government agency.

4  **Q.**   Can you tell us a little bit about which government

5  agencies you consulted for?

6  **A.**   Well, it would be hard to understand unless you asked me

7  what I did before.

8  **Q.**   Sure.  Well, what did you do before?

9  **A.**   9/11 happened.  And people talked about al-Qaeda, people

10  talked about Afghanistan.  So I wondered whether I had trained

11  people who did 9/11.  And it turned out there were no Afghans

12  in al-Qaeda at the time so they weren't my guys.  And if they

13  were not my guys, who were they?  So I started studying

14  al-Qaeda at that point and wrote a book *Understanding Terror*

15  *Network*.  I first testified at the 9/11 Commission in 2003, and

16  turned that testimony into a book that's probably one of the

17  most cited book in the field at this point.

18      And so because of that, just about every intelligence

19  agency, law enforcement, started calling me and asking me to

20  come and be patriotic and consult with them.  And since I was

21  spending just about all my time in Washington D.C., I decided I

22  was -- to move my family to be with me.  Because I was spending

23  about three or four days a week at Washington, D.C.  My family

24  was in Philadelphia.  So I moved to Washington, D.C., in 2005.

25  **Q.**   So your government consulting work was around essentially

1    some of the themes and topics you discussed in your book

2    *Understanding Terror Networks,* is that right?

3    **A.**   That's right.

4    **Q.**   Why don't we start by -- can you give us a very brief kind

5    of general synopsis of what *Understanding Terror Networks* is

6    about?

7    **A.**   *Understanding Terror Networks,* the first two chapters is

8    really the background, the context, in which 9/11 happened.

9    You know, what gave rise to al-Qaeda in the Middle East.  The

10   third chapter was very new.  I used a methodology of

11   epidemiology in medicine to kind of look at terrorists, and so

12   I started bringing empirical evidence, drawing empirical

13   evidence, through percentage, graphs, and so on, showing that

14   terrorists at that time were fairly well educated, mostly

15   married, and so on.  So most of your conception of a terrorist

16   was really refuted by the empirical evidence.

17       The fourth chapter was how people join a terrorist

18   organization, what later became known as radicalization.  And

19   the fifth chapter was a social network analysis of the various

20   people arrested in Europe and the United States and showing

21   that there were three or four clusters of terrorists.

22   **Q.**   So as a result of this book, which specific government

23   agencies did you end up consulting for?

24   **A.**   Just about every one of them.

25   **Q.**   Did you do any work for the Secret Service?

1    **A.**    Yes.  Secret Service specifically asked me to come on

2    board for at least a year to protect the President against

3    terrorist attacks.  And I did that from 2006 to 2007.

4         And by that time, was given back my security clearances

5    which I had at the agency.  So I had a security clearance which

6    allowed me to look at all secret documents on terrorism.

7    Because in a sense, protecting the President of the United

8    States required me to be able to access anything I wanted to.

9    **Q.**    Did you also do any work for the New York City Police

10   Department?

11   **A.**    Yes.  When I was consulting with the government of

12   Singapore, David Cohen, who's a deputy commissioner of the

13   police department, called me up and said, Marc, can you help us

14   out and defend the city?  We've created a position for you

15   called the scholar in residence.  And so, you know, this is New

16   York; it's very hard to pass up.  So, of course, I accepted and

17   I was there for a year.

18   **Q.**    How about, did you do any work for the United States Army?

19   **A.**    Yes.  So after the Fort Hood massacre -- I think it was

20   November 5, 2009 -- the Deputy Chief of Staff of the Army,

21   General Zanher, and that's a very difficult name to spell, it's

22   Z-A-N-H-E-R, Richard Zanher, called me up in Singapore and

23   said, Marc, we really need you here.

24        And so I came back.  I met with him.  They asked me to

25   come on board to be the special adviser to the Chief of Staff

1   of the Army on the insider threat, which is what they called

2   either traitors or terrorism from within the Army.  Wondering

3   whether they had more terrorists or traitors like Major Hasan.

4   If you recall, Major Hasan killed 13 people in 2009.

5       And so I was there for -- until April of 2013.  So for

6   almost three and-a-half years.

7   **Q.**   Okay.  You've already mentioned your book, *Understanding*

8   *Terror Networks*.  Have you written any other books?

9   **A.**   Yes, I have.

10  **Q.**   How many?

11  **A.**   Well, the fourth sitting there at the prosecution table.

12  That the fellow can show, right?  A fifth book is coming out in

13  about two months on the London bombings.  And another

14  two-volume books on what's happening in France, probably at the

15  end of next year.

16  **Q.**   Are your books peer reviewed?

17  **A.**   Yes, they were, from the University of Pennsylvania.  So

18  they have to go through a peer-review process with one or two

19  referees saying, Yes, it conforms to social science, to tenets

20  of social science.

21  **Q.**   As a result of your 40-plus years of experience, do you

22  have specialized knowledge about terrorism and political

23  violence?

24  **A.**   Well, it's just about all that I do now.

25  **Q.**   And you've already mentioned that you testified in front

1   of the 9/11 Commission.  Have you been -- have you testified as

2   an expert witness in civil or criminal cases surrounding topics

3   surrounding political violence and terrorism?

4   A.   Yes, I have.

5   Q.   How many times?

6   A.   Testimonies, maybe eight to ten.  Writing report -- a lot

7   of those cases are sentencing cases because a defendant pleads

8   guilty.  And so I've written a report for the rest.  And in

9   some cases I've been qualified.  But since the defendant pled

10  guilty, my testimony was not needed.  So about 24 cases, 25

11  cases, in all.

12  Q.   Have you ever been hired as an expert witness in a

13  criminal case by the government?  To be an expert on behalf of

14  the government in a criminal case?

15  A.   Criminal case connected to terrorism?

16  Q.   Yes.  Correct.

17  A.   By the government, yes.  One time.  The Boyd case, North

18  Carolina.  But he pled guilty so I didn't have to testify.

19       MR. FAKHOURY:  Your Honor, we would tender Dr. Sageman

20  as an expert.

21       MR. HASIB:  No objection.

22       THE COURT:  You can proceed.

23       MR. FAKHOURY:  Thank you.

24  BY MR. FAKHOURY:

25  Q.   And there's this humongous binder in front of you.  Can

1  you flip to Exhibit 1020?

2  **A.**   Sorry.  When you get my age you have to switch glasses.

3  Now I can't see you, but I can see the exhibit.  10 --

4  **Q.**   1020.  It's going to be all the way in the back.

5  **A.**   Yes.

6  **Q.**   Okay.  Is this your CV?

7  **A.**   Yes.  It's one of my CV's yes.  Yes.  One of the more

8  current ones.

9  **Q.**   And this has a summary of your qualifications, correct?

10  **A.**   Yeah.  My background, my professional area, qualification,

11  areas of expertise and so on, yes.

12       **MR. FAKHOURY:**  Your Honor, we move Exhibit 1020 into

13  evidence.

14       **MR. HASIB:**  No objection, Your Honor.

15       **THE COURT:**  It's admitted.

16    (Trial Exhibit 1020 received in evidence)

17  **BY MR. FAKHOURY:**

18  **Q.**   Okay.  Dr. Sageman, our office has retained you to work on

19  Mr. Shafi's case, correct?

20  **A.**   Yes.

21  **Q.**   Are you being paid for your work?

22  **A.**   I'm paid for my time.

23  **Q.**   And how much are you paid for your time?

24  **A.**   $300 an hour.

25  **Q.**   What work did you specifically do in this case?

1     Actually, let me strike that.  Let me ask it in a

2  different way.

3     As part of the work you've done in this case, have you had

4  an opportunity to review the discovery provided by the

5  government in this case?

6  **A.**   Yes.

7  **Q.**   Okay.  Have you reviewed all of the discovery provided by

8  the government in this case?

9  **A.**   Well, I thought I did, but then I just heard the testimony

10  of the person in your office, and I wasn't aware of that part

11  of the discovery.  So I didn't review that part, but just about

12  everything else, yes.

13  **Q.**   Okay.  There were some -- you may have heard some

14  reference to 15 phone calls admitted into evidence.  Did you

15  review those phone calls?

16  **A.**   Yes, I did.

17  **Q.**   Did you review other phone calls made by Mr. Shafi?

18  **A.**   Yeah, hundreds of them.

19  **Q.**   Now, you were in court when Dr. Vidino testified, right?

20  **A.**   Yes.

21  **Q.**   Okay.  And you obviously heard his testimony, correct?

22  **A.**   Yes.

23  **Q.**   I want to start by asking you about something that

24  Dr. Vidino testified about.  The concept that he called

25  radicalization.

1    **A.**    Yes.

2    **Q.**    First question to you is, do you agree with Dr. Vidino's

3    definition of radicalization?

4    **A.**    Well, as Lorenzo -- Dr. Vidino -- testified, there are

5    many definition.   There's no consensus on a definition of

6    radicalization.   And the definition that he used is not one

7    that I would completely agree with.

8    **Q.**    What would you disagree with?

9    **A.**    I would -- to me, radicalization -- I go back to 1960s.

10   So radicalization is a process of acquiring ideas which run

11   counter to the mainstream ideas of your society.   Your country.

12        So, for instance, if you are religious, like *salafi* Muslim

13   in London, you would be considered a radical because those are

14   not the mainstream ideas of even Muslims in London.   But in

15   Saudi Arabia, you'd be considered mainstream, you would not be

16   considered radical.   So it depends very much on the context

17   that you are talking about.

18        So to me, radicalization is just the acquisition of those

19   ideas that run counter to mainstream ideas, societal ideas, at

20   the time.

21        Where I differ from Dr. Vidino is he thinks that

22   radicalization includes legitimation of violence.   No.   There

23   is no indication in what people call radicalization, radical

24   ideas, about legitimation of violence.   It's a different

25   process.

Q.    Why do you think it's important to separate out those two processes?

A.    Well, about ten years ago in a sense I worked with the FBI in both their behavioral unit where they come up with this two-step process, radicalization and mobilization.  Although I did not call it that.  There was, one, the acquisition of ideas, and the second was a turning to political violence.  Which is my terminology.  Hence the title of my big book.

And it was very clear that people who had radical ideas, meaning ideas that run counter to society, their general society, most of them do not turn violent.  Many of them still reject violence.  And so it's -- the turn to violence is a secondary process.

And then as I learned more, as I left government service in 2013, I had about five years to kind of think about what I had learned.  And, you know, remember I had access to just about everything the government had.  So I interviewed a lot of terrorists myself.  I've interviewed about 50 terrorists -- mostly in prison in Guantanamo, in Afghanistan, Saudi Arabia, in France, England -- and tried to make sense about what I learned.  And I realized that even this whole concept of two steps really was not what I was learning from the empirical evidence.

And so the process that I describe in my last two books that had been published -- namely, *Misunderstanding Terrorism*

1  and *Turning to Political Violence*, delineates this process of

2  turning to violence.

3      And you can have radical ideas and be violent.  You can

4  have radical ideas and not be violent.  And you can be violent

5  without radical ideas.  The two are not the same.

6      But the process is actually very similar in not just

7  Muslim terrorist, but I went back in that large book and went

8  back to the French Revolution.  Looked at terrorists throughout

9  the last 240 years.  I looked at 34 campaigns of political

10  violence.  Each campaign has hundreds of incident.  And some

11  incidents included sometimes ten terrorists.  So I've looked at

12  several thousand people to really look at that.  And the

13  process that I describe in my book is, basically, supported

14  about 90 percent of the cases.

15  **Q.**  Let me ask you another question.  You mentioned that under

16  your concept of radicalization, it sort of depends on the

17  society you're in at that given moment.  Are there, in your

18  opinion, are there ideas that westerners would consider radical

19  that would be otherwise considered mainstream in the Middle

20  East or North Africa?

21  **A.**  Yes.  As I just mentioned, the example of a *salafi* Muslim;

22  a *salafi* Muslim is a very literalist Muslim who believes

23  everything in the Quran.  It's one of -- it's a subset of the

24  four schools of jurisprudence in Islam.  The *salafi* in London

25  would be considered radical.  But if he goes to Saudi Arabia

1  where the whole society is *salafi*, it would be considered

2  mainstream.  Or even to just about any of the gulf states,

3  whether it's Kuwait, Oman, Qatar.

4  **Q.**   Based on your review of the evidence in this case, do you

5  have an opinion about whether Mr. Shafi had radical ideas,

6  under your framework?

7  **A.**   Yes.

8  **Q.**   And what is that opinion?

9  **A.**   I think he had radical ideas.  What he was thinking was

10  very much different from what regular American citizens were

11  thinking about the Middle East.

12  **Q.**   Let's shift gears a little bit now to talk about something

13  else Dr. Vidino testified about, which is mobilization.  Do you

14  agree with his definition of mobilization?

15  **A.**   No, I don't.

16  **Q.**   Okay.  Why is that?

17  **A.**   Mobilization is a term from sociology.  It comes from --

18  it's called something -- a discipline within sociology called

19  social movement theory.  And mobilization in social movement

20  theory is just joining a movement.  It's clear that in my

21  definition, or in most government definition, this is

22  radicalization.  So in a sense, what the government says and

23  what academia says is really at odds with each other.  So that

24  creates a lot of misunderstanding and friction.

25     But I also found out that this is not how people become

1   violent.  And so this whole notion of mobilization is really

2   the government's conception of how people become violent.  But

3   I did not find that to be true empirically.

4   **Q.**   Do you have a different phrase or terminology you would

5   use to describe the process by which somebody becomes violent?

6   **A.**   Yes.  It's title of my book.  *Turning to Political*

7   *Violence*.

8   **Q.**   Based on your review of the evidence in this case, do you

9   believe that Mr. Shafi was on this pathway to political

10  violence as laid out in your literature?

11  **A.**   No.

12  **Q.**   And why is that?

13  **A.**   How I describe people becoming terrorist or violent, they

14  really think of themselves as soldiers defending their

15  community that's attacked by either a government or by some

16  other community.  And it's very clear to me that there's no

17  indicators in the discovery material that Mr. Shafi thought of

18  himself as a soldier.  Nowhere does he say, I'm a *mujahid*,

19  which is a *jihadi*.  But that's -- the *mujahid* is the singular

20  of *mujahidin*.  Nowhere does he say, I'm a soldier of *Allah*.  No

21  where does he say -- he doesn't think of himself as a soldier.

22  What he wanted to do is to share the suffering of people he

23  identified with.  Namely, the victims in Syria.

24  **Q.**    Is that common?  Or is that something you see -- let me

25  ask it this way:  You've testified that you've interviewed

1  about 50 terrorists under your -- that's your term.

2  **A.**    No, no.    Terrorists who were convicted terrorists.    So not

3  -- legally.    And not just here, but in Japan, elsewhere.

4  **Q.**    So in your interviews of those individuals, did you see

5  the same sort of focus on suffering and dying rather than

6  killing?

7  **A.**    Well, many of them were focused -- this is how they

8  politicize.    They acquired this belief by social identity

9  because they identified with victims of their own group being

10  victimized abroad, and so they decided that they wanted to do

11  something about it.    They wanted to defend it.    Become soldiers

12  to defend it.

13      Those were the guys who decide to become terrorists, to

14  become violent.    But many, many people -- it's almost a ratio

15  of ten to one or a hundred to one -- identify with the victims

16  because we're all human beings, and very few of them decide to

17  become soldiers, to actually kill other people.    Because that's

18  what soldiers do.

19  **Q.**    I want to talk about some specific items or pieces of

20  evidence that we've heard in this case.

21      The first is a June 5 phone call between Mr. Shafi and

22  Saleem Karim.    This is a long phone call where they discuss

23  Mohammad al-Joulani.    Do you recall that phone call?

24  **A.**    Yes.

25  **Q.**    And have you reviewed that -- have you reviewed the

1    transcript of that phone call?

2    **A.**    Yes.

3    **Q.**    What, in your view, is the significance of that phone

4    call?

5    **A.**    Well, he just, I guess, just watched on Al Jazeera the

6    interview of al-Joulani and was so enthralled with it that even

7    at 2:30 or 2:40 a.m. he called his friend who's in

8    Pennsylvania, so it's 5:30 over there, and said, This is great.

9    This is great.  I heard this.  It's fantastic.

10       I don't know if you heard it, but the voice was rambling,

11   they were half asleep, both of them.  And so he was very

12   enthusiastic about Joulani.  And then, of course, al-Nusrah

13   because Joulani is the *emir* of al-Nusrah.

14   **Q.**    In your review of the evidence in this case, did you see

15   any indication that this feeling of being enamored with Joulani

16   and al-Nusrah, is there any discussion in the discovery you

17   reviewed that that continued after June 5, 2015?

18   **A.**    No, not really.  Remember, Karim was on the plane.  So he

19   picked up Karim, I guess, later that day or the next day at

20   midnight.  A little bit after midnight.  And then the big

21   conversation that we have next -- I think there may have been a

22   few conversations, it kind of lasted a minute or so.  But the

23   big one after that is on June 8 when he doesn't really mention

24   Joulani or al-Nusrah in that conversation.  He goes on to -- he

25   wants to do other things.

1   **Q.**  But there was some reference in Dr. Vidino's testimony to

2  some statements that Mr. Shafi said about spilling gallons of

3  blood.  Do you recall that --

4   **A.**  Yes.

5   **Q.**  -- statement?

6   **A.**  This comes from -- this comes a week later.

7   **Q.**  Okay.  And does that statement have any significance to

8  you?

9   **A.**  Yes.  As I said, he identified with the victims in Syria.

10  He idealized, in a sense, a victim, because they were victims.

11  They now became pure, in his mind.  And he felt very guilty

12  that he's here in this country, protected, not suffering, and

13  all the people in his community are suffering over there.

14     So he wanted -- he identified with them and he wanted to

15  share in their suffering.  That's why he said, you know, I just

16  hope *Allah* doesn't take my soul until I have at least like a

17  couple of gallon of blood that I've spilled for him.  At least

18  something like that.  How can I meet *Allah* when my face has no

19  scars on it?  It's very much this wanting to share in the

20  suffering.  It's from guilt.

21   **Q.**  There was another -- and I can't actually recall if

22  Dr. Vidino testified about this.  But we've heard evidence in

23  this case about another phone call that Mr. Shafi had with

24  Mr. Karim where Mr. Shafi expressed he was jealous of an

25  associate or somebody who had died in Syria.  Did you recall

SAGEMAN - DIRECT / FAKHOURY

1  that conversation?

2  **A.**    Yes.  It happened two days later.  It was a very short

3  conversation.  I think that Mr. Karim said he knew somebody who

4  died in Syria.  And he said, Oh, I'm so freaking jealous.

5  **Q.**    Okay.  So is there any significance to that statement in

6  your mind?

7  **A.**    Same thing.  I want to share in the suffering because I

8  don't think I'm worthy, you know, being here protected, living

9  in luxury, while my fellow Muslims are dying in Syria.

10 **Q.**    And just so we're clear, in your view sharing in suffering

11 is not equated with killing.

12 **A.**    That's correct.  One is being a soldier.  And being a

13 soldier, people say different things.  You know, they say, I'm

14 a soldier.  I want to go out and kill people.  I want to be a

15 glorified hero.  That's really what soldiers say.

16 **Q.**    Okay.  I want to change topics now -- and now this is

17 something Dr. Vidino did testify about -- about a dream that

18 Mr. Shafi had where he saw Anwar al-Awlaki.  Do you remember

19 that testimony from Dr. Vidino as well as the overall -- the

20 dream that he was referencing?  Do you recall that?

21 **A.**    Yes.  At first when I read the discovery material I must

22 admit, I must confess that I missed that.  But after I

23 interviewed Mr. Shafi five, six times, he --

24          **MR. HASIB:**  Objection, Your Honor.

25          **THE COURT:**  Yeah.  Sustained.

 1          And let's proceed with a question that then Dr. Sageman

 2   can answer, as opposed to laying out something and --

 3              **MR. FAKHOURY:**  Sure.

 4   **BY MR. FAKHOURY:**

 5   **Q.**   Without getting into anything you learned from your

 6   interviews with Mr. Shafi; based on the discovery material,

 7   what is the significance to you of Mr. Shafi describing this

 8   dream?

 9   **A.**   Dr. Vidino was right.  I think a lot of religious Muslims

10   put a lot of importance to dreams that they have.  They think

11   they're either signs of god or signs of what they should do.

12   Hints.  Which is a little bit ironic since I'm a psychiatrist.

13   We used to put a lot of importance on dreams but for very

14   different reason.

15          But I was surprised that Muslims care a lot about the

16   dreams.  And the specific dreams from the discovery material,

17   especially in the conversation on June 30 and July 1, was that

18   he had met -- he had met al-Awlaki in his dream on April 19, I

19   think, was the date.  Let me check.  This is, by the way, my

20   own outline as opposed to the government's outline.  I did that

21   before.

22          And I think that -- yeah.  It was April 19, 2015, that he

23   had texted:  I saw Sheikh Anwar in my dreams and he gave me

24   specific orders.

25          And the orders was Mr. Shafi wanting to leave this

1   country.  He wanted to leave this country because he felt he

2   was treated like an enemy.  He wanted to do *hijra*, which is a

3   natural thing.  It's not the *jihadi* thing to do.  *Hijra,* as

4   Dr. Vidino explained, is to just -- for a lot of Muslims, so

5   difficult to be a Muslim here.  A Muslim in a non-Muslim

6   country.  That they want to go to a Muslim majority country so

7   they can be comfortable.  A little bit like Jerusalem.  To go

8   back to Israel.

9       And in Hebrew it's called (*Hebrew*).  It's called *hijra* in

10  Arabic.  It's the same thing.  You want to go back to -- or,

11  you want go to a community that's Muslim.

12      So he wanted to leave this country.  And al-Awlaki told

13  him that he could leave in October 2016.  And this was, of

14  course, April 2015.  And he was hesitating.  So al-Awlaki told

15  him:  You could leave in June of this year if you wanted to,

16  but I wouldn't recommend it.

17      **MR. HASIB:**  I'm going to object again as to the basis

18  for Dr. Sageman's knowledge for this particular testimony of

19  his.

20      **THE COURT:**  Sustained.  Let's just focus on -- you

21  were asking him, I thought, about the importance of dreams and

22  juxtaposing that to what Dr. Vidino had testified to.  Let's do

23  that rather than a narrative of that.

24      **MR. FAKHOURY:**  Sure.  Actually, I'm going to shift

25  gear a little bit anyway.

 1            THE COURT:  Okay.

 2    BY MR. FAKHOURY:

 3    Q.   In your review of the evidence, did you see any indication

 4    that Mr. Shafi had reached out to or made contact with anyone

 5    from the al-Nusrah Front or any other terrorist organization?

 6    A.   No, he did not.  I reviewed all the evidence and I didn't

 7    find a hint of it.

 8    Q.   Based on your review of the evidence in this case, do you

 9    have an opinion about whether Mr. Shafi took the steps to place

10    himself under the direction and control of the al-Nusrah Front?

11    A.   No, he did not.

12            MR. FAKHOURY:  Can I have a minute, Your Honor?

13            THE COURT:  You may.

14       (Pause)

15            MR. FAKHOURY:  I have no further questions, Your

16    Honor.  Thank you.

17            THE COURT:  All right.  Thank you.

18            THE WITNESS:  May I have a glass of water, please?

19            MR. FAKHOURY:  Yes.  I'll get you one.

20            THE COURT:  That we can do.

21            MR. HASIB:  Can we see Your Honor for a moment?

22       (The following proceedings were heard at the sidebar:)

23            THE COURT:  So how long do you think you'll go?

24            MR. HASIB:  It's going to go past 1:00.  I expect to

25    be 45 minutes, maybe an hour.  No longer than that.  We're

1  finishing early tomorrow morning.

2      The other thing about continuing today, Dr. Sageman was

3  reading from some notes.  We don't know what those are.  We

4  want those as *Jencks*.

5          **THE COURT:**  Sure.  I don't know whether it's *Jencks*,

6  but you're entitled to look at them.

7          **MR. FAKHOURY:**  It's just summaries of the evidence,

8  but you can have it.  That's not a problem.

9          **THE COURT:**  So here's my idea.  That we break now and

10 have Dr. Sageman testify first thing, then take a break, then

11 go into closings.

12         **MR. FAKHOURY:**  You mean have him testify tomorrow

13 morning?

14         **THE COURT:**  Tomorrow morning.

15         **MR. FAKHOURY:**  Sure.  Whatever the Court --

16         **THE COURT:**  As opposed to trying to take a break now

17 for a little bit and then do the cross-examination if the jury

18 was able to stay, which I think -- I don't think it's

19 necessary.  And -- so that's what I'm thinking.

20         **MR. FAKHOURY:**  That's fine with me.

21         **THE COURT:**  All right.

22         **MR. HASIB:**  Okay.

23     (The following proceedings were heard in open court:)

24         **THE COURT:**  So ladies and gentlemen, because of where

25 we are in the testimony of Dr. Sageman, I think we'll break

1  early today and come back first thing in the morning.  My

2  expectation is that after Dr. Sageman finishes we may move on

3  to the next phase of the case.  We'll see.

4     But between now and tomorrow -- we're getting close, but

5  we're not done with the evidence.  Once the evidence is in, the

6  lawyers are going to give you their perspectives on what you've

7  heard, I'm going to tell you what the law is.  And after that

8  you'll be able to start working on the case, talking about it

9  and working through things.  And that will be coming soon.

10    So between now and then, please follow the admonitions

11 that I've given you, have a good afternoon, and we'll see you

12 again tomorrow morning slightly before 8.

13    (The jurors exiting the courtroom.)

14 (The following proceedings were held in open court, outside the

15 presence of the jury:)

16    **THE COURT:**  Please be seated, everybody.

17    Then, Dr. Sageman, you've had some notes that you were

18 using to refer as a summary.  And if you, when this is done,

19 provide them to the government so they can take a look.

20    **THE WITNESS:**  Sure.

21    **THE COURT:**  And aside from that, shall we talk about

22 the jury instructions now rather than wait until 3?  Or do you

23 want to wait until 3 because you need to.

24    **MR. FAKHOURY:**  The only thing I need is I actually did

25 not bring a copy with me.  If I could have five minutes to grab

1    my pleadings and we can talk about it now or we can come back

2    at 3.  Whatever the Court wants.

3         THE COURT:  Well, what about the government?  What do

4    you think?

5         MS. LaPUNZINA:  We have the same request, five minutes

6    or 3:00 p.m., please.

7         THE COURT:  So it seems to me -- I assume Mr. Shafi

8    would like to come back -- or, would like to be here during the

9    jury instruction conference.  And I also think that it would be

10   helpful to have the jury -- somebody working on producing the

11   final instructions once we go through it.  So why don't we

12   break now and come back at ten of, if that's enough time.

13        MR. FAKHOURY:  That's fine.  Thank you, Your Honor.

14        MR. HASIB:  One request, Your Honor.  If the defense

15   team could be instructed that Dr. Sageman is now our witness.

16   They have no further contact with him at this point.

17        MR. FAKHOURY:  That's not a problem.

18        MR. MATTHEWS:  No problem.

19        THE COURT:  So instructed.  All right.  See you in ten

20   minutes.

21        THE WITNESS:  Do you want to make copies of it?  Five

22   pages?  I'll wait for you here.

23                  (Recess taken at 12:40 p.m.)

24                (Proceedings resumed at 12:50 p.m.)

25

1    (The following proceedings were held in open court, continuing

2    outside the presence of the jury:)

3         **THE COURT:**  All right.  So Mr. Fakhoury or

4    Mr. Matthews, where would you like to start?

5         **MR. FAKHOURY:**  Your Honor, I think on the jury

6    instruction, I think essentially there's only, I think, two

7    real issues that we've been -- based on your tentative in terms

8    of what you were inclined to do.  And so that is with respect

9    to the material support definition and then the First Amendment

10   instruction.  So those are essentially the two that we have

11   concerns with.

12        I think, obviously, the vast majority of the instructions

13   are not disputed, and we don't have issues with using Ninth

14   Circuit pattern instructions.

15        Of course, these two instructions, the material support

16   and the First Amendment are the two instructions for which

17   there's no Ninth Circuit pattern.  We can appreciate there's a

18   little bit of difficulty in terms of crafting an appropriate

19   instruction.

20        So with respect to the material support instruction, and

21   specifically I'm looking at page -- it's pages -- it's ECF

22   pages 57 and 58, or pages 52 and 53 on the -- in the bottom

23   right-hand corner.  Just so we're all on the same page.  You

24   know, obviously we would prefer our proposed instruction.  I

25   think our proposed instruction gives a little more specific

1    guidance to the jury.

2        You know, I think part of the problem in this case is

3    these terms are very -- they have very specific meanings and

4    they have very -- I guess maybe a way to say it, sort of

5    technical meanings.  And I think it's important the jury be

6    given as much guidance and as much instruction as possible in

7    terms of what these instructions mean.  I think that's

8    especially important given the Supreme Court's decision in

9    *Holder* which really lays out how the statute is supposed to be

10   interpreted in order to be consistent with the First Amendment.

11       So I think our instruction does that clearer than the

12   government's instruction.  And you know, we've listed out in

13   the authority section there have been other courts that -- you

14   know, no one's given this specific instruction, but have given

15   bits and pieces of it.  And so again, in our view, we think

16   this instruction adequately instructs what *Holder* requires and

17   provides more guidance to the jury on how to assess these very

18   sort of -- maybe not esoteric, but very technical, precise,

19   terms that have to be interpreted a particular way in order to

20   survive First Amendment scrutiny.

21       And so our view is that our instruction captures that, and

22   we would ask for our instruction.

23       If the Court overrules our objection, we do have some

24   minor suggested revisions to the government's instruction.  I

25   want to be clear that we're not waiving any objection, but we

 1    just wanted to flag a couple things that we thought could be

 2    done to improve the government's instruction.

 3         So that's our take on the material support instruction.

 4    Happy to address the First Amendment or --

 5              **THE COURT:**  Let's stay there for a second.

 6         Mr. Hasib or --

 7              **MR. HASIB:**  Your Honor, Mr. Fakhoury is right.  Their

 8    proposed instruction has not been used before, and it is sort

 9    of a mishmash of a bunch of different things.

10         We have some issues with the -- the first thing we have an

11    issue with is use of the word "coordination."  That is not

12    something that's in *Pugh*.  It's not in *Elhuzayel*, it's not in

13    *Salman*.  I think we found it in the *Mehanna* case, but that

14    instruction omitted the word "control" which is clearly in the

15    statute.

16         So we really object to use of the word "coordination."

17    It's just not anywhere that we think is a source of authority.

18    And this really -- it goes back to some of the prior litigation

19    in this case.  Specifically, the motion to dismiss.  This Court

20    held, I think -- it was Mr. Shih that was handling this at the

21    time -- but the Court held that both parties know that the

22    government will have to prove that the attempt to provide

23    material support must include that Mr. Shafi attempted to place

24    himself under the direction or control.  Direction or control.

25    And the direction or control language comes from the statute.

1    Coordination does not.  So we have a big problem with the use

2    of the word "coordination."

3        I think beyond that, I'd be curious to hear what their

4    minor changes are to our proposed instruction.  But I think

5    Your Honor got it right, let's go from the statute and the

6    definition, of what's in the law for the instruction.

7            THE COURT:  So my concern, in addition to

8    coordination, was that it seems to me that the defendant's

9    proposed instruction is somewhat confusing; more confusing for

10   the jury because it goes from the provision as personnel means,

11   and then it goes to the attempt.  And I just -- I think that

12   the government's instruction is not only correct as to the

13   language, but it's a clearer instruction.

14       So if -- assuming that I overrule your desire to have your

15   own instruction, what are the changes that you'd like to see in

16   the government's?

17           MR. FAKHOURY:  Your Honor -- and I apologize for not

18   showing this to anyone ahead of time.  We've been busy.

19       The modification we would have is -- I mean, I can read

20   it.  I'm happy to try to -- I can show it to Mr. Hasib and

21   maybe --

22           THE COURT:  What's the concept you're putting in?

23           MR. FAKHOURY:  Sure.  It's essentially some rephrasing

24   of the words.  So I can read it into the record just so we can

25   make a record of it.

1    So what we would propose would be to have the instruction

2  read -- and, again, just to make clear we're not waiving our

3  objection.

4        **THE COURT:**  I understand.

5        **MR. FAKHOURY:**  Is to have it read:  The term

6  "personnel" means one or more persons, which can include the

7  defendant's own person.

8    Then the next sentence would be, The, and then we would

9  ask to strike out all of the language.  So to strike out:

10  Defendant can be convicted for attempting to provide material

11  support or resources in the form of personnel if you find.

12    So we would ask that that be stricken.  And instead add:

13  The government must prove beyond a reasonable doubt.  And then

14  continue the instruction.  That the defendant -- we would ask,

15  has to be removed -- knowingly attempted to provide.  Strike

16  out all that language up through -- until himself.  Because

17  there's no allegation that it's anybody other than Mr. Shafi.

18  To work under the al-Nusrah Front's direction or control.

19    However, the defendant cannot be convicted if he acted --

20  so we would replace "attempted to work" with "acted," entirely

21  independently of the al-Nusrah Front to advance its goals and

22  objectives, or if he merely intended to associate with the

23  al-Nusrah Front or persons connected to the al-Nusrah Front

24  without placing himself under their direction, coordination or

25  control.

1    And I can show this to -- this is kind of what we were

2    thinking.

3        **MR. HASIB:**  Your Honor?  It becomes very one-sided

4    instruction at that point.  Removing that sentence.  The

5    defendant can be convicted for attempting to provide material

6    support in the form of personnel if you find that the defendant

7    has knowingly attempted to provide himself.

8        I think that we're ready to agree with.  We're not

9    alleging that he sent anyone else to al-Nusrah.  So I think we

10   can excise "one or more individuals."  But I think the

11   following sentence doesn't make a whole lot of sense to us

12   unless you have the preceding sentence in there, and they're

13   asking to remove that preceding sentence.

14       So I would leave it the way it is.  But we would concede

15   if we want to just limit it to personnel being himself, I think

16   we'd be on board with.

17       **THE COURT:**  Well, why don't you do that.  Every time I

18   look at what's here the page jumps because the court reporter

19   is changing the transcript.  So why don't you get me a copy so

20   that I can actually look at what you've said.

21       **MR. FAKHOURY:**  Absolutely.

22       **THE COURT:**  So that I can just be sure about what to

23   do.

24       **MR. FAKHOURY:**  Sure.  And I'm sorry I don't have a

25   copy now, Your Honor.  My apologies.

1     **THE COURT:**  So if you can get that.  We're going to be

2  back here at 2:00 case management conference -- you're not --

3  but you may -- you should be with a copy of whatever it is that

4  you --

5     **MR. FAKHOURY:**  Absolutely.  No problem.

6     **THE COURT:**  All right.  And then the second --

7     Is there anything else that you wanted to say with respect

8  to the material support?

9     **MR. FAKHOURY:**  Your Honor, the only thing I wanted to

10  add is just to respond very briefly to what Mr. Hasib said

11  about coordination.

12     You know, coordination comes from the Supreme Court's

13  opinion.  And just a couple references very quickly.  You know,

14  page 31 and 32 of Humanitarian Law Project says:  "The statute

15  reaches only material support coordinated with or under the

16  direction of a designated foreign terrorist organization,

17  independent advocacy that might be viewed as promoting the

18  group's legitimacy is not covered."

19     On page 26 of that opinion, the Supreme Court said,

20  "Congress has avoided any restriction on independent advocacy

21  or indeed any activities not directed to, coordinated with, or

22  controlled by foreign terrorist groups."

23     So I do think there is a basis for requesting language

24  about coordination.  It's true the instructions that have been

25  given that Mr. Hasib mentioned don't say that word

 1   specifically, but it comes from even a greater course which is

 2   a Supreme Court opinion.

 3        So that's our only point on that.

 4        **THE COURT:**  You may not have been in the case, either,

 5   at the time that I looked at this the first time.  But I think

 6   this -- wasn't this argument made to me before?  And didn't

 7   Mr. Hasib accurately state what I wrote?

 8        And I will go back, but that seems right to me.

 9        **MR. FAKHOURY:**  Yes, absolutely.  My -- yes, I think

10   the Court ruled on it in the context of the motion in dismiss

11   the indictment.  And I certainly don't disagree that Mr. Hasib

12   accurately stated what the Court said in that context.

13        **THE COURT:**  I'll go back and look at the law again.

14   But -- I thought I'd gone through at least what I think the law

15   is.  So -- I appreciate your making the point.

16        **MR. FAKHOURY:**  Understood.

17        **THE COURT:**  All right.  First Amendment.

18        **MR. FAKHOURY:**  So, Your Honor, with respect to the

19   First Amendment issue, we have some real concerns with the

20   *Hassan* instruction.  And I think I can appreciate that we maybe

21   -- maybe I muddied the waters a little bit by pointing out our

22   pleadings that *Hassan*, the case itself, had a First Amendment

23   instruction.

24        **THE COURT:**  You did start me there.

25        **MR. FAKHOURY:**  Yes, and I regret it much so now.  But

 1   just so that it's clear why exactly we even got into *Hassan* in

 2   the first place.

 3        If the Court recalls, in the government's motions *in*

 4   *limine*, the government moved to preclude us from referencing

 5   the First Amendment, and they cited *Hassan* as authority for its

 6   position that the First Amendment had no role to play here and

 7   there shouldn't be any reference to it.

 8        We pointed out in our response that *Hassan* itself, the

 9   jury was instructed about the First Amendment generally.  And

10   so we just -- I pointed that out to show, Hey, even the case

11   that they're citing doesn't actually stand for the idea that

12   the First Amendment has -- you know, should not even be

13   mentioned or referenced in the jury trial at all.

14        But the *Hassan* instruction itself -- well, let me say it

15   this way.  We are not asking for the *Hassan* instruction.  And I

16   think there's some real -- we have real concerns about the

17   *Hassan* instruction.  And I'm trying to find it exactly.

18             **THE COURT:**  Let me -- as you're -- before you launch

19   on the next thing.  The one change that I was thinking about

20   making with the *Hassan* instruction, which may address a little

21   but not everything that you're concerned about, is to strike

22   the last sentence.  And instead say:  These rights do not

23   include providing material support to an organization which is

24   engaged or engages in terrorist activity or conspiring to do

25   so.

1          **MR. HASIB:**  Just so I'm clear, this --

2          **THE COURT:**  This would be instead of the last sentence

3    which says:  Having instructed you about the First Amendment,

4    it's a defense, so forget about what I just said.  I thought

5    that what I just proposed to you makes more sense in the

6    context of the case.

7          **MR. HASIB:**  I'm sorry.  Can Your Honor repeat the --

8          **THE COURT:**  Yes.  These rights do not include

9    providing material support to an organization which is engaged

10   in, or engages in, terrorist activity or conspiring to do so.

11         **MR. HASIB:**  That sounds good to us.  I think it's an

12   accurate statement of the law.

13         Yeah, I think we're on board with that.

14         **MR. FAKHOURY:**  Your Honor, so I guess my first comment

15   would be I would absolutely support striking that last

16   sentence.  So we're in agreement on that.

17         I think what the concern I had more generally about this

18   instruction was -- there were two things.  Number one is the

19   title of it:  The First Amendment is not a defense to the crime

20   charged.  I would suggest that should just be changed to:

21   First Amendment.

22         I think the second issue we have is -- and I think this is

23   what we're really concerned with -- is we're throwing out the

24   concept of the First Amendment, which absolutely is implicated

25   in the case, but we're not giving the jury any guidance in

1    terms of how to handle the First Amendment or what role it has

2    to play.

3        Now, I would certainly agree that the First Amendment does

4    not defend -- is not a defense to the -- to providing material

5    support.  And so I don't have an issue with that sentence.  I

6    think the question becomes, well, we've introduced the concept

7    of the First Amendment and then we've said it's not a defense

8    to the charge.  So then I think we're leaving the jury with

9    sort of like wondering, Well, why are we even talking about the

10   First Amendment, then?

11       So my suggestion would be that the instruction give the

12   jury guidance on how to assess the First Amendment interests

13   involved in the case.

14       So, for example -- and we referenced some of the other

15   jury instructions.  Some of these instructions like *Khan* and

16   Mustafa -- or, not Mustafa.  Rather, *Kabir*.  Basically, tell

17   the jury, Look, you can consider speech, which is absolutely a

18   central role in this case.  Obviously the recordings, the text

19   messages, the Google search queries, the YouTube search

20   queries.  So the jury can consider speech as it relates to the

21   elements of the crime.  Meaning, they can consider speech made

22   by Mr. Shafi or anyone else as it sheds insight into intent, as

23   it sheds insight into substantial step; but that he cannot be

24   convicted solely on the basis of his speech.

25       And that there has to be something -- in other words, we

1   want to tether speech to the permissible grounds under which

2   the jury can consider speech.  Meaning, the elements of the

3   crime.

4        And that's something that the instructions that we've

5   cited do.  They, basically, tell the jury, Look, you can

6   consider speech for these purposes, but you cannot consider it

7   in and of itself in isolation.

8        I think that's -- in our view, it's the accurate statement

9   of the law.  And at least if we're going to introduce the First

10  Amendment to the jury as a concept, we should be giving them

11  some guidance on the role it has to play in the case.

12       So I would suggest that if we can kind of give the jury

13  some guidance on what they can consider the speech -- you know,

14  like the permissible bases for which they can consider speech,

15  and the impermissible bases for which they can consider speech.

16  That, cabined with the jury instructions regarding the specific

17  elements of the crime, would be enough for them to, basically,

18  assess the speech-related parts of this case in the context of

19  the specific crime.

20       So that's sort of how we envisioned it.  Obviously, we've

21  proposed a pretty thorough First Amendment instruction.  I'm

22  happy to try again with a different set of instructions.  Maybe

23  something narrower if the Court wants.  I'm open to whatever

24  the Court wants to consider, and I can provide something else

25  if the Court wants.  But that's really our concern.

1    Just being sure the jury understands how they can consider

2  the speech-related evidence in this case and that they're not

3  -- and eliminating any risk that they're solely prosecuting

4  him -- or convicting him, rather -- based on pretty nasty

5  things that they've heard in the recorded phone calls.

6         **THE COURT:**  To be clear, you gave me four instructions

7  on the First Amendment.  Won't you be able to argue from the

8  instruction that is proposed by the government where that says

9  the First Amendment establishes certain rights which accrue to

10  the defendant.  The First Amendment provides that it shall make

11  no law respecting the establishment of religion or prohibiting

12  the free exercise, or bridging freedom of speech, or the right

13  of people to be peaceably assembled.  The right of freedom of

14  speech and to engage in peaceful assembly extends to one's

15  politics.

16    Aren't you going to be able to argue from that everything

17  you need to argue without -- and without, then, confusing

18  anybody about what this is -- what the government's case is

19  about, which is material support?

20         **MR. FAKHOURY:**  Well, I'm certainly going to try to

21  argue it, Your Honor, but it obviously carries more weight when

22  it comes from the instruction.  Not as an advocacy point, but

23  rather as a statement of the law.  Because the Court's also

24  going to instruct the jury that it's the Court that determines

25  what's the law and not the lawyers.

1        And so what my fear is -- I will certainly try to make

2    those arguments; and I could get objected to as a misstatement

3    of the law, I could get -- in rebuttal the government could

4    say, Well, you know, Mr. Fakhoury talked about the First

5    Amendment, but here's what the jury instruction says.  And the

6    jury instruction says it's not an defense to material support.

7    I mean, the lawyers may be able to understand the nuance there,

8    but lay jurors are not going to be able to understand -- no

9    disrespect to them, but this is a pretty nuanced issue we're

10   talking about.

11       And so I think having instructions that come from the

12   Court and that explains how they can consider speech as it

13   pertains to the elements of the crime is, I think, appropriate.

14   And, again, I'm certainly going to argue it, as the Court

15   anticipated.  But it does need to come, I think, from the

16   Court.

17       **THE COURT:**  Right.  And you understand that by

18   striking this last sentence, I take away the statement that

19   it's not a defense to the case.  The thing that I saw in the

20   government instruction was that it would be a little confusing

21   to say, Yes, here's the First Amendment, but forget about it

22   because it's the defense.

23       But I do think that the First Amendment has to be cabined

24   by what this case is about.  And that's why I thought my

25   sentence was a good one.

1        Let me hear from the government.

2        **MS. LaPUNZINA:**  Your Honor, the government agrees with

3   the Court's proposal.  And just to restate our earlier

4   position, the reason why we didn't think a First Amendment

5   instruction was necessary at all is in fact because this case

6   involves attempt to travel.  This is not a speech case inciting

7   others to commit violence.  Just where the activity is based in

8   the speech.

9        And so, therefore, having a long, convoluted First

10  Amendment instruction just further confuses the issue.  And the

11  cases that have dealt with travelers, so to speak, have either

12  not had a First Amendment instruction because it was not

13  applicable, or followed the *Hassan* model.

14       So we would accept the Court's proposal to the last

15  sentence.  To omit the government's proposed last sentence and

16  to replace it with the one the Court proposed.

17       **MR. FAKHOURY:**  Your Honor, the response I would have

18  to that, briefly, is travel is First Amendment protected

19  activity.  So I think that is implicated.

20       But with respect to the Court's concerns about the First

21  Amendment being cabined, I don't actually disagree with that.

22  I think the issue is how do we give guidance to the jury about

23  how they cabin it?  In other words, the instruction that's

24  being proposed has a lot -- has an assumption that the jury

25  will understand the permissible bases for which they can

1  consider speech and the impermissible basis for which they can

2  consider speech.

3       And I think we need to give them a little bit more to work

4  with so that they can fully understand how the First Amendment

5  comes into play and how the First Amendment is cabined.  So,

6  again, I agree the First Amendment doesn't include providing

7  material support; but kind of the flip side of that is the

8  First Amendment protects freedom of speech even when that

9  speech is nasty or offensive or disgusting.

10      So the need is to make sure the jury understands they

11 can't convict him solely on the basis of speech, but they can

12 consider speech to determine whether he's provided material

13 support.  And if they've determined he's provided material

14 support as laid out in the jury instructions defining material

15 support and attempt, then they can -- you know, they can

16 convict him on that basis regardless of his First Amendment

17 rights.

18      **THE COURT:**  I think when the instructions are read

19 together, that's exactly what happens.  So I think I'm going to

20 overrule your objection.  I will look one more time at some of

21 the sentences that you have.  I thought what was provided was

22 confusing and not helpful and made this entire case a different

23 case than the one that's being tried.  But I'll look one more

24 time.

25      **MR. FAKHOURY:**  Thank you, Your Honor.

1          **THE COURT:**  And then the final -- so did the

2   government have any things that they wanted to raise on the

3   jury instructions?

4          **MS. LaPUNZINA:**  No, Your Honor.

5          **THE COURT:**  All right.  Then the verdict forms.  You

6   had two different perspectives on the verdict forms.

7          **MS. LaPUNZINA:**  Your Honor, actually, if I could go

8   back to the foreign terrorist organization.  At the time that

9   we submitted the joint proposed jury instructions, we did not

10  have a stipulation at that time.  So we'll meet with

11  Mr. Matthews and Mr. Fakhoury to discuss.  We might just add a

12  sentence to that one since there has been a stipulation to it.

13  I think we left it open in the jury instructions.

14         **MR. FAKHOURY:**  That's fine.

15         **THE COURT:**  Okay.  And then with respect to the

16  verdict form.

17         **MR. FAKHOURY:**  Yes, Your Honor.  You know, as the

18  Court's aware, we've asked for a special verdict form.  And I

19  think in our view there's been -- well, the case involves two

20  trips and two terrorist organizations, or testimony about two

21  terrorist organizations, but Mr. Shafi is only on trial for one

22  trip and one terrorist organization.

23         And so in order to avoid potential for confusion, we

24  suggested the special verdict form which makes it more clear

25  that we're talking about June 2015 al-Nusrah Front.  And so

1    that's why we wanted to ask the Court to consider a special

2    verdict form.

3            THE COURT:  Okay.  And what was the government's

4    perspective?

5            MR. HASIB:  Your Honor, the -- I hear what the defense

6    is saying about the 2014 and 2015 issue.  I think Your Honor

7    has sufficiently addressed that with the jury with the limiting

8    instruction.  I think you've given at least once, and maybe

9    twice.  I don't recall.

10        On top of that, there is, albeit it's an unpublished case,

11   but it's a Ninth Circuit, *United States versus Four Star*, 75

12   Fed -- I never know what that is -- appx.

13           THE COURT:  That means that it's appendix.  Not

14   published.

15           MR. HASIB:  That's why.  I don't cite very often to

16   unpublished cases.

17        But 75 Fed Appendix 603.  It's Ninth Circuit case from

18   2003 which finds that special verdicts are not necessary where

19   there's only one count charged, and the jury's instructed to be

20   unanimous on the substantial step.  I think that's pretty close

21   to the situation that we have here.

22        You know, doing this in multiple phases for a one-count

23   indictment just doesn't make sense.  The defense is essentially

24   asking them, Let's have a special verdict as to each element of

25   the offense.  That's not typically necessary unless for some

1   reason there's a particularly complicated -- if it's a RICO

2   case or something like that I could see that happening.  But

3   not for this.

4       **THE COURT:**  So the specific issue that you're

5   concerned about, Mr. Fakhoury, isn't it taken care of by the

6   attempt instruction which says:  First, beginning no later than

7   June 2015 through on or about June 30, 2015, the defendant

8   intended to commit?

9       The reason I don't like the special verdict form is that I

10  think it would focus the jury just on that form instead of all

11  of the instructions.  And I think the instructions are quite

12  clear about what is at issue in this case.  And I know that you

13  and Mr. Matthews will be quite clear about that.  And I think

14  I've been clear during the course of the case about it.  So I'm

15  not worried that they're going to be deciding about the 2014

16  trip.

17      **MR. FAKHOURY:**  Your Honor, I guess, again, our fear is

18  that there's a risk that the jury will consider -- well, our

19  concern is that the jury will essentially have the details of

20  2014 mixed up with the details of 2015.  And that they will

21  have all the testimony they've heard about ISIS with the --

22  with Special Agent Reinke and with Dr. Vidino, and Dr. Sageman,

23  even, to a lesser extent so far.

24      That there will be a spillover of the testimony regarding

25  ISIS into testimony regarding al-Nusrah.  And that there's a

 1    temptation to just say, Well, you know, he did it in 2014 and

 2    he did it in 2015, and there was ISIS searches and al-Nusrah

 3    searches, and that's good enough for us.

 4         I understand we can never -- it's always -- we don't know

 5    what happens back there and we can't avoid every potential

 6    problem, but we can try to anticipate them.  And so this is, I

 7    think, one way to anticipate it.

 8         I don't agree -- well, I don't know if they would focus on

 9    the verdict form rather than the total instructions.

10    Obviously, the verdict form speaks in the language of the

11    elements of the crime and that would necessarily require them

12    to refer back to the jury instructions.  And I have hope, and

13    I'm optimistic, that the jury will take its -- that it will

14    take its responsibility serious and review all of the

15    instructions.  And they're going to hear the instructions in

16    open court and --

17              **THE COURT:**  And you may well show this one, among

18    others.

19              **MR. FAKHOURY:**  Absolutely.  I think that's exactly

20    right.  So, again, the special verdict form is just a way to

21    help guide them through what are some pretty complicated issues

22    in the case.  I understand it's a single count.  It's sort of

23    an unusual request in a single count.  This is also somewhat of

24    a different case.  I mean, it is a complex case.  It's a very

25    sensitive topic.  And so in our view that's a way to kind of

1    address some of the concerns that we have.

2        I would add if -- on the attempt instruction itself, the

3    government's proposed attempt instruction, I missed this but I

4    would ask that on -- and this is page 49, or ECF page 54, that

5    in the section that says "first" --

6            THE COURT:  Yeah.  The name.  The al-Nusrah Front.

7            MR. FAKHOURY:  Yes.  Exactly.

8            THE COURT:  I had written that in on my paper and

9    forgot to mention that.  But, yeah, after "terrorist

10   organization" there should be a comma, and it should say,

11   "namely, al-Nusrah Front."

12           MR. FAKHOURY:  And in any event, so that's our view.

13   And obviously, we've made a record and so --

14           THE COURT:  So I'm inclined to go with the

15   government's verdict form.  I think it's -- I don't think

16   either one of them is particularly complex, so I'm not worried

17   about the special verdict -- the reasons why sometimes special

18   verdict forms are necessary.  But I do think it just calls -- I

19   think the issues that the defendant's concerned about are well

20   taken care of in the instructions.  And so I think the more

21   simple the better.

22           MR. FAKHOURY:  Understood.  Thank you, Your Honor.

23           THE COURT:  All right.  So this is what I'd like.  I

24   would like -- because you may have noticed I've been holding

25   the door for the jury, I don't have my law clerk here today who

1    I would otherwise ask to prepare the closing instructions.

2        I believe I've given you specific guidance on all of the

3    instructions.  If the government would prepare a draft and put

4    it on ECF so the defense can look at it and I could look at it.

5    And if you could also send me, through Ms. Davis, a Word

6    version of that so that I can make changes.

7        To the defendant's concern about the title of the

8    instructions, I don't -- I guess it's helpful to have the title

9    as they're going through there.  Often I take the titles off

10   and just have them numbered in a way that I can follow them.

11   But if there's a concern about the --

12       **MR. FAKHOURY:**  The only title we had a concern with

13   was the First Amendment one.  Which if the Court's going to

14   strike that last language, then would need to be changed.  If

15   the Court doesn't want to put titles, that's fine with us.

16   Whatever the Court's preference is.

17       **MR. HASIB:**  How about just call it the First

18   Amendment.

19       **THE COURT:**  Yeah, why don't we call it the First

20   Amendment.  If someone looks at the titles and says, Gee, we

21   should get rid of them all -- let's keep them.  I think they're

22   probably a helpful guide for the jury.

23       All right.  Is there anything else that we ought to do

24   now?

25       **MS. LaPUNZINA:**  One moment, Your Honor, please.

1        **THE COURT:**  Yeah.

2     (Pause)

3        **MR. HASIB:**  Your Honor, can we just -- one more time.

4   The sentence that Your Honor proposed adding to --

5        **THE COURT:**  The First Amendment?

6        **MR. HASIB:**  Yes.  These rights do not include

7   providing material support or resources to a foreign terrorist

8   organization.

9        **THE COURT:**  To an organization which is engaged or

10  engages in terrorist activity or conspiring to do so.  That's

11  what I said.  And if you can -- if you have better language, I

12  would accept small edits.

13       **MR. FAKHOURY:**  Your Honor, on that sentence

14  specifically, because this is not a conspiracy charge, I would

15  suggest we not have any references to conspiring to do so.

16       **THE COURT:**  I think that's a good idea.  Does the

17  government agree?

18       **MS. LaPUNZINA:**  I think if I'm understanding the

19  Court's sentence properly, it's the point that the organization

20  engages in -- is engaged in or engages in or conspires to.

21       **THE COURT:**  Yeah.  But that -- if I was suggesting

22  that, then that would be confusing.

23       **MS. LaPUNZINA:**  So then to an organization which is

24  engaged in?

25       **THE COURT:**  Yeah.  I think -- I don't know where I

 1  came up with the bright idea of "or conspiring to do so."  But

 2  I'm not sure it's necessary in that sentence.

 3          MR. FAKHOURY:  I would add that if we cabin it to an

 4  organization engaged in terrorism or terrorist activity,

 5  there's a specific instruction defining those terms.  So that

 6  at least ties it back to the earlier instruction with the

 7  statutory definitions.  And that instruction doesn't reference

 8  conspiracy or conspiring.

 9          THE COURT:  Yeah.  I don't think we need to include

10  that.

11          MR. HASIB:  All right.  Nothing further from the

12  government, Your Honor.

13          MR. MATTHEWS:  So that would be an 8:00 start?

14          THE COURT:  Well, Mr. Matthews --

15          MR. MATTHEWS:  I don't know why I'm so consumed with

16  that.

17          THE COURT:  So here's what I'm thinking.  I'm thinking

18  that at 8:00 Dr. SagSageman is cross-examination will start.

19  And when that's done, we'll take a half hour break so everybody

20  can adjust, and then go into the closings.

21      So the only reason to come early -- and I think there

22  probably is good reason to come early -- I'm sorry -- is to

23  make sure that the jury instructions are right.

24          MR. MATTHEWS:  No.  Just talking about presence in the

25  courtroom and --

1          **THE COURT:**  I think that just the way that trial's

2    work, there's going to be something that somebody wants me to

3    look at one more time or that I've forgotten.

4          **MR. MATTHEWS:**  It will probably be us.

5          **THE COURT:**  Might be you.  Might be me.  But let's do

6    it at 7:30.

7          **MR. MATTHEWS:**  Very well.

8          **MR. FAKHOURY:**  That's fine, Your Honor.  Then I had

9    one last question which is:  So assuming we finish closing

10   arguments -- I think pretty clearly we're going to finish

11   closing arguments tomorrow -- is the jury going to deliberate

12   until 1:00 p.m.?  Are they going to start deliberating until

13   they're done?  Is the Court going to keep the 8 to 1 schedule?

14   I'm just kind of curious how that's going to work.

15         **THE COURT:**  I always tell the jury that it's their

16   decision how long they deliberate.  I think there's -- I know

17   that there's one juror -- oh, you know, the other thing we need

18   to do -- there's one juror who needs to leave at 2 for work.

19   Or has.  I don't know whether that's going to be an ongoing

20   issue or not.  So I'm going to let them do what they want to

21   do.  If they're still deliberating on Friday, I'm going to need

22   to leave at 2 so I would make them stop at that point.  But

23   otherwise I'll leave it to them.

24         But the one thing that we need to do tomorrow -- and I

25   hope you will remind me -- at the close of the evidence just

 1  before we do the half hour break we should just double check

 2  back with the juror who was concerned about the issue that we

 3  discussed earlier.  So we'll do that right at the end.

 4       **MR. MATTHEWS:**  And when would the Court want argument

 5  on the Rule 29 motion?

 6       **THE COURT:**  Well, I would be happy to hear something

 7  now if you wanted to do it.  If you -- I am deeming that it's

 8  made.  And what I have done is have people propose a schedule

 9  for me to look at it.

10       **MR. FAKHOURY:**  That would be our preference.

11       **THE COURT:**  I'm so surprised.

12     All right.  So that's how we'll deal with the Rule 29.

13       **MR. FAKHOURY:**  Thank you, Your Honor.

14       **MS. LaPUNZINA:**  Your Honor, one scheduling question.

15  We'll work on the Word document for Your Honor.  We'll share it

16  with Mr. Matthews and Mr. Fakhoury so that we don't have to

17  keep going back and forth.

18     Is there a deadline by which time you would like to get it

19  from us today?

20       **THE COURT:**  I would like to have a Word -- I would

21  like to see what you're working on.  So you can send the first

22  draft to Ms. Davis.  And then if the final one can be posted

23  and I can look at it first thing in the morning.

24       **MS. LaPUNZINA:**  All right.  Thank you.

25       **MR. HASIB:**  It's possible -- Ms. LaPunzina and I

**PROCEEDINGS**

 1    haven't had a chance to put our heads together -- it's possible

 2    we may call a rebuttal witness.  If we did, I think it would be

 3    quick.  I don't think it upsets the scheduling with closing

 4    arguments or anything like that.  But just wanted to give

 5    everybody a heads up.

 6            **THE COURT:**  You have 25 minutes to tell the defendant

 7    who that might be.

 8            **MR. HASIB:**  Will do.

 9            **THE COURT:**  Thank you very much, everybody.

10        (Court adjourned at 1:33 p.m.)

11                            ---oOo---

1

2

3                          **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, October 16th, 2018

8

9

10

11    _____/s/Vicki Eastvold_____

12                  Vicki Eastvold, RMR, CRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25